## AFFIDAVIT OF HSI SPECIAL AGENT KEVIN J. CRONIN

I, Kevin J. Cronin, being duly sworn, depose and state:

### I. INTRODUCTION

1. I am a Special Agent with the United States Department of Homeland Security, Office of Homeland Security Investigations ("HSI"). I have been a Special Agent employed by the Department of Homeland Security since its creation in 2003, and at its predecessor, the Immigration and Naturalization Service ("INS"), since 1998. I am currently assigned to the National Security Investigations Division ("NSID") in Boston. Among other things, I am responsible for conducting investigations of human rights violators, including persons who have engaged in genocide, war crimes, or torture, which routinely require me to gather evidence and identify witnesses abroad.

2. During my employment as a Special Agent with the Department of Homeland Security, I have submitted affidavits in conjunction with applications for numerous criminal complaints. I have participated in the execution of numerous federal search and arrest warrants in such investigations, including investigations of immigration offenses and perjury.

3. The NSID has handled numerous investigations involving participants in, and events occurring during, the Rwandan genocide. These include investigations that resulted in criminal charges adjudicated in the First Circuit: *United States v. Munyenyezi* in the District of New Hampshire in 2013[1] and *United States v. Kantengwa* in the District of Massachusetts in 2012.[2]

4. During the course of investigations involving the Rwandan genocide, NSID consulted with a preeminent historian of the Rwandan genocide, the late Alison Des Forges, who

---

[1] 781 F.3d 532 (1st Cir. 2015), *cert. denied*, 136 S.Ct. 214 (2015).
[2] 781 F.3d 545 (1st Cir. 2015).

provided information on the structure of genocidal tactics used in Rwanda, including Butare, a prefecture, which is a political territory similar to a state, in southern Rwanda. NSID also consulted extensively with Boston University Professor Timothy Longman, who served as an expert witness concerning the Rwandan genocide at the *Munyenyezi* and *Kantengwa* trials. Professor Longman is also a preeminent historian of the Rwandan genocide and did extensive field work in Butare both before and after the genocide, working directly with Alison Des Forges.

5. In addition, NSID consulted with Dr. Rony Zachariah, a Médecins Sans Frontières (also known as Doctors Without Borders) physician who was present in Butare, working at the Butare University Hospital before and during the first weeks of the genocide. Dr. Zachariah witnessed the arrival of the genocide in Butare and at the hospital in particular.

6. NSID agents have traveled to Rwanda to conduct investigative activities on nine occasions since August 2008. During these trips, agents have interviewed scores of witnesses about their observations during the period of genocide in Butare. Such interviews often included questions about the dominant political party, the Mouvement Révolutionaire National pour le Développement ("MRND"), and its role in the genocide. Witnesses provided identifying characteristics and habits of MRND members, which occasionally led to the identification of specific members of the MRND. I have personally interviewed numerous witnesses in Butare in connection with NSID's investigation of Jean Leonard Teganya ("TEGANYA")

7. This affidavit is submitted in support of a criminal complaint charging TEGANYA with immigration fraud, in violation of 18 U.S.C. § 1546 and perjury, in violation of 18 U.S.C. § 1621(2), in connection with his application for asylum. The facts set forth in this affidavit are based upon information I obtained from Rwandan witnesses; information supplied

by other HSI Special Agents and other law enforcement officers; information provided by historians who have studied the Rwandan genocide; and information provided by Dr. Zachariah. It is also based upon other aspects of my personal involvement in this investigation and on my training and experience. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

## II. FACTS AND CIRCUMSTANCES

### A. Overview of the Rwandan Genocide

8. Rwanda is one of the smallest countries in Central Africa, with approximately 7 million people, divided into two main ethnic groups, the Hutu and the Tutsi. The Hutus account for 90 percent of the population. Following Rwanda's independence from Belgium in 1962, the Hutu majority gained control of the government and engaged in discrimination and acts of violence against Tutsis. As a result, numerous Tutsis fled Rwanda and some formed a rebel guerilla army, known as the Rwandan Patriotic Front ("RPF").

