
Federal Court       Cour fédérale


Date: 20121022

Docket: IMM-9799-12

Citation: 2012 FC 1230

Ottawa, Ontario, October 22, 2012

PRESENT:    The Honourable Mr. Justice Shore

BETWEEN:

**JEAN LEONARD TEGANYA**

Applicant

and

**THE MINISTER OF CITIZENSHIP
AND IMMIGRATION**

Respondent

## REASONS FOR ORDER AND ORDER

[1]     This decision is in response to an application, heard today, Monday morning, October 22, 2012, to stay the Applicant's removal to Rwanda in less than eighteen hours, at 3:30 a.m., Tuesday, October 23, 2012.

[2]     The Applicant came to Canada in 1999; he was excluded from refugee protection under Articles 1(F)(a) and 1(F)(c) of the Convention relating to the Status of Refugees, not once, but twice

(twice, due to a procedural fairness argument in respect of the first hearing he had had before the Refugee Protection Division [RPD] of the Immigration and Refugee Board).

[3] The first RPD decision was set aside by this Court due to an accepted challenge to procedural fairness.

[4] The second decision, as did the first RPD decision, nevertheless, still determined that the Applicant, as a medical intern in a Rwandan hospital where atrocities had taken place, had lived in a context of direct knowledge of atrocities committed; and, as a result, he was determined to have been complicit.

[5] Upon considering the Applicant's case anew, the RPD decided that the Applicant is to be excluded under the very same articles of the Convention relating to the Status of Refugees as had been determined in the first decision of the RPD:

> Article 1
>
> F. The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:
>
>> ( a ) He has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
>> ...
>
>> ( c ) He has been guilty of acts contrary to the purposes and principles of the United Nations.

[6] The second decision of the RPD specified that moderate Hutus and Tutsis had been killed at the same hospital where the Applicant was present during a massacre. The fact that the Applicant

was left unscathed was conceived by the RPD to have demonstrated that the Applicant had been considered to be an extremist.

[7] Although the information on file specifies that the Applicant's father belonged to the ruling party during the genocide, and, that the father of the Applicant had been arrested, detained and sentenced to twenty two years imprisonment, does not implicate the Applicant as having been associated with crimes his father may have committed. To date, the Applicant was never, knowingly, charged, neither was he accused of anything, nor was there any investigation in his regard by the Rwandan government.

[8] Although pre-trial detention does exist in Rwanda for those who stand trial, the Applicant's evidence in that regard and country conditions, considered in a second Pre-Removal Risk Assessment [PRRA], determined no clear and convincing evidence of a risk to the Applicant.

[9] Country conditions do not support a determination of a speculative nature of "irreparable harm" to the Applicant, even if he is, or would be, wanted for genocide atrocities. Under the country conditions before the second PRRA decision-maker, the second decision, itself, in that regard, clearly stated (in view of no new evidence of significance having been provided since the first PRRA decision), that fears of criminal prosecution in Rwanda, do not support an argument for a finding of "irreparable harm" (second PRRA decision of March 7, 2012 at p 7 of the Motion Record).

[10] It is important to note that this Court has clearly stated in a June 2011 decision, in respect of the second PRRA determination, that the determination of that PRRA is not unreasonable even with the possibility of a prolonged detention or of prison conditions as they were specified in the evidence before the PRRA decision-maker.

[11] This Court, in regard to this application, has been made fully cognizant, through written and oral arguments by counsel on both sides, of the decisions of the Refugee Protection Division, two Pre-Removal Risk Assessments and one decision in regard to humanitarian and compassionate [H&C] grounds, all of which have been dismissed by decision-makers in the past in respect of the Applicant.

[12] For all of the above reasons, the tri-partite *Toth v Canada (Minister of Employment and Immigration)* (1988), 86 NR 302 (FCA) decision test is not met in any of the three conjunctive, thus, essential, criteria of that test; therefore, the stay of removal is denied.

