UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
vs.                            )   Criminal Action
                               )
JEAN LEONARD TEGANYA,          )   No. 17-10292-FDS
                   Defendant   )
                               )
                               )
                               )

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

PRETRIAL CONFERENCE

John Joseph Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, MA 02210

March 5, 2019
2:00 p.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by GEORGE P. VARGHESE,
ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
Massachusetts  02110;

For the Defendant:

    Federal Public Defender Office, by SCOTT LAUER, ESQ.,
And TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
Boston, Massachusetts 02210.

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Thank you.  Court is now in session in the matter of United States vs. Jean Leonard Teganya, Criminal Action Number 17-10292.

Would counsel please identify themselves for the record.

MR. VARGHESE:  Good afternoon, your Honor, George Varghese for the United States.

MR. GARLAND:  Good afternoon, your Honor, Scott Garland on behalf of the United States.

THE COURT:  Good afternoon.

MR. LAUER:  Good afternoon, your Honor, Scott Lauer from the Federal Defender Office, and with me, as you can see, is Tim Watkins.

THE COURT:  Does this mean you're back, Mr. Watkins?

MR. WATKINS:  A cameo appearance just for this case.

THE COURT:  For today or for the trial?

MR. WATKINS:  For the trial, then they send me back to the swamp after that.

THE COURT:  Welcome back.

MR. LAUER:  Thank you.

THE COURT:  This is the final pretrial in this case. I have a couple motions in limine, which I think I will take up first in no particular order.  The defendant has moved to exclude evidence regarding the Canadian legal decision, which

1    is Number 97, and I guess let me ask counsel the following:

2         I mean, I think I'm viewing this framework, this is my

3    starting point anyway, so certain facts about what happened in

4    Canadian it seems to me are relevant and admissible, meaning

5    not excludable under Rule 403.  He files for refugee status in

6    1999.  His request to be admitted as a refugee is denied.  That

7    denial was based on Canadian law.

8         During those proceedings, he makes certain statements

9    or admits to certain facts, whatever happened.  That process

02:05PM 10    was not concluded until October, 2012, and after which

11    he -- well, I guess the likely result of that final denial is

12    that he would be deported or removed from Canada.

13         What I don't understand why it would be admissible

14    would be the reasoning of the Canadian authorities, including

15    specific findings of fact or conclusions, whether it's of an

16    immigration board or a court or whatever.

17         If that is relevant, it's not clear to me why under

18    Rule 403 it ought to come in, and then my understanding is he

19    crosses the border into U.S., he's arrested, he makes a

02:06PM 20    statement in some form or another concerning the Canadian

21    proceedings.  He makes other statements as well.  Maybe it's a

22    detention hearing.

23         It seems to me his complaints as to the Canadian

24    proceedings, you know, whether they're fair or not fair are not

25    relevant.  Now, to the extent he makes a statement in Canada or

1  in the United States as to what happened in Rwanda, that may be

2  very much relevant, and so my instinct is that some of this can

3  come in, but, in particular, I would draw a distinction between

4  the result, that is, that he applied for refugee status and was

5  denied because I think that is irrelevant and the reasoning or

6  the fact finding, he was denied because they didn't believe him

7  or concluded he had participated in a genocide.

8        I don't see why that comes in, so I guess because it's

9  your motion, Mr. Lauer, let me start with you.  What's your

02:07PM 10  reaction to all of that?

11        MR. LAUER:  I don't have a lot to add to what you've

12  just outlined.  I think the recitation of facts regarding what

13  took place in Canada that you just went through is

14  uncontroversial, and we wouldn't object to evidence in that

15  form.  The concern clearly is the extent to which the

16  government seeks to introduce evidence as to matters of fact

17  that were heard by a different court or different courts.

18        THE COURT:  And if he makes a statement in that

19  proceeding, then it's a statement of a party opponent, and it

02:07PM 20  comes in presumably.

21        MR. LAUER:  Yes.  I don't think my motion was

22  attempting to deal with that.  What the motion attempts to do

23  is bring to the Court's attention that the government is

24  attempting to introduce evidence as to factual findings and

25  legal conclusions reached by courts in Canada who had before

1  them very different evidence and very different standards of

2  law than will be applied here in this proceeding.

3  THE COURT:  Frankly, if it's the same, I'm not sure it

4  matters because it suggests that there isn't anything for this

5  jury to do except rubber stamp the Canadian findings, so to

6  speak, which is the Rule 403 danger even if it's technically

7  relevant.

8  MR. LAUER:  I'm in complete agreement.

9  THE COURT:  Mr. Garland, what's wrong with that?

02:08PM 10  MR. GARLAND:  Mr. Varghese is going to address that.

11  THE COURT:  Mr. Varghese.

12  MR. VARGHESE:  Your Honor, I don't necessarily

13  disagree with anything the Court has said in terms of the way

14  that the evidence was laid out.  I think the concern is for the

15  government just that the admissions that the defendant made in

16  Canada should come in, and I think the Court said that.

17  THE COURT:  It would be, for instance, say the

18  defendant takes the stand in a detention hearing or sometimes

19  they even testify in the grand jury, whatever, you make a

02:09PM 20  statement, you don't necessarily say to the jury, oh, this was

21  in a detention hearing to find out whether we should lock him

22  up, you just say it's a prior proceeding.

23  MR. VARGHESE:  Exactly.

24  THE COURT:  It's under oath, and if he needs to be

25  confronted if he takes the stand with a prior inconsistent

1    statement or if it just comes in as a statement of a party

2    opponent, the jury is just told it's a legal proceeding under

3    oath.