9. In or about the early 1990s, the RPF invaded Rwanda; thereafter, Hutu President Juvenal Habyarimana executed agreements that mandated that the Hutus and Tutsis share power. These agreements, which were negotiated between July 1992 and June 1993, were signed in Arusha, Tanzania, and came to be known as the Arusha Accords. Pursuant to the Accords, Habyarimana's party, the MRND, shared power with several other parties, as well as those that represented the RPF.

10. On or about April 6, 1994, the Rwandan president's plane, which was carrying President Habyarimana and Burundi's new president, was shot down by ground-fired missiles as it approached Rwanda's airport in Kigali. This assassination precipitated a period of political

violence in Rwanda. In particular, Hutu extremists, with positions of power in an interim government formed after Habyarimana's assassination, began targeting and killing prominent opposition figures, including moderate Hutu politicians and Tutsi leaders. Included among those killed were government ministers opposed to the extremists.

11. The killings spread throughout the countryside as Hutus, armed with machetes, clubs, guns, and grenades, began killing Tutsi civilians, at times targeting Tutsis based upon identification cards that were mandatory for all Rwandans over the age of 18 that identified the bearer's ethnicity. Hutus, manning roadblocks at locations in Rwanda, demanded production from passers-by of identification cards, often killing individuals identified as Tutsi. Women who were Tutsi and identified as such at roadblocks were at times not killed immediately, but were taken into custody, imprisoned by Hutus, and raped. The period of targeted violence that followed from April 6th to July 4th of 1994 is commonly referred to as the Rwandan genocide. Approximately 800,000 people, or more than 10% of the Rwandan population, are estimated to have been murdered during the genocide.

**B. Butare University Hospital and TEGANYA's Conduct During the Genocide**

12. The Butare prefecture, located in south of Rwanda, was the intellectual and cultural center of Rwanda at the time of the genocide. Butare had a high percentage of Tutsis as compared to the national average demographics and a strong moderate and multi-ethnic political presence. On or about April 19, 1994, the interim Rwandan government removed the Tutsi governor in Butare. On or about April 20, 1994, soldiers and paramilitaries sent by the interim government arrived in full force in Butare with the establishment of roadblocks and arrests by military patrols. These measures resulted in several small-scale massacres and targeted killings.

13. As the intellectual capital of Rwanda, Butare was the site of the national

university to which the Butare University Hospital ("the Hospital") was attached. Some students were killed at the university in the early days of the genocide in Butare. The Hospital was itself the site of many atrocities. During the evening, on or about April 22, 1994, Tutsi patients were removed from the hospital upon verification of their identification cards and subsequently beaten or hacked to death behind the hospital. On or about the morning of April 23, 1994, prisoners hauled the dead bodies into cargo trucks. That same day, more Tutsi patients were slaughtered by militia behind the Hospital and hospital nurses who were Tutsi were also killed. Killings and other acts of violence aimed at Tutsis continued throughout the duration of the genocide.

14. TEGANYA was a medical student and medical trainee at the Hospital before and during most of the genocide. He was living in a dormitory on the Hospital grounds during most of the genocide. Several witnesses present in Butare during the genocide describe TEGANYA's conduct during the genocide. Those witnesses describe him as active in the MRND and its militia and state that he actively participated in the persecution of Tutsis.

15. According to one witness who knew TEGANYA in high school, TEGANYA associated with Hutu extremists then and espoused anti-Tutsi views.

16. Among the indicia of TEGANYA's MRND membership while at the Hospital, as described by several witnesses, were his wearing of MRND clothing (which Dr. Longman and lay witnesses have explained was worn only by MRND party members), attendance at meetings promoting Hutu supremacy known as "Hutu Power" and at meetings espousing MRND ideology.

17. Among the conduct witnesses describe as showing TEGANYA's active role in the persecution of Tutsis was his leading a group of Interahamwe (MRND youth militia) on a search of the Hospital for Tutsis; identifying Tutsis and helping in their capture; and assisting in

the forcible removal of a group of Tutsis from the Hospital to a location where they were killed.