## ORDER

**THIS COURT ORDERS that** the Applicant's application for a stay of removal be dismissed.

"Michel M.J. Shore"
Judge

## FEDERAL COURT

## SOLICITORS OF RECORD

**DOCKET:** IMM-9799-12

**STYLE OF CAUSE:** JEAN LEONARD TEGANYA v
THE MINISTER OF CITIZENSHIP
AND IMMIGRATION

**MOTION HELD VIA TELECONFERENCE ON OCTOBER 22, 2012 FROM OTTAWA, ONTARIO AND TORONTO, ONTARIO**

**REASONS FOR ORDER
AND ORDER:** SHORE J.

**DATED:** October 22, 2012

### ORAL AND WRITTEN REPRESENTATIONS BY:

Clare Crummey                                                 FOR THE APPLICANT

Leila Jawando                                                FOR THE RESPONDENT

### SOLICITORS OF RECORD:

Waldman & Associates                              FOR THE APPLICANT
Toronto, Ontario

Myles J. Kirvan                                              FOR THE RESPONDENT
Deputy Attorney General of Canada
Toronto, Ontario

Decisions > Federal Court Decisions > Teganya v. Canada (Minister of Citizenship and Immigration)

Help

# Federal Court Decisions

Case name: Teganya v. Canada (Minister of Citizenship and Immigration)
Court (s) Database: Federal Court Decisions
Date: 2006-05-12
Neutral citation: 2006 FC 590
File numbers: IMM-6085-05

**Date: 20060512**

**Docket: IMM-6085-05**

**Citation: 2006 FC 590**

Ottawa, Ontario, May 12, 2006

PRESENT: THE HONOURABLE MR. JUSTICE BLAIS

BETWEEN:

JEAN LEONARD TEGANYA

Applicant

and

MINISTER OF CITIZENSHIP AND IMMIGRATION

Respondent

## REASONS FOR JUDGMENT AND JUDGMENT

[1]    This is an application for judicial review filed pursuant to section 72 of the *Immigration and Refugee Protection Act*, S.C. 2001, c. 27 (the Act) of the decision by the Refugee Protection Division of the Immigration and Refugee Board (the Board) dated September 6, 2005, that Jean Leonard Teganya (the applicant) did not qualify as a Convention Refugee within the meaning of the *United Nations Convention Relating to the Status of Refugees* (the

Convention) or as a person in need of protection under paragraphs 1F(*a*) and 1F(*c*) of Article 1 of the Convention.

## RELEVANT FACTS

[2]     The applicant is a citizen of Rwanda who claims to be a survivor of the Rwandan genocide of 1994 because of his Hutu ethnicity. The applicant is a native of Gisenyi, where the majority of Hutu radicals belong to the Revolutionary Movement for Development (MRND), the party in power at the time of the genocide. He claims that he did not belong to this radical group, responsible for the genocide of Tutsis and moderate Hutus.

[3]     During the period of the massacres from April to June 1994, the applicant had the status of a medical student and was interning at the Butare University hospital. He allegedly left the hospital on June 17, 1994, and fled Rwanda for the former Zaïre on July 17 of that same year. Then, he headed to Kenya and India before taking the road to exile to Canada in November 1999.

[4]     A panel of two members heard the applicant on December 10, 2001 and on February 12, 2002. On March 15, 2002, the panel determined that the applicant was not a Convention refugee and that he was excluded from the application of the Convention under paragraphs 1F(*a*) and (*c*). The Federal Court of Canada, Trial Division, set aside the decision in February 2003.

[5]     A second refugee claim was heard on February 7, 2005 and June 27, 2005.

## ISSUE

[6]     Did the Board err in excluding the applicant from the application of the definition of "Convention refugee"?

## ANALYSIS

[7]  Section 98 of the Act reads as follows:

> 98. A person referred to in section E or F of Article 1 of the Refugee Convention is not a Convention refugee or a person in need of protection.

> 98. La personne visée aux sections E ou F de l'article premier de la Convention sur les réfugiés ne peut avoir la qualité de réfugié ni de personne à protéger.

[8]  Paragraphs (*a*) and (*c*) of section F of Article 1 of the Convention read as follows:

> F. The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that.
>
> (*a*) He has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
> (*c*) He has been guilty of acts contrary to the purposes and principles of the United Nations.

> F. Les dispositions de cette Convention ne seront pas applicables aux personnes dont on aura des raisons sérieuses de penser:
>
> *a*) Qu'elles ont commis un crime contre la paix, un crime de guerre ou un crime contre l'humanité, au sens des instruments internationaux élaborés pour prévoir des dispositions relatives à ces crimes;
>
> *c*) Qu'elles se sont rendues coupables d'agissements contraires aux buts et aux principes des Nations Unies.

[9]  The appropriate standard of review for the Board's decision to the effect that certain acts are included in the definition of "crimes against humanity" is the standard of correctness (*Mendez-Levya v. Canada (Minister of Citizenship and Immigration)*, 2001 FCT 523; *Gonzalez v. Canada (Minister of Employment and Immigration)* (1994), 24 Imm. L.R. (2d) 229). The case law appears to establish that the appropriate standard of review for the Board's decision to the effect that certain acts were committed is that of patent unreasonableness (*Mugesera v. Canada (Minister of Citizenship and Immigration)*, [2003] F.C.J. No. 1292, 2003 FCA 325).

[10]  The Federal Court of Appeal has repeatedly adopted the definition of crimes against humanity found under article 6 of the Charter of the International Military Tribunal. This includes:

> Crimes against humanity. - namely, murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian

> population, before or during the war, or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.
>
> *Sivakumar v. Canada (Minister of Employment and Immigration)*, [1994] 1 F.C. 433; *Gonzalez v. Canada (Minister of Employment and Immigration)*, [1994] 3 F.C. 646; *Sumaida v. Canada (Minister of Citizenship and Immigration)*, [2000] 3 F.C. 66.)

[11]   Paragraph 1(F) of the Convention requires that there be "serious reasons for considering" that an individual has committed a crime against humanity. In *Ramirez v. Canada (Minister of Employment and Immigration)*, [1992] 2 F.C. 306, the Court stated that this standard was lower than the balance of probabilities. The government had to adduce evidence meeting that standard (*Srour v. Canada (Minister of Citizenship and Immigration.)*, [1995] F.C.J. No. 133).

[12]   Accomplices as well as principal actors may be considered to have committed international crimes. The concept of complicity has been defined as a personal and knowing participation or an association whereby individuals may be rendered responsible for the acts of others because of their close association with the principal actors. Complicity rests on the existence of a shared common purpose and the knowledge that all of the parties may have of it (see *Ramirez supra*; *Sivakuma, supra*).

[13]   In this case, to be excluded from the definition of Convention refugee, it had to be established that these crimes against humanity took place. Further, to establish that the applicant was acting as an accomplice to these crimes, it had to be established that the applicant had knowledge of these crimes and a shared common purpose with those who committed those crimes.

[14]   The Board noted that the documentary evidence submitted established that numerous crimes against humanity had been committed at Butare Hospital during the Rwandan genocide and that the applicant had knowledge of these crimes:

> Moreover, the panel may conclude that the claimant is himself admitting that he knew about the genocidal intentions of the Hutu extremists when he writes, in Exhibit A-5, in reply to Question 37: [Translation] "The majority of radical Hutus were members of the MRND, the party in power" at the time of the genocide. And when he adds, in paragraphs 6 and 7 of Exhibit P-14, that the army controlled the hospital and the military sowed terror.
>
> The documentary evidence regarding the situation in the Butare hospital, where the claimant worked during the period of the genocide, is quite clear:
>
> According to Exhibit AA-3 (Rwanda death, despair and defiance):
>
> The readiness of some senior medical practitioners to comply with the killings at Butare hospital has been noted. Other doctors acceded to the requests of the interahamwe to expel Tutsi patients who faced a certain death the moment they set foot outside the hospital. Some doctors refused to treat Tutsis. Others actively encouraged the murder of Tutsi patients, their Tutsi medical colleagues and workers at the hospital lectures at the university as well as students.

[15]   I am satisfied that the documentary evidence establishes that crimes against humanity were committed within the meaning of the international instruments drawn up to make provisions in respect of such crimes. The evidence also establishes that the applicant was aware that these crimes against humanity were committed. Indeed, the evidence establishes that in response to questions asked at the hearing, the applicant admitted that he knew that the MRND had committed crimes against humanity. The Board's finding on that point is not patently unreasonable.

[16]   The Board had also determined that the applicant acted as an accomplice in crimes against humanity based on the shared common purpose with the perpetrators of these monstrous acts.

> At the hearing, the claimant reiterated his admissions contained in Exhibit P-14, and asserted that [Translation] "in addition to the military who lined the corridors of the hospital, there were also individuals partly dressed in military uniform, who sowed terror." He was thus aware of what was going to happen there.
>
> When questioned on this point, the claimant maintained that he had to complete his internship in spite of everything. He remained on the campus for two months and 12 days, from April 5 to June 17, 1994. Throughout the hearing, he did not offer any other justification or any defence of this

'ederal Court - Tegansev1.Canada (Minister of Citizenship and Immigration) Page 12 of 16
Case 1:17-cv-10292-FDS Document 12-9 Filed 08/09/17 Page 12 of 16
Page 6 of 1

> continuing presence at the hospital during that period. The panel rejects this answer about the claimant's desire to complete his internship; it its opinion, this justification is not reasonable in the context of the Rwandan horror.
>
> ...
>
> Although he claims that he did not participate actively in the massacres, the panel is of the opinion that he was a witness close to the extremists. The panel is entitled to ask itself whether the claimant's passivity in the face of the massacres is not equivalent to endorsing the policies and methods of the party in power.
>
> ...
>
> The targets of the Hutu extremists at the Butare university hospital were thus Tutsis and moderate Hutus. The panel is entitled to ask itself why the presence of the claimant on the campus did not seem to concern the extremists, who pursued their dirty work for several weeks. Is it not reasonable to think that the Hutu extremists, in leaving alive the claimant, who is not a Tutsi, had every reason to believe that the claimant was not a Hutu moderate and shared the same purpose, namely to eliminate the Tutsis and the moderate Hutus?
>
> In the panel's opinion, it is not unreasonable to think that the claimant owes his life to his complicity with the extremists.
>
> ...
>
> He would not have survived in such an environment if he had not been perceived as sharing the common purpose to kill Tutsis and moderate Hutus.

[17] In *El-Kachi v. Canada (Minister of Citizenship and Immigration)*, [2002] F.C.J. No. 554, at paragraph 18, Mr. Justice Edmond P. Blanchard reviewed the case law relating to complicity and exclusion from the definition of Convention refugee:

> The question of complicity was also considered by Reed J. in *Penate v. Canada (Minister of Citizenship and Immigration)*, [1994] 2 F.C. 79. Following an analysis of *Ramirez v. Canada (Minister of Employment and Immigration)*, [1992] 2 F.C. 306 (C.A.), *Moreno v. Canada (Minister of Employment and Immigration)*, [1994] 1 F.C. 298 (C.A.) and *Sivakumar v. Canada (Minister of Employment and Immigration)*, [1994] 1 F.C. 433, Reed J. concluded at 84-85:
>
>> As I understand the jurisprudence, it is that a person who is a member of the persecuting group and who has <u>knowledge that activities</u> are being committed by the group and who <u>neither takes steps to prevent them occurring (if he has the power to do so) nor disengages himself from the group at the earliest opportunity</u> (consistent with safety for himself) but who lends his active support to the group will be considered to be an accomplice. A shared common purpose will be considered to exist. I note that the situation envisaged by this jurisprudence is not one in which isolated incidents of international offences have occurred but where the commission of such offences is a continuous and regular part of the operation.
>
> [Emphasis added.]

[18]  The applicant did not disassociate himself from the MRND at the first opportunity. To the contrary, he continued with his internship even when he was aware of the crimes being committed around him. Further, he claims to be a moderate Hutu, yet the documentary evidence shows that the moderate Hutus were killed at the Butare Hospital. I think that the Board was correct to find that the applicant was not an innocent spectator because he would not have survived in such a setting unless it was perceived that he shared the common intention of killing the Tutsis and Hutu moderates.

[19]  The respondent claims that the Board's decision was based on a connection between the father's political affiliations and the applicant's possible involvement in the massacre at the hospital. Even if the Commission took this into consideration, it is not a determinative factor in the decision. In my opinion, the evidence as a whole is sufficient to support a determination that there are "serious reasons for considering" that the applicant was an accomplice in the crimes against humanity committed by the MRND. The Commission therefore did not err in regard to the applicant's complicity.

[20]  The applicant submitted the following question for certification:
> In the absence of a finding that a Refugee claimant was a member of, or was linked to, an organization that the IRB-RPD has categorized as being one with a limited and brutal purpose, does the IRB-RPD err in law if it finds the Refugee complicit in Crimes against Humanity without identifying either acts or omissions on the refugee's part which would render that person complicit with specific crimes?

[21]  The respondent filed written submissions challenging the question proposed for certification.

[22]  I agree with the reasons proposed by the respondent. In fact, the Federal Court of Appeal has already settled the issue of complicity and over the years several decisions have set out the applicable parameters.

[23]   In the matter before us, the Refugee Protection Division determined that the applicant was an accomplice in crimes committed by the military, the Interahamwe militia and other members of the medical personnel.

[24]   As pointed out by the respondent, the Court of Appeal has already determined that it is not necessary to connect the claimant with specific crimes to find there was complicity. In *Sumaida v. Canada (Minister of Citizenship and Immigration)*, [2000] 3 F.C. 66, [2000] F.C.J. No. 10, and confirmed by *Harb v. Canada (Minister of Citizenship and Immigration)*, [2003] F.C.J. No. 103, the Court of Appeal states:

> Our Court never required in that case that a claimant be linked to specific crimes as the actual perpetrator or that the crimes against humanity committed by an organization be necessarily and directly attributable to specific acts or omissions of a claimant.
>
> Indeed, short of that kind of direct involvement and of evidence supporting it, our Court accepted the notion of complicity defined as a personal and knowing participation in Ramirez (see page 438 of the Sivakumar decision) as well as complicity through association whereby individuals may be rendered responsible for the acts of others because of their close association with the principal actors (see pages 439-440 of the Sivakumar decision).

[25]   It was necessary for the decision-maker to decide whether the applicant had knowledge or involvement such that he could be considered to have personally and knowingly participated in the crimes committed. The decision-maker made a determination to that effect.

[26]   In my opinion, this is not a question of general importance; therefore it will not be certified.

# JUDGMENT

1. The application for judicial review is dismissed;

2. No question shall be certified.

"Pierre Blais"<br>Judge

Certified true translation

Kelley A. Harvey, BCL, LLB

Federal Court - Teganya v. Canada (Minister of Citizenship and Immigration)
Case 1:17-cr-10292-FDS Document 12-9 Filed 08/09/17 Page 16 of 16
Page 10 of 1

## FEDERAL COURT

### SOLICITORS OF RECORD

| | |
|---|---|
| **DOCKET:** | IMM-6085-05 |
| **STYLE OF CAUSE:** | JEAN LEONARD TEGANYA<br>v.<br>MINISTER OF CITIZENSHIP AND IMMIGRATION |
| **PLACE OF HEARING:** | Montréal |
| **DATE OF HEARING:** | April 19, 2006 |
| **REASONS FOR JUDGMENT AND JUDGMENT:** | Blais J. |
| **DATE OF REASONS:** | May 12, 2006 |

### APPEARANCES:

William Sloan            FOR THE APPLICANT

Michel Pépin            FOR THE RESPONDENT

### SOLICITORS OF RECORD:

William Sloan
Montréal, Quebec            FOR THE APPLICANT

John H. Sims, Q.C.
Deputy Attorney General of Canada            FOR THE RESPONDENT