4         MR. VARGHESE:  The only concern, your Honor, would be

5    the excuses that he gives in the United States about that

6    Canadian proceeding.  We sort of view that as in a sense

7    allowing him to put his defense on without the opportunity for

8    the opportunity to rebut it, and it comes very early on, the

9    very same day he walks across the border, he spins this yarn

02:09PM 10    about how the Canadian opinion really has nothing to do with

11    him and that these Canadian immigration officers leapt to this

12    conclusion, but when you actually parse the opinion, it's very

13    clear, that's not what Canada did.

14         THE COURT:  But, again, his opinion, whether it's fair

15    or unfair, why does that come in?  In other words, if he says I

16    was at the such-and-such hospital in Rwanda, that comes in, if

17    he says the Canadian Judge was biased against me, why would

18    that come in?

19         MR. VARGHESE:  I don't believe it should come in.  I

02:10PM 20    agree with that, your Honor.  Thank you.

21         THE COURT:  The devil often is in the details here,

22    but I'm going to approach it with this framework in mind, and

23    as with anything else, may change once we get in the heat of

24    battle, but for now, I think that's the basic framework I'm

25    going to use to decide this, and so we'll call that granted in

part and denied in part, Number 97, and we can revisit it as

necessary during the trial.

        All right.  The government has also moved in limine to

limit the testimony of Noel Twagiramunga, if I'm pronouncing

that correctly, Number 91, who is the defendant's expert, who I

understand it at least in part intends to testify concerning

certain cultural or social or political issues in Rwanda that

may affect or are alleged to affect witness credibility.

        Who wants to be heard on that?

02:11PM  MR. GARLAND:  Your Honor, that's me.  So there are

some things that Mr. Twagiramunga definitely is qualified to

testify about.  He is definitely qualified to testify as a

historian as to what happened in pre-genocide Rwanda.  That

much is absolutely clear.

        It is also probably true that he is qualified to

testify about post-genocide Rwanda, that is, he has the

requisite familiarity with the academia, his own research, but

the real question is whether he can testify about what the

defense wants him to, which is to essentially say that our

02:12PM  witnesses will get up there and testify in a particular way

because they're going to feel some effects from the

authoritarian regime, and the other thing that I think he's

going to be testifying about is what sort of fate awaits

Mr. Teganya if he is returned back to Rwanda.

        I'll take the second one first, which is that we've

1  cited, I think it was First Circuit opinion, which as the Court

2  is aware, the jury generally is not supposed to be concerned

3  with at all the consequences of what happens after this,

4  whether it's the sentence that you would impose, if any, or

5  what would happen with collateral consequences, and it feels

6  like that's a back door way of getting in that.

7  One of the things that the defense has suggested is,

8  well, that is really going to be relevant because the

9  government wants to show that the fact that Mr. Teganya was a

02:13PM 10  refugee or fugitive, I should say, in Canada is something we're

11  going to rely on to show his consciousness of guilt, which is

12  what he was really worried about was going back to Rwanda.

13  That's not a proposition we're intending to make. The

14  proposition we intend to make is that he crossed the border

15  illegally. Let me back up. He made certain statements in

16  Canada. Those statements during that process, as you just

17  talked about, can be relevant, and we're going to show how

18  they're inconsistent with other positions that he's taken and

19  inconsistent with the witnesses who will testify.

02:13PM 20  We're also going to show that he crossed the border

21  illegally and did not even go to the U.S. border patrol or Port

22  of Entry there because he understood his claim of asylum wasn't

23  a good one, and so he wanted to avoid even making that in the

24  first place. He wanted to go elsewhere in the United States

25  without coming to border patrol awareness, and so what would

1  have happened to him over in Rwanda if he were caught, that

2  seems to be very much a side issue.

3         Now, if you then go to the question why doesn't

4  Mr. Twagiramunga's expertise in post-Rwanda, why is that not

5  relevant, the answer is this:

6         Mr. Twagiramunga has a couple of points he's made in

7  his academic research.  One of them is that the current regime

8  in Rwanda, which has been around since about 1994, hasn't done

9  a good job of prosecuting the Tutsis, who basically were the

10  saviors who came in.  That has nothing to do with whether

11  Mr. Teganya committed genocide or didn't commit genocide before

12  the RPF came in.

13         The second thing that he said is that the Kagame

14  government has been repressing the civil and political rights

15  of people of its critics.  In this case, there's no evidence,

16  we're aware of no evidence that Mr. Teganya was a critic of the

17  Kagame regime, and, furthermore, there's no evidence that we're

18  aware of that Mr. Twagiramunga has any expertise whatsoever on

19  how to show that the Kagame regime in Rwanda goes and basically

02:15PM 20  puts its thumb on the scale of court proceedings.

21         In fact, exactly the opposite.  He's made statements

22  in various places that the legal system there works.  There is

23  a lot of evidence that there have been a lot of acquittals over

24  there.  Furthermore, as the defense is aware, a number of the

25  witnesses from Rwanda, actually all of the witnesses from

Rwanda, I believe, were paroled into the United States.

When they were paroled into the United States, they needed to sign an affidavit in order to get parole status or to be evaluated for it, and in those affidavits, they said that they did not fear persecution or prosecution back in Rwanda on the basis of the testimony that they were going to give here, and, in fact, we're unaware of any case whatsoever in which people have testified here and been subject to pressure back there because of what they said.

In fact, even in the *Munyenyezi* case that was tried here, there was a mistrial, there were Rwandan witnesses for the defense, they went back to Rwanda, they came back from Rwanda over here.  There's no allegation of that whatsoever.

THE COURT:  I can't exclude that piece of the testimony on that basis.  I mean, that goes to the credibility of the testimony or maybe cross-examination, but let me ask this:

Putting aside for a moment evidence concerning Teganya's fate if he's sent back to Rwanda and putting aside the general proposition that post-1994 Rwanda events are irrelevant, as I understand it, part of what is going on here or what defendants propose is that the expert will testify as to a cultural or social or political backdrop that could affect the credibility of witnesses and that may be necessary to assess the credibility.

1    You may think it's wrong, but what if, for example,

2   there are pressures on the witnesses, that they will feel

3   pressure to adhere to a certain story or to tell a certain

4   story, how would the jury know that without expert testimony?

5    MR. GARLAND:  I think there the argument would be,

6   your Honor, that Mr. Twagiramunga just doesn't have the basis

7   of experience to testify to that.

8    THE COURT:  Let me assume that away.  I may need to

9   have a voir dire or, you know, a mini Daubert hearing on that

02:18PM 10   very question.

11    MR. GARLAND:  I think even in that case, your Honor,

12   even in that case, that comes dangerously close to what the

13   Court, what the First Circuit was saying in the I think it was

14   the *Kantengwa* case, which was cited by the defense because

15   there, what the First Circuit notes is that the government

16   expert there, Timothy Longman, was talking about, well, how do

17   we look at what happened in the past, how do we look at the

18   credibility of various historical circumstances and sources

19   there, how do we weigh those, and this is what a historian

02:19PM 20   does, they look at various things that happened in the past and

21   act as a historian, and what they do then next is they say this

22   isn't a circumstance like in *Marvel Characters vs. Kirby*, and

23   they cite the opinion.

24    They basically say there is a difference between a

25   historian coming in and saying here's how you weigh historical

1   sources from what happened in the past versus opining basically

2   on the credibility of witnesses.

3          THE COURT:  Okay.  But this is a little different.

4   Let me, I guess, set some markers.  No one expert or otherwise

5   can opine on the credibility of a specific witness, okay.  You

6   also can't offer expert testimony about stereotyping, you know,

7   all Tutsi people tell the truth or all Tutsi lie or anything of

8   that sort.

9          You can't have expert testimony about what I'll call a

02:20PM 10   cultural defense, it is my culture to stand by while others

11  commit genocide, therefore, I'm innocent.  You can't have

12  testimony about that, but even in the United States, there are

13  cultural norms sometimes that make dissent from acceptable or

14  accepted narratives quite difficult.

15         Let me give you a hypothetical, which may or may not

16  work, but let me try it.  So, suppose you have awoken from a

17  Rip Van Winkle slumber, you've been asleep for 25 years, and

18  now you're called upon to sit in a campus sexual assault, and

19  you're weighing the credibility of the witnesses.

02:20PM 20         You might not know that there is a tremendous social

21  pressures on college campuses right now for people to have

22  certain kinds of opinions and not have other kinds of opinions,

23  which could affect a witness.  It could be a witness to a

24  sexual assault.  You might feel pressure to adhere to that

25  story even if it turns out there were doubts, you know, they

should have acknowledged doubts, or, conversely, someone coming

forward to dispute the sexual assault occurred in the current

campus environment might feel tremendous pressure not to do so

or to change their story, the point being that there are

cultural norms sometimes that would affect a witness's

testimony.

I don't know, obviously, whether such a cultural or

social or political norm exists in Rwanda, but the defense is

going to say there are such norms, and if he is qualified to so

opine, obviously, the jury would know nothing about those norms

as long as we're keeping it within bounds, that is, that

there's a foundation, that he has sufficient familiarity with

Rwanda and social/political/cultural norms that he can make

this opinion but also making clear maybe with a cautionary

instruction that he's not opining on anybody's credibility,

he's not stereotyping, he's simply describing this norm that

exists that may affect the testimony of these witnesses.

Why wouldn't that be helpful to the jury, and what's

wrong with it exactly?  Again, carefully limited perhaps with

some cautionary instructions to make sure we're not stepping

over any lines, but just these are the norms.  If you're

Russian, you know that you don't dissent from Vladimir Putin's

government.  That is a current, I assume it is, a current

cultural political fact in Russia, and so if that were somehow

relevant, somebody might testify that, yeah, this is the way it

is, that people don't take the stand in Russian and criticize

the Putin government or the North Korean Government or

whatever, right, I mean, these things exist.

MR. GARLAND:  I think to answer the Court's

hypothetical, I think if there were an expert who actually were

qualified to testify to that, not just generally that there's

an authoritarian regime and, therefore, that authoritarian

regime must express itself through indirect pressure or that

the citizen must, therefore, assume that if they testify to

something over in America about another guy, if they could

actually show that there was real evidence that that's how the

government works, that's fine.

I think the danger without doing a pretty good voir

dire is that what Mr. Twagiramunga will say, I should say

Dr. Twagiramunga would say is that yes, he's an expert in the

fact that it is an authoritarian regime, and even if we were to

grant that point, that doesn't mean that what that government

does is to interfere into prosecutions.

Moreover, nor does it mean that Dr. Twagiramunga has

the done any academic research on that question of whether

that's the way it expresses itself, and what we would suggest

is that given an opportunity to examine Dr. Twagiramunga about

this, I believe that we would be able to identify that he

hasn't done any research in this, and, in fact, has made other

statements that are complimentary about the judicial system and

1  the legal system over in Rwanda as well that there have been a

2  number of other actual statistics that one could use to suggest

3  that there has not been that sort of a cultural norm, the

4  number of acquittals, for example, the appointment of who to

5  judges at local courts, et cetera, et cetera, so all of that.

6       I don't think that -- so what the government is

7  suggesting is that just because you may be an expert on the

8  current political system in Rwanda, that doesn't necessarily

9  mean that you can then make speculative questions or

02:25PM 10  speculative judgments about how its citizens, who you may never

11  have interviewed on this particular point about, would feel.

12  That would be the argument.  Those are two different

13  expertises.

14            THE COURT:  Okay.  Mr. Lauer.

15            MR. LAUER:  To the extent that there's some question

16  about Dr. Twagiramunga's qualifications or basis for such an

17  opinion, certainly the Court is free to conduct a hearing, and,

18  you know, the government will have the right to put those

19  questions to him, but as a general matter here, I think the

02:26PM 20  Court has latched onto what the defense perceives to be the key

21  factor, which is this is a case where the witness credibility

22  will be at issue, and bias is extremely important, and

23  defense should be able to probe biases that exist.

24            And in this particular case, witnesses are coming from

25  a country that many Americans, the jury is likely to be

1  unfamiliar with, they are likely to be unfamiliar with the

2  politics of Rwanda, as they exist now, cultural norms, and we

3  are not proposing to inquire of Dr. Twagiramunga if he believes

4  that other witnesses are lying.

5  We intend to ask him about his research, about the

6  research of other scholars, including scholars that the

7  government has relied on past cases that goes to this question,

8  so we believe that Dr. Twagiramunga does have the requisite

9  basis to testify to that, and for the reasons outlined in our

02:27PM 10  memo and expressed here today, we think the jury should hear

11  it, and we think it will be helpful to them in making

12  assessments of the case and witness credibility.

13  THE COURT:  Here's how I'm going to handle this.  I

14  think or my instinct is that if a proper foundation has been

15  laid such that he is qualified to render whatever the expert

16  testimony is, that this is probably fair game with some

17  important limitations and perhaps some cautionary instructions.

18  I think what I will want to do, and we have some time

19  to work with, obviously, is to do some kind of voir dire.  I

02:28PM 20  think probably what I would like from the defense is something

21  in the nature of an offer of proof as to his qualifications.

22  Did you do an expert disclosure of some kind?  I don't

23  remember.

24  MR. LAUER:  We provided the government with a letter

25  outlining the general terms.

1          THE COURT:  I may need more than that.

2          MR. LAUER:  We can certainly expand upon that.

3          THE COURT:  An offer of proof just to save time and to

4     give both the government and me time to react to that.

5          He's in the United States, correct?

6          MR. LAUER:  He is presently residing in the

7     Springfield area, so he's available relatively easily.

8          THE COURT:  Okay.  So let's do that.  How about maybe

9     within 14 days file an offer of proof.  I don't think -- it's a

02:29PM 10    part the government does not object to, I don't think we need

11    anything on that but just this one subset particularly, and I

12    guess the question in my mind is can he opine as to current

13    political, social or cultural norms, if that's the right word,

14    or the current political cultural and social environment in

15    Rwanda that may affect the credibility of witnesses or may be

16    necessary to understand to assess the credibility of witnesses.

17         And, again, as a general proposition, other than that,

18    I think post-1994 Rwanda events are irrelevant, and I would

19    certainly need to be convinced that any testimony one way or

02:30PM 20    the other of Mr. Teganya's fate if returns to Rwanda should be

21    excluded.

22         MR. LAUER:  Your Honor, if I could on that point?

23         THE COURT:  Yes.

24         MR. LAUER:  I did raise that in our response.  The

25    government has provided notice that they intend to present

1  evidence to the jury, and I would expect argument, to the

2  effect that Mr. Teganya's flight from Canada was motivated by

3  consciousness of guilt.

4      And, in fact, the response to that, and what we

5  believe the government is doing by eliciting that is opening

6  the door to an explanation of why he did so and what his

7  motivations were, so while it may not be admissible absent that

8  sort of door opening, I do want to signal to the Court that we

9  do expect the government to pursue that line of argument, and,

02:31PM 10  if so, we are going to make an argument that we should be

11  permitted to respond.

12      THE COURT:  Do you want to respond, Mr. Garland?  In

13  other words, let's say you make the argument he came through

14  the main woods because he knew he was guilty of genocide and

15  was trying to avoid further legal proceedings, and I'm not

16  quite sure how the government or how the defense would prove

17  this without Mr. Teganya taking the stand, but let's assume for

18  the moment that they want to put on evidence that he was

19  frightened of returning to Rwanda for fear that something

02:32PM 20  terrible will happen to him, imprisonment or worse, what's your

21  reaction to that?

22      MR. GARLAND:  Our reaction to that, he was coming over

23  here for the purpose of trying to get asylum somewhere.

24  Obviously, there's something in a claim of asylum that says I

25  don't want to go back to Rwanda.  We take that as given because

1    that's what it means to say that you're a refugee.

2          THE COURT:  Because I would be persecuted if I go

3    back?

4          MR. GARLAND:  Right.  He's already going to be able to

5    say that.  Our proof at that point is that he's going to

6    be -- and part of the concern, of course, is that the jury will

7    now be thinking that, well, wait a minute, we're trying to

8    figure out the false statements within this asylum claim, do we

9    now have to figure out whether he should have been granted

02:33PM 10   asylum, which, as the Court is very aware, that's not what

11   they're going to be asked to decide at all, so part of what

12   Mr. Lauer is suggesting is going to be a wholesale confusion of

13   the issues since it's already going to be before the Court and

14   before the jury that Mr. Teganya in both places was saying I

15   was feared persecution back in Rwanda.

16         The second thing is that argument that we have is that

17   not that he was -- not just that he was fleeing Canada to come

18   over here because he thought his claim of asylum was unfounded,

19   but once he comes over the border, the way he comes in, the way

02:33PM 20   he comes in is not to skirt the border, go to the port of entry

21   of the U.S., knock on their door and say, hi there, I'd like to

22   claim asylum.  That's not what he's doing.

23         What he does, he goes six miles out of his way to

24   avoid that place and to come in, so that has, again, nothing to

25   do with what was going on back in Rwanda, what happened there

1   but very much so that his own belief that what he was going to

2   be able to convince a government of was ill-founded.

3        The other thing is that once the Court opens that door

4   and does an examination of this other government and what it's

5   been doing post-Rwanda, it's hard to know where to stop at that

6   point because that takes on a whole other line in itself.

7        And part of the issue with putting that off to make

8   the defendant's case is the following:  We have an expert.  The

9   expert is going to be the first person who testifies.  After

02:34PM 10   that expert is done, he's going to go back to London, won't be

11   here again.

12        If we need to, we have the ability to, as I say, we

13   have evidence from Mr. Teganya's writings are inconsistent with

14   this position.  They want to have him talk about and other

15   things as well.

16        Part of what we're trying to figure out at this point

17   is how far to go with the expert to front this issue, and we

18   also don't want to be accused of having broached this issue

19   with our first witness opening the door to the other side

02:35PM 20   because that is a rabbit's hole that the jury could go down in

21   trying to figure out what to do with Mr. Teganya.  That's not

22   what they're supposed to be doing.

23        THE COURT:  All right.  It seems to me that at a

24   minimum, there's a clear distinction between his mental state

25   at the time he's crossing the border and what would actually

1    happen to him.  In other words, it's all speculation.  You're

2    right, it's certainly true that inherent in this, in any asylum

3    application is a claim that you fear persecution returning to

4    your home country.

5         We can hardly avoid that, but it seems to me that

6    expert testimony about how people in his position have been

7    treated is perhaps out of bounds for a variety of reasons under

8    Rule 403, if nothing else, because it doesn't really go to his

9    intent.

02:36PM 10        Mr. Lauer, do you want to respond to that?

11        MR. LAUER:  Well, your Honor, it's hard to address

12   this in the abstract without the benefit of hearing what the

13   government's expert might be saying, and it sounds like there's

14   some question on the part of the government as to how far to go

15   with him, but what I would say is that to the extent that the

16   government is making a claim that the defendant's entrance into

17   the United States via the woods as opposed to a port of entry

18   was somehow a reflection of his consciousness of guilt, in

19   other words, a reflection of the fact that he had done

02:36PM 20   something wrong, participated in the genocide, then there is an

21   answer to that, and the answer to that relates directly to the

22   current political situation in Rwanda, how persons who are

23   similarly situated to him, persons with familial connections to

24   the prior regime, the sort of treatment that they can expect to

25   receive, and, you know, as I said, I don't quite know what to

1    say not having heard, you know, the government's evidence in

2    the case, but I think that there should be an opportunity for

3    the defense to respond to that, and Dr. Twagiramunga, as the

4    government has noted, does have ample scholarship on

5    post-genocide Rwanda and could testify as to those matters.

6         Now there may be limitations on that.  This is not the

7    forum to litigate an asylum claim, but in some limited form, I

8    think a response would be reasonable.

9         THE COURT:  All right.  I'm not sure I'm prepared to

02:38PM 10    make a final or even a semifinal ruling on this question.  It

11    seems to me that the defendant's mental state is, of course, at

12    issue.  It always is.

13         It's not clear to me as a Rule 403 matter, if nothing

14    else, why we need expert testimony about current events in

15    Rwanda unless there is a direct tie to the defendant's mental

16    state, but maybe there is.

17         I'd have to hear the evidence, and that's always the

18    danger, whatever the evidence is, is that if you open a door,

19    the other side gets to paint a more complete picture, and I'm

02:38PM 20    not sure what else to say besides that, so let's take it a step

21    at a time.

22         In the meantime, I'm going to keep this motion pending

23    pending further developments, and, again, I'd ask the

24    defendants to produce an offer of proof of what I'll call the

25    political and social norms within 14 days or by March 19th,

which should give us ample time to react and set up a voir dire, if necessary.

Okay.  I think those are my only two motions.  Am I right on that?

THE CLERK:  Yes.

THE COURT:  Let's talk about impanelment.  It is expected to be a long trial.  We are going to bring in somewhere between 60 and 100 people.  We are still working with Mr. McAlear.  We may have others downstairs because there's another trial where jurors are being brought in every day, so we may have some backup, so to speak, whatever that number is, but let's say that we bring 60 people in, we will put all 60 people under oath.

I will ask my voir dire questions, as I think you know.  What I'll do is I'll ask a question.  If someone raises their hand, I'll call them up to sidebar one-by-one to explore with them whatever the issue is.

I do permit very limited, discrete, thoughtful attorney voir dire at sidebar if you think I haven't explored something fully enough, and then once we've gone through that process, we will take the first 12 people on the list plus alternates and put them in the box for the exercise of peremptory challenges.

How many alternates do you think I ought to impanel? I think I need at least two.  The question is should I go

1    farther than that?  What's the government's view?

2          MR. VARGHESE:  Your Honor, I think we should do four

3    just in case given the length of the trial.

4          MR. LAUER:  I don't disagree.

5          THE COURT:  That will make impanelment longer,

6    obviously, but we will make it 16.  The last four people

7    impaneled regardless of their juror seat will be the

8    alternates.  They will not be told that they are the

9    alternates.  You will know, but they won't know, and an order

02:41PM 10    of impanelment, they will be 1, 2, 3, 4, so if something

11    happens to one of the jurors, you'll know who replaces them,

12    and you'll also, of course, have this randomized list in front

13    of you, and as we cross out names, you'll know when we exercise

14    peremptories who the next person on the list will be, which

15    will help inform the exercise of your peremptory.

16          In terms of the voir dire questions, sort of as a

17    philosophical matter, it's as important for me sometimes to

18    make statements as well as to ask questions, that is, to

19    introduce questions so they don't come out of the blue so that

02:42PM 20    people are thinking about the issues, so, for example, I expect

21    to ask a question about views on immigration issues, but

22    introduce that by basically saying something to the effect that

23    this is, you know, very much in the news, a lot of people have

24    strong opinions on immigration, and, of course, this case has

25    nothing to do with any of that, it's a particular narrow,

1    discrete issue.

2            It's not a referendum or a vote on American

3    immigration policy, but, nonetheless, there may be people

4    whose, you know, views are so strong one way or the other that

5    it would affect your ability to be a fair juror, something like

6    that, and then ask the question do any of you have a feeling

7    about or feelings about immigration issues or immigrants that

8    would affect your ability to be fair and impartial.

9            So I think there are a number of things.  I think I

02:43PM 10   need to ask that some question in some form or another

11   concerning genocide or make that statement to say that, you

12   know, there may be genocide survivors or people with friends or

13   family members affected by it, and, again, this is the only

14   real issue there from our standpoint is whether or not any of

15   that would affect their ability to be fair.

16           I always approach law enforcement questions that way,

17   that is, I try to explain what we're looking for in terms of

18   law enforcement bias, why it matters, whether you're pro law

19   enforcement or anti-law enforcement, so I think that's how I

02:44PM 20   need to approach these issues.

21           Again, I'm going to ask the questions, but I think I

22   need to make sure that the people understand what it is we're

23   talking about.  At the risk of grossly painting with a broad

24   brush, I think there are always people who want to get out of

25   jury duty no matter what, and they tend to get themselves out,

1   but the people who remain tend to be ordinary, decent people

2   that just sometimes, you know, need to be reminded of what's

3   important and why we're asking the questions the way we do and

4   making sure that they're examining their own feelings carefully

5   to make sure they can be fair and open-minded.

6           I'll have this in drug cases, for example, where a lot

7   of people have very strong views about drugs.  Sometimes, you

8   know, if your son died of a fentanyl overdose, it might be hard

9   for you to be, usually it is hard for you to be rational and

02:45PM 10  fair as a juror, but people might say, for example, they hate

11  drugs, and my response is, well, that's fine, most people hate

12  drugs.  That doesn't really the question whether this defendant

13  is guilty of these charges and try to tease it out that way, so

14  I do think I need to sort of introduce some of these questions.

15          Does the defense want me to ask any race-related

16  question, that is, sometimes with a Hispanic or Black

17  defendant, I will, again, do a short introduction and then ask

18  people questions?  Do you want me to do that here?

19          MR. LAUER:  We do not, your Honor.  We think that

02:45PM 20  probably your question about immigration will cover much of

21  that, but I did want to bring to your attention that this case

22  is going to involve at least some graphic testimony regarding

23  violence and sexual assault.

24          THE COURT:  Actually, yes, that's another one of the

25  things I'm going to do.  I think I need to tell people

1  basically that one way or another the evidence is likely to be

2  disturbing or unsettling, and I guess I don't quite know how to

3  phrase it, but the thrust of it would be, we're not looking for

4  people who are cold or insensitive, but we do need people who,

5  you know, are going to take their duty seriously and keep their

6  eye on the ball and pay attention to the facts and listen to my

7  instructions and to sort through that.

8  I notice the government had photographs.  Are there

9  graphic photos that you expect to introduce, somewhat graphic

02:46PM 10  photos?

11  MR. GARLAND:  There may be, your Honor.

12  THE COURT:  Okay.

13  MR. GARLAND:  More likely to be dead bodies, so there

14  may be some, yes.

15  THE COURT:  Okay.  I think I just need to front that.

16  Okay.  I don't want to lose six jurors in the middle of the

17  trial because they can't handle it, not simply asking the

18  question but sort of trying to confront it directly, this is

19  what the evidence is going to be, and we expect that normal

02:47PM 20  people may have, you know, uncomfortable reactions, but it's

21  important that under any circumstances the jurors not decide

22  the case based on their reactions to photographs or evidence

23  but because they've listened to all of the evidence and are

24  making a proper determination of whether the government has met

25  its burden of proof.

1          MR. LAUER:  If I could, your Honor.

2          THE COURT:  Yes.

3          MR. LAUER:  We would actually ask the Court to be a

4     little bit more direct about it in the same way that someone

5     who has a loved one who may have passed away due to a fentanyl

6     overdose would have a hard time putting it aside, someone who

7     has been sexually assaulted or someone whose loved one has been

8     sexually assaulted is likely to have those same feelings.

9          THE COURT:  Is that going to be part of this case,

02:48PM 10    sexual assault?

11          MR. LAUER:  Yes, there will be direct testimony about

12    sexual assault and rape.

13          THE COURT:  Okay.  Then I will do that as well.  All

14    right.  The defense had some other objections or issues with

15    the voir dire questions.  I'll pull those up.

16          I'm going to describe the case.  Let me talk about

17    that.  In all these things, I hope, I'm certainly going to make

18    every effort to be scrupulously neutral, but I think I want to

19    say something that more or less goes like this, that the

02:49PM 20    defendant is from Rwanda, that it's a nation in East Central

21    Africa, that for a short period of time in 1994, there were

22    mass killings in Rwanda rooted largely although not entirely

23    along tribal lines, those events have come to be known as the

24    Rwandan genocide, this case involves false statements, perjury,

25    et cetera, that bear on those issues, something like that so

1   that they understand -- I'm doing this off the top of my head,

2   and I'm going to pick my words very carefully, but I don't

3   think I can say this is a bank robbery case, you know, the kind

4   of things I normally say, I think I need to walk through

5   Rwanda, events of 1994 and how it may bear on what the

6   government says are the charges here.

7           MR. VARGHESE:  Your Honor.

8           THE COURT:  Yes.

9           MR. VARGHESE:  Would you be amenable to having the

02:50PM 10  parties submit a statement of the case for the Court?

11          THE COURT:  That's fine.  You don't need to do it

12  jointly, you can give me suggestions or if you can agree on it,

13  that's fine.  The other thing is I could circulate a proposed

14  statement as well so you can have something to shoot at.  The

15  trick, as always, from my standpoint is making sure I'm not

16  putting a thumb on the scale, so I have to really walk

17  carefully through that.

18          Oh, I am going to ask, I think I need to, it's a

19  standard question, have they heard anything about the case, any

02:51PM 20  publicity?  I don't know if there's going to be an NPR story

21  the morning of the trial.  I need to ask that question.  I just

22  don't see any way around that.

23          I'm routinely shocked in high profile cases how few

24  jurors have had any exposure at all, and it seems to be getting

25  worse and worse as no one reads newspapers anymore.  You know,

you can ask people, the story has be on the front page of the
paper every day for three weeks.  Have you read it?  Nope.  Are
you related to a cop?  100 hands go up.  But, anyway, I need to
ask the question.

All right.  So I am hoping that we will get a jury by
the end of Friday.  Obviously, if we don't, we will spill over
to Monday.  I am going to try to make that as brisk as I can
consistent with fairness.  I think we are the only jury,
obviously, being impaneled that day.  They need to show up and
watch a video.  Do you know when they're going to be ready,
Lisa?

THE CLERK:  I think between 9:40 and 9:45.

THE COURT:  Why don't I see counsel at nine to wrap up
whatever we need to wrap up, otherwise the default is going to
be I want to see you every morning at 8:30 unless I say it's
earlier, like 8:00.

Before I leave voir dire, so if we have four
alternates, that's, what, eight peremptories for the
government -- hold on.  It's ordinarily six plus ten with four
alternates.  Does each side get two extra ones; is that right?

MR. VARGHESE:  I believe that's right, your Honor.

THE COURT:  So it will be eight and twelve.
Peremptories will be exercised one-by-one at sidebar in
alternating rounds, so the government will go first in the
first round, so let's say we put 16 people in the box.  The

1   government at sidebar says we strike Juror Number 1, defense

2   says Juror Number 2, the government says Juror Number 3,

3   government says Number 4, defense 5, government 6, and then

4   people are satisfied, we will strike those six jurors, replace

5   them with Jurors 15, 16, 17, 18, 19 and 20.

6          In the next round, defense will go first, but there

7   will be no backstrikes, that is, you have only one chance to

8   exercise a peremptory on a juror, so in keeping with my

9   hypothetical, if we put 14 people in the box and six are

02:54PM 10  struck, the remaining eight will be on the jury, and, again,

11  the last four people picked will be the alternates regardless

12  of where they are sitting in the jury.

13         Any questions or anything else about voir dire?  We

14  can revisit this again Friday morning, okay.

15         All right.  Trial mechanics, let me just touch on some

16  things quickly.  My standard trial day will be 9 to 1.  I have

17  cleared the afternoon of March 12th.  March 11th has proved

18  more difficult.  I have some safety valve availability on

19  March 13th, which is Wednesday.  I normally teach on Wednesday

02:54PM 20  afternoon, but it's spring break.  I have a sentencing and a

21  hearing, but there may be things we can do with that, but

22  unless you think differently, I think I will tell the jury

23  something like this, that our normal trial day will be 9 to 1.

24  I'll tell them what days we're not sitting.  I'll tell them

25  we're going to probably sit occasional afternoons to stay on

1    track, and the first such afternoon will be March the 12th,

2    where we'll go after 2:00.  I don't like keeping them past 4:30

3    so they can get a head start getting out of town.  They tend to

4    be unhappy, but, again, we'll see how that goes.

5         We don't provide them lunch, so we need to send them

6    away for lunch and get them all back by two.  We pay for lunch

7    when they're deliberating but not when we're in session.

8         My normal break schedule is 10:30 and 12:00.  With 16

9    people, the breaks tend to be a lot longer in terms of people

02:55PM 10  going to the bathroom.  I may do a one break system.  I'll feel

11   my way forward.  We'll have one break at eleven.  Obviously, if

12   somebody raises their hand, we can take a break, but I'm

13   concerned about losing the time.  It's just hard to get 16

14   people, you know, in and out, into the bathrooms and back into

15   the courtroom, so it will be one or the other, either

16   we'll break at 10:30 or noon or we'll break at eleven.

17        I'm not sure.  I guess, let me ask you, do you have

18   any questions about my trial practices, preferences?  We have a

19   document camera, obviously, that you can use.  I won't chain

02:56PM 20  you to the podium, but it certainly ought to be the default

21   position from which you testify.  I do use this witness stand.

22   I experimented with mock trials in my class and found that 100

23   percent of the jurors prefer this stand to that one.

24        There was a single mock juror that preferred the one

25   across the way, so I use this one.  It means my clerks can't

1   see what's going on, so they may have to move around, but

2   that's the one we'll use.

3        Objections should be either the word "objection" or

4   something simple like "objection, hearsay," all argument to be

5   at sidebar, and one of the reasons that I want to see you every

6   morning is I want to try to anticipate objections.  Really

7   while the jury is in the box, I would like the case to move

8   briskly.  I can spend all kinds of time before trial, after

9   trial every day, but I don't want to waste their time.  I

02:57PM 10  really want it to move.

11        And at the risk of stating the obvious, one of the

12  reasons 9 to 1 works and the all day schedule does not is

13  people's, you know, ability to concentrate and interest lags as

14  we tend to go all day, but, you know, I'm convinced that we

15  need to do it at least sometimes.

16        Anything else anybody it occurs to you that you want

17  to take up?  Mr. Varghese.

18        MR. VARGHESE:  Two things, your Honor.  For many of

19  the witnesses, we're going to need an interpreter.

02:58PM 20        THE COURT:  Yes.

21        MR. VARGHESE:  And so just to make sure it was okay

22  with the Court, if we have --

23        THE COURT:  Usually the way it works, the interpreter

24  will be right here, in other words, that's the interpreter for

25  the entire proceeding, so, for example, in my MS-13 trials, if

we had a witness who spoke only Spanish, the interpreter would

be there.  Now, the defendants also spoke only Spanish, and

they had a different interpreter who was doing the headphones,

and I assume Mr. Teganya's English is good enough that he

doesn't need an interpreter?

MR. LAUER:  No interpreter required.

MR. VARGHESE:  There is -- we would request having an

interpreter at our table, your Honor, to help us.

THE COURT:  That's up to you.  In other words, just to

privately consult with you?

MR. GARLAND:  Just to make sure the interpretation is

correct.  We found in prior trials that there was a discrepancy

between what the witness was saying and what was being

interpreted.

THE COURT:  Okay.  This is, we're going to have some

English, some French and some African languages?

MR. GARLAND:  Primarily, it's going to be

Kinyarwandan, which is the language spoken in Rwanda.  The

government will have no French-speaking witnesses.

THE COURT:  Okay.  Defense, same?

MR. LAUER:  Largely Kinyarwandan, probably a handful

of French.

THE COURT:  How much interpreters do we have, in other

words, if the interpreter takes ill or is stuck in traffic, do

we just have one?

1        MR. GARLAND:  We have two court-certified interpreters

2   that the government has.

3        THE COURT:  Okay.

4        MR. GARLAND:  I don't know what the defense.

5        THE COURT:  The reason I'm asking, I had a trial

6   involving a lot of Laotian defendants, and we had one

7   interpreter, and everything depended on his health, how tired

8   he was.  I mean, you know, he was running the show by the end

9   of the trial.

02:59PM 10        MR. GARLAND:  Did he have the robe on, too?

11        THE COURT:  It's just the way it is, right, so just

12   keep that in mind.

13        MR. GARLAND:  We have four other interpreters that are

14   helping us in terms of logistics and moving things around, but

15   in terms of court-certified, we have two.

16        THE COURT:  If something happens with a Spanish

17   interpreter, you know, we can find one in 15 minutes, but I

18   think this is likely to be more difficult?

19        Anything else, Mr. Lauer?

03:00PM 20        MR. LAUER:  No, your Honor.

21        THE COURT:  Okay.  Who is going to open for the

22   government?

23        MR. GARLAND:  I am, your Honor.

24        THE COURT:  How long do you expect that to take?

25        MR. GARLAND:  Thirty minutes.

1          THE COURT:  Mr. Lauer.

2          MR. LAUER:  Shorter, 15 to 20.

3          THE COURT:  You expect to open at the beginning of the

4     case?

5          MR. LAUER:  Yes.

6          THE COURT:  All right.  That's fine.  I probably told

7     you this, you're presumed innocent.  Time management is

8     important in every trial, but I think particularly important in

9     this one.  You know, if you tell me half an hour and you take

03:00PM 10    45 minutes, I'm not going to cut you off, but I will also make

11    a mental note that you're not good at estimating your time, so

12    just remember time is an issue, that's all.

13         And if it looks like we are falling behind, I will

14    start to tighten the screws, you know, again, I can't unfairly

15    affect the defense, but I will keep an eye on time.  Obviously,

16    it applies to the defense even though you have a right to put

17    on a defense.  I'm not going to give you complete carte blanche

18    either, so we'll see how that goes.

19         All right.  So I will see you at 9:00 Friday.  If

03:01PM 20    there's anything anybody wants to raise, I am happy to have a

21    conference on short notice even by telephone, if necessary.

22    You know, I'd rather deal with it sooner rather than later.  I

23    invite the parties to submit anything, a statement of the case

24    or further refinements on voir dire questions in response to

25    this colloquy, and I've been drafting something, and I will

1    circulate my own, I guess, proposal for the statement of the

2    case, I'll call it, the thing I tell the jury at the beginning

3    of the case what it is all about.  Okay.  Thank you.

4            THE CLERK:  All rise.

5            (Whereupon, the hearing was adjourned at 3:01 p.m.)

6

7                   C E R T I F I C A T E

8    UNITED STATES DISTRICT COURT )

9    DISTRICT OF MASSACHUSETTS ) ss.

10   CITY OF BOSTON )

11           I do hereby certify that the foregoing transcript,

12   Pages 1 through 38 inclusive, was recorded by me

13   stenographically at the time and place aforesaid in Criminal

14   Action No. 17-10292-FDS, UNITED STATES OF AMERICA vs.

15   JEAN LEONARD TEGANYA and thereafter by me reduced to

16   typewriting and is a true and accurate record of the

17   proceedings.

18           Dated March 14, 2019.

19

20                   s/s Valerie A. O'Hara

21           _____

22               VALERIE A. O'HARA

23               OFFICIAL COURT REPORTER

24

25