18. The killing in Butare ended when RPF forces arrived in July 1994. According to TEGANYA, he left Butare in mid-June 1994 and left Rwanda in mid-July. From Rwanda he traveled to Congo, India, and then Canada.

### C. Teganya's Failed Attempt to Secure Refugee Status or Asylum in Canada

19. TEGANYA arrived in Canada in late 1999 and immediately applied for refugee status and later for asylum. I have reviewed documents TEGANYA submitted to Canada in support of an application for refugee status and asylum. Over the course of several years adjudicating TEGANYA's claim, the Canadian Immigration and Refugee Board ("the Board") twice determined that TEGANYA was not entitled to the relief he sought because the Board determined that TEGANYA had been complicit in atrocities committed at the Hospital during the genocide.

20. After approximately 15 years of litigation of TEGANYA's refugee and asylum claims in Canada, Canadian authorities ordered TEGANYA removed from the country. TEGANYA sought a stay of his removal, which a Canadian federal court denied. TEGANYA fled Canada before Canadian authorities could effect his removal, crossing the border into the United States illegally.

### D. Teganya's Arrival In The United States And Application For Asylum

21. On August 3, 2014, U.S. Customs and Border Protection officers encountered TEGANYA in Maine on foot after he had walked into Houlton, Maine from Canada. During the interview that followed, TEGANYA told the officers that he had not entered at a port of entry and that he walked across the border illegally. Entering the U.S. without border inspection is a removable offense. TEGANYA was taken into custody and put into U.S. immigration removal

proceedings. He claimed asylum based the same claims rejected by Canadian authorities.

22. TEGANYA formally applied for asylum on September 13, 2014, by submitting an Application for Asylum and Withholding of Removal, Form I-589 ("Asylum Application"). In response to the question on the Asylum Application, "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," TEGANYA responded as follows:

> My father was the local President (formerly Kibilira District) of MRND from 1991 to 1994. As a student, I belonged to the Red Cross Youth Section from 1986 to 1991. I was president of the Red Cross Youth Section from 1989 to 1990. I will submit a detailed declaration prior to my asylum hearing.

Based on statements by Rwandan witnesses, I submit that there is probable cause to believe that the above statement by TEGANYA is false. That is because, in the affidavit in support of the Asylum Application, TEGANYA discussed his father's activities as an MRND member, but provided no information concerning his own affiliation with the MRND, the Interahamwe, or Hutu extremists.

23. TEGANYA signed the Asylum Application under the following certification:

> I certify, under the penalty of perjury under the laws of the United States of America that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application[,] affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact – shall be fined in

accordance with this title or imprisoned for up to 25 years.

24. Based on my training and experience and on consultation with USCIS Immigration Officers, including those with experience adjudicating asylum applications, I am aware that whether a Rwandan present in Rwanda during the genocide was a member of the MRND is a material fact. This is so because if USCIS were aware of the applicant's membership in the MRND, then USCIS would make further inquiry into the applicant's activities during the genocide to determine, for example, whether the applicant is barred from receiving the benefit he seeks by virtue of having participated in the persecution of others. Because asylum claims are dependent on a finding that an applicant has a credible fear of persecution, lies about membership in the MRND are also material because they bear directly on the applicant's credibility.

/

/

/

/

/

/

### III. CONCLUSION

25. Based on the foregoing, there is probable cause to believe that on or about September 13, 2014, Jean Leonard Teganya committed immigration fraud, in violation of 18 U.S.C. § 1546 and perjury, in violation of 18 U.S.C. § 1621(2) by making material false statements under oath on an Application for Asylum and Withholding of Removal, Form I-589 in connection with his application for asylum.

_____
Kevin J. Cronin
Special Agent
Homeland Security Investigations
Department of Homeland Security

Sworn and subscribed before me this 3rd day of August, 2017.

_____
MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE