UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| |
UNITED STATES OF AMERICA |
|
v. | Court No.: 17-CR-10292-FDS
|
JEAN LEONARD TEGANYA, |
|
Defendant. |
| |

## GOVERNMENT'S SENTENCING MEMORANDUM

If the United States were asking the Court to sentence Defendant Teganya for his crimes during the Rwandan genocide of Hutus against Tutsis — not only helping Interahamwe and soldiers find Tutsis at the Butare university hospital for them to kill and rape, but also participating in at least seven murders and five rapes himself — surely it would ask the Court to sentence him to life in prison.[1] But the United States is not asking for a sentence for genocide. It is instead asking the Court to sentence Defendant Teganya for the crimes of conviction: the most serious violations of immigration fraud and perjury possible, compounded by his total denial of responsibility and his attempts to obstruct justice before this Court.

For these, Defendant Teganya deserves to be sentenced to the maximum penalty on each count and to serve in prison an aggregate sentence of twenty years.

---

[1] *See* 18 U.S.C. § 1091 (providing that a person present in the United States who killed others with intent to destroy an ethnic group may be sentenced to death or to imprisonment for life). *See also United States v. Munyenyezi,* 781 F.3d 532, 544 (1st Cir. 2015) (quoting district court as noting that it would sentence defendant who manned roadblock in Butare, Rwanda to life in prison if the sentencing was for her participation in genocide, rather than for lying about genocide), *cert. den.,*136 S. Ct. 214 (2015); Court's Sentencing Memo., *United States v. Mohammed Jabbateh,* 16-CR-00088-PD at 31 (E.D. Penn. May 21, 2018) (same, quoting *Munyenyezi*), *app. filed,* (3d Cir. Apr. 26, 2018).

## I.    FACTS

From presiding at this trial, the Court is well-versed in the facts of this case, and thus only a brief recitation of the evidence demonstrating Teganya's criminal conduct is provided in support of the government's sentencing recommendation.  In summary, during the Rwandan genocide, Teganya went to the university hospital in Butare every day.  Even though Teganya was studying to be a doctor, during the genocide he failed to provide Tutsis medical care and in fact helped soldiers, the Interahamwe, and extremist Hutus search for, identify, capture, and forcibly remove Tutsis hiding at the hospital and on hospital grounds to be killed or raped.  Even worse, he personally participated in at least seven murders and five rapes.  When the genocide ended, Teganya fled, ultimately entering Canada on a false passport.  He made a life for himself in Canada, marrying and raising children, and seeking refugee status.  When Canada denied this because it thought he had participated in the genocide, it sought to deport him.  Teganya became a fugitive for two years.  Finally, he entered the United States illegally through a remote forest to evade the border patrol.  Teganya never intended to seek asylum in the United States, because he had seen his bid in Canada fail.  So after he crossed through the forest, he walked away from the official border crossing station and sought to start his new life in the United States.

But the United States Customs and Border Control caught him in Maine and so Teganya's plans were ruined.  To avoid being returned to Rwanda, he claimed asylum.  He falsely denied having been a member of Rwanda's persecuting party, the MRND; falsely denied having persecuted Tutsis himself; and even falsely denied having seen or even knowing about any genocidal atrocities at the time even though he had committed them himself, walked by the killing grounds right outside his dorm, and been there every day hour upon hour.

At trial, Teganya repeated these lies on the stand.  He even claimed that Rwanda would torture or kill him for his father's crimes, even though his father had never been killed himself.

2

He claimed that Rwanda would single him out because of his political opinions, even though his own expert admitted that Teganya would not have aroused the government's political concern. And Teganya presented at least one witness who tried to establish a false alibi for him.

### A.    Rwanda's Ethnic Tensions

Rwanda has two major ethnic groups:  the Hutu, who are about 80% of the population, and the Tutsi, who are about 18% of the population, who have been political and economic rivals since at least the early 1900s.  Being a Hutu or a Tutsi could determine whether a Rwandan would be admitted at a preferred school, would win a scholarship, and would obtain a good job. Consequently, Rwandan adults were required to carry ethnic identity cards.  In the thirty years leading up to the 1994 genocide, the Hutus held power through their political party, the MRND. All Rwandans were members of the MRND automatically.  This changed only in 1991, when Rwanda adopted a multi-party system, although the MRND and Hutus still remained in power. From 1990 through early 1994 before the genocide, tensions mounted.  Extremist Hutus called Tutsis "inyenzi," or cockroaches, and led mass killings of Tutsis.

### B.    Genocide Begins

On April 6, 1994, a plane that carried the president of Rwanda, a Hutu and the head of the MRND, was shot down.  The MRND quickly began a nationwide genocide of Tutsis, to beat, rape, and kill them, and to burn their houses and steal their possessions.  The MRND justified this treatment out of fear that an expatriate army dominated by Tutsis, the Rwandan Patriotic Front, might invade from outside Rwanda and gain help from the Tutsis inside Rwanda.  Tutsis were taken from and harmed at their houses, churches, checkpoints and roadblocks, in public spaces, and elsewhere.  The genocide was carried out by government soldiers; by the Interahamwe, which was an under-30 "youth" wing of the MRND; and by civilian Hutus who were either extremist, afraid of Tutsis because of the pervasive propaganda, or forced by others to participate.

The slaughter throughout Rwanda was pervasive. It was not a secret and it was not hidden. Rather, it was done in the open. Radio commentators openly called for the slaughter of Tutsis. Piles of bodies were left by the side of the road and in open fields. Killing, raping, and looting were done in the day and the night. This was because the military, the local authorities, the Interahamwe, and the citizenry controlled where Tutsis could go or not and whether they lived or not. While the genocide in Rwanda lasted only about 100 days, approximately 800,000 people were killed – roughly 8,000 people per day.

The genocide started in Kigali and quickly spread across the country, but reached Butare much later. The killings started there around April 20, 1994. As throughout Rwanda, the slaughter in Butare was pervasive, open, and notorious. Killing, raping, and looting were done in the day and the night because, again, extremist Hutus were in control.

As a result, in the first two weeks, the genocide in Butare annihilated more than half the region's Tutsi. At first, militias swept through neighborhoods to find Tutsis. Then, in the early days of May, genocidaires pushed to eliminate remaining Tutsis, which brought new attention to locations where the Tutsis had until then been tolerated. At this point, civilians and the Interahamwe organized a substantial part of the population to hunt down Tutsis, either to kill them immediately or to hand them over to local authorities for execution.

The genocide in Butare reached the hospital at the National University of Rwanda. There, the slaughter consumed Tutsi medical personnel, Tutsi patients, Tutsi students, and Tutsi civilians who had sought refuge. As expert witnesses for both the government and defense testified, the Butare hospital is a known genocide site where Tutsis were slaughtered. Soldiers and Interhamwe returned to the hospital repeatedly to search out those in hiding. They disposed of bodies at several

mass graves or disposal areas around the hospital. One was at a pit close by the medical school's Kiza Dormitory.

The genocide at the university hospital was, as throughout the country, pervasive, not in secret, not hidden, but was instead done during the day and night because the military, the local authorities, the Interahamwe, and the citizenry controlled Tutsis' movements and whether they would live. On April 20, 1994, the Tutsi medical staff of Doctors Without Borders, who were assisting with emergency medical operations at the hospital, were murdered offsite at the refugee camp where they were living. That evening, military helicopters landed at the hospital to deliver about 30 to 40 wounded soldiers from the Rwandan Presidential Guard into the hospital's care.

From then on, the hospital focused on treating government soldiers rather than Tutsi patients and refugees, and at the same time, Tutsi patients were killed or taken away to be killed. For example, about 40 Tutsi child patients were taken away from the hospital, with only 6 or 7 ever found again. A day or so later, 40 Tutsi adult patients were murdered at the hospital. The following day, at about 8 a.m. on April 23, 1994, prisoners loaded the bodies of these Tutsi patients onto three dump trucks, all out in the open. After a protest by Doctors Without Borders, a Rwandan army captain said, in broad daylight, that the hospital "stank with Tutsis" and that soldiers needed to "clean up." The carnage intensified. Five Doctors Without Borders nurses were taken away to be killed: four because they were Tutsi, one because she was a Hutu pregnant with a Tutsi baby. Throughout the day, Tutsi patients were also taken away to be killed. Those who were taken away to be killed pleaded for their lives, cried, and screamed. The screams could be heard across the hospital grounds.

By April 24, 1994, most, if not all, of the Tutsi patients were missing, having been killed or taken away to be killed. The hospital was so dangerous that Doctors Without Borders personnel

departed, even though that group specialized in working in war zones.

As the genocide continued, Tutsis still came to the hospital for refuge and treatment. They hid in the hospital's various buildings, including the maternity and dermatology wards, often moving between places to avoid detection by the soldiers, Interahamwe, and others who were searching for Tutsis to rape and kill. While wounded soldiers received medical treatment in the surgical ward, Tutsi patients often went untreated. Those Tutsi patients lucky enough to receive treatment often received substandard care. For example, at least some Tutsi patients received sutures from medical students who, ignoring normal medical practice and specific direction from a doctor, refused use local anesthetic to alleviate the patients' pain.

### C.      The Defendant and His Part in the Genocide

Defendant Jean Leonard Teganya came from Gisenyi, a prefecture (or state) in northern Rwanda. Many of the Hutu and MRND elite, including the assassinated president, came from the northern prefectures. Teganya's father, in fact, was president of the local Gisenyi MRND group.

Teganya had started medical school at the university in Butare in 1991. Teganya was a member of the MRND at that time and continued throughout the end of the genocide. He wore MRND clothing and displayed an MRND flag on his bedroom wall at least during the 1991-1992 school year. He attended political meetings or rallies wearing MRND clothing, associated almost exclusively with Hutu classmates, disparaged Tutsis, and also regularly attended Interahamwe combat training after hours at the school gymnasium or, when training with weapons, at a hidden spot in the woods near campus. At the Interahamwe training, Teganya was a student leader.

Teganya had returned to school before the president's plane was shot down, and he remained there during the entirety of the genocide. He first lived off-campus but then moved into the Kiza Dormitory sometime in April when Butare became unsafe. The Kiza Dormitory was just outside the hospital grounds, only a two-minute walk to the maternity ward that marked the outer

6

boundary of the hospital closest to Kiza, and only a five-minute walk to the reception area that marked the outer boundary furthest from Kiza. Teganya lived in the Kiza Dormitory through the end of the genocide in July 1994.

During the genocide, Teganya attended the hospital every day starting at around 8 a.m. He was thus at the hospital during the genocidal events described above. He also walked past the various areas at which the events described above took place. For example, he walked past the body pit near the Kiza Dormitory. He also walked past the maternity and dermatology wards where Tutsi patients were hiding and being terrorized. He worked at an area near where the Doctors Without Borders nurses and other patients were forcibly removed to be killed.

During the genocide, Teganya spent part of his time helping doctors tend to wounded soldiers. He did not tend or help anyone else tend to Tutsis who were in need of medical care.

But Teganya did more than just help soldiers and ignore Tutsis. Teganya actively persecuted Tutsis at the university hospital. He helped the Interahamwe and the soldiers search for, identify, capture, and forcibly remove Tutsis hiding at the hospital and hospital grounds so that they would be killed or raped. Moreover, Teganya participated in at least seven murders and five rapes:

- **Jean-Claude Karekezi:** Karekezi was a Tutsi who worked at the pharmacy, who believed during the genocide that Teganya was trying to find him and get him killed. Eventually, when Karekezi was spotted by a wounded soldier and identified as a Tutsi, Karekezi ran and hid. Teganya was summoned, heard what happened, and said that the Tutsi must have been Karekezi. Teganya, along with a group of soldiers, searched for Karekezi around the hospital grounds. They were armed; Teganya carried a small axe or hatchet. When they found Karekezi, they marched him down to the field next to the mortuary. Teganya pushed Karekezi down and hit him on the head with his axe, killing him. This was during the day.

- **Protais Nyangezi:** Nyangezi was a Tutsi patient at the hospital who was wounded or ill. Teganya and others, again armed, found Nyangezi, forced him to the same area where Karekezi was killed, and killed Nyangezi. This was during the day.

- **Mathias Gasarabwe:** Gasarabwe was a Tutsi patient at the hospital who was wounded or ill. Teganya was part of a crowd that forced Gasarabwe out from where he was at the hospital and pushed Gasarabwe to the spot at which he was ultimately killed. Teganya struck Gasarabwe on the head with his axe. Gasarabwe died right away. This was during the day.

- **Four Tutsi students from the Kiza Dorm, names unknown:** Innocent Habimana, a member of the Interhamwe, testified that one day during the genocide, Teganya flagged down his Interahamwe group in front of the Kiza Dormitory. Teganya said that he had found four Tutsi students hiding inside the dormitory and tried to turn the students over to Habimana's Interahamwe group to be killed. Habimana protested, and told Teganya that he needed to do work too. So Teganya and his group took two students, while Habimana and his group took the other two. Teganya's group killed two Tutsi students behind the Kiza Dormitory near the body pit, while Habimana's group killed the other two.

- **Esperance Mukamurenzi:** Esperance Mukamurenzi was a Tutsi woman who hid in the maternity ward during the genocide. She often saw Teganya with Interahamwe members beating Tutsis and taking them to be killed or raped. She said that the Tutsi refugees referred to the Interahamwe as "Teganya's army." She saw Teganya and his group take her husband's aunt, Venancia, to be killed. She explained that the Tutsis were killed behind the maternity ward where she was hiding. Members of "Teganya's army" took her on at least three occasions and raped her on the hospital grounds.

- **Consolée Mukeshimana:** Consolée Mukeshimana was a Tutsi woman who hid in the surgical ward during the genocide. She had met Teganya a month prior to the genocide when her son was admitted to the hospital. She saw Teganya again at the hospital during the genocide when he came, along with soldiers and others, and forcibly removed the Tutsi refugees from the surgical ward to the dermatology ward. While hiding in the dermatology ward, she saw Teganya every day with Interahamwe members beating Tutsis and taking them to be killed or raped. Teganya also came and took her cousin Veneranda and raped her on three occasions; after the third time, her cousin never returned. Following the death of Veneranda, Teganya took her and raped her twice as well. Ms. Mukeshimana was six months' pregnant at the time Teganya raped her.

## D. Immigration Crimes: Immigration Fraud in Canada, Illegal Entry into the United States, and Lies During United States Immigration Proceedings

### 1. *Illegal Entry into Canada, Fugitive in Canada, and Illegal Entry into the United States*

The genocide ended in July 1994, when the Tutsi-led Rwandan Patriotic Front entered

Rwanda and put a stop to it. Teganya, like many Hutus, fled the country. He went first to a refugee

camp in Rwanda, next to Congo, then to Kenya, and then on to India.

Teganya next went to Canada. To do so, he obtained a false Zimbabwean passport in a false identity. He did this because his Rwandan passport had expired and he wanted to avoid renewing his passport back in Rwanda, out of fear that he would be arrested for genocide. He used the false passport to travel to and enter Canada.

While in Canada, Teganya got a job, married, and had children, all under his real identity. He also applied for refugee status, claiming that if returned to Rwanda, he faced harm from the Rwandan government as payback for his father's crimes of genocide, even though Teganya himself claimed he had not participated in the genocide. (His father, the former president of the Gisenyi MRND had been jailed for a couple decades for participating in the genocide.) After a long process of adjudication and appeal, Canada rejected Teganya's claims about not having participated in the genocide and thus denied his refugee application and ordered him deported.

Rather than be deported, Teganya went into hiding – for two years. Canada put Teganya on its list of most-wanted fugitives. After fifteen years in Canada, the last two in hiding, Teganya surreptitiously left Canada for the United States.

On August 3, 2014, Teganya entered the United States to elude border and immigration authorities. He avoided the most direct routes from his home outside Montreal, Canada, south into the United States (via I-87, I-89, or I-91), because he knew that those border crossings were monitored carefully. Instead, he traveled more than 400 miles out of his way, around the northeastern corner of the United States, to the lesser-monitored area of Houlton, Maine. Although Houlton has a lawful border crossing (via I-95), Teganya skirted that by crossing the border illegally through a forest about six miles from the lawful border crossing. Once in the United States, Teganya did not present himself at the lawful border crossing to claim asylum, nor did he

intend to do so.  Instead, he was arrested by the United States Border Patrol while walking away from Houlton's lawful border crossing.

### 2. *Lies on the Asylum Application, Form I-589*

Upon his arrest, Mr. Teganya claimed asylum in the United States.  To claim asylum, he filled out an I-589 form, entitled "Application for Asylum and for Withholding of Removal."  On that form, he lied at least three times under oath and penalty of perjury.  Those lies were all material either to Teganya's qualification for asylum or to the investigation of his asylum claim.

The first lie was in response to being asked whether he feared "harm or mistreatment" if he were returned to Rwanda.  Teganya answered "yes," and explained that "the Rwandan authorities will seek to detain, arrest and possibly kill me because of my father's political opinion, which will be imputed to me.  Further, there was a lot of publicity regarding my case in Canada which has endangered my return to Rwanda."  This was a lie in several ways.  First, Teganya omitted saying that the Rwandan government would detain and arrest him because he had participated in the genocide.  Second, Rwanda had not killed Teganya's father for his own opinions, so there was no reason to believe that Rwanda would kill Teganya for sharing his father's political opinions.  Third, as noted by the defense's own expert witness, Teganya's political opinions were not the sort with which Rwanda's government was concerned.  A related lie was in response to a being asked whether he was afraid of being subjected to torture in Rwanda.  Teganya answered "yes," and explained that his "father [was] in prison having been charged as a war criminal," and that he (Teganya) "had no connection to him or his activities, yet [he] fear[ed] that the Rwandan government [would] seek to impri[s]on and possibly kill [him] due to [his] father's alleged activities."  This was false for the reasons noted above.

The next lie, which was charged in Counts 1 and 2, was in response to a question that asked whether he or his family had belonged to any organizations or groups back in Rwanda.  Teganya

responded "yes," and listed his father's position in the MRND, his own membership and executive position in the Red Cross Youth Section from 1989 to 1990. Teganya concealed that he had been a member of the MRND and the Interahamwe.

The last lie, which was charged in Counts 3 and 4, was in response to a question that asked whether he or his family had ever persecuted others because of their race, religion, nationality, membership in a particular social group or belief in a particular political opinion. He responded "No." This was a lie in light of all his acts against Tutsis during the genocide, including the murders and rapes described above.

### 3. Lies During the Immigration Custody/Bail Hearing

After submitting the I-589 form, an immigration hearing was held on September 16, 2014, to determine whether to keep Teganya in immigration custody while his asylum application was pending or whether to instead let him free on bail. Teganya testified under oath during that hearing and lied repeatedly about material matters. Three of those lies were charged in Count 5: Teganya's denial of having belonged to the MRND, his denial of ever having seen anybody being turned over to be slaughtered at the hospital in Rwanda at which he had worked, and his denial of having seen any atrocities occur in the hospital during the genocide. Other lies that Teganya made during the hearing were not charged, such as his claims that he was unaware there was a genocide occurring at the hospital until after it had occurred and that he saw no atrocities occur because they mostly happened at night.

These were all lies in light of what happened at the hospital, how pervasive and open it was, and Teganya's own genocidal actions at the hospital. They were also lies because they contradicted statements he had made during his refugee proceedings in Canada. Specifically, Teganya admitted in Canada that he was aware during the genocide that Tutsis were being

massacred on the hospital grounds and in the vicinity of the hospital, and that Hutu soldiers were sowing terror within the hospital.

As a result of all these lies, the immigration court allowed Teganya to go free on bail of only $12,000. That decision was later overturned on appeal and remanded to the immigration court to reconsider the bail in light of the allegations of Teganya's role in the genocide.

### E. Obstruction of Justice at Trial

In addition to the lies to immigration authorities, Teganya obstructed justice before this Court in at least two ways.

First, Teganya took the witness stand and falsely reasserted the lies charged in the indictment, falsely denied being aware of the genocide while it happened, falsely denied having seen evidence of the genocide while it happened, falsely denied having belonged to the MRND, falsely denied having killed or participating in the killing of seven Tutsis, falsely denied helping other soldiers to rape women and girls, falsely denied raping anybody himself, falsely claimed that he had tried to protect two Tutsi friends from Hutus himself, and falsely claimed that he had done all this because his life would be at stake if he were returned to Rwanda.

Second, Teganya offered at least one witness, Aimable Rwabakumba, who falsely denied Teganya's participation in the genocide and attempted to give Teganya an alibi during that period.

The government offers no opinion on whether Teganya also obstructed justice by offering the testimony of multiple witnesses who told conflicting details about significant details: many testified about taking meals with him regularly at the university cafeteria, whereas many others testified that after the first year Teganya took most meals at his off-campus house or apartment; similarly, some testified that during the genocide hospital hours ended by 2 p.m., whereas others testified that it was 6 p.m.

The government is not asserting that Teganya obstructed justice by offering the testimony of various witnesses whose passports contained false places of birth or whose immigration or visa documents contained statements that contradicted their testimony at trial. At this point, the government lacks proof that Teganya knew about these falsehoods beforehand.

## II.     SENTENCING GUIDELINE CALCULATIONS

### A.     18 U.S.C. § 1546(a) - Immigration Fraud – Counts 1 and 3

Counts 1 and 3 are governed by United States Sentencing Guidelines ("USSG") § 2L2.2 (Fraudulently Acquiring Documents Relating to Naturalization, Citizenship, or Legal Resident Status for Own Use, Etc.). The base offense level is 8. USSG § 2L2.2(a). Teganya qualifies for all three upward adjustments in § 2L2.2(b)(4): (b)(4)(A) (offense committed to conceal the defendant's membership in a military or paramilitary organization involved in a serious human rights offense during the defendant's membership), (b)(4)(B)(i) (offense committed to conceal incitement to genocide), and (b)(4)(B)(ii) (offense committed to conceal the defendant's participation in a serious human rights offense). Since only the greatest applies, under (b)(4)(B)(ii), the offense level increases by 10 levels to 18, and since the resulting offense level is less than 25, the offense level increases automatically to 25. USSG § 2L2.2(b)(4)(A),(B).

Because Teganya willfully obstructed and attempted to obstruct the administration of justice during his trial, the offense level increases by 2 to 27. USSG § 3C1.1. Teganya qualifies for this adjustment because he perjured himself and suborned the perjury of Aimable Rwabakumba. This is exactly the conduct to which this adjustment applies. *See* USSG § 3C1.1 n.4(B) (listing perjury and suborning perjury as covered obstructive conduct). Granted, the guideline cautions that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1

n.2. Here, however, there was no confusion, mistake, or misremembering. There was only Teganya's attempt to perpetuate the story he had concocted back in 2014, when he submitted his false asylum application, and even earlier in Canada, when he submitted his refugee application.

Nor was this merely a quibble about how to interpret the evidence, as Teganya suggested during the presentence investigation. He is correct that "[i]t is, of course, improper to impose such an enhancement [for obstruction of justice] mechanically, merely because an evidentiary conflict exists or because the jury rejects the defendant's explanation of the facts and finds him guilty." *United States v. Gobbi,* 471 F.3d 302, 314 (1st Cir. 2006). But here, just as in *Gobbi,* the defendant's "wholesale denial of any involvement in [the crimes alleged] constituted a web of lies," and thus the defendant committed prototypical perjury and the obstruction of justice enhancement applies. *Id.* To be sure, "in order to apply an obstruction of justice enhancement for perjury, the sentencing judge has to make findings that encompass all the elements of perjury — falsity, materiality, and willfulness," *United States v. Nagell,* 911 F.3d 23, 30 (1st Cir. 2018) (citation and internal quotation marks omitted). But Teganya's trial testimony was false, material, and willful for all the same reasons that his lies during immigration proceedings were false, material, and willful. He obstructed justice and deserves the upward adjustment.

### B.  18 U.S.C. § 1621(2) – Perjury – Counts 2 and 4

Counts 2 and 4 are governed by USSG § 2J1.3. The base offense level is 14. USSG § 2J1.3(a). Because the perjury resulted in substantial interference with the administration of justice, the offense level increases by 3 to 17. USSG § 2J1.3(b)(2). With a 2-level upward adjustment for obstruction of justice under USSG § 3C1.1, the offense level is 19.

### C.  18 U.S.C. § 1621(1) – Perjury – Count 5

Count 5 is governed by USSG § 2J1.3. The base offense level is 14. USSG § 2J1.3(a). The perjury resulted in substantial interference with the administration of justice, and thus the

offense level increases by 3 to 17.  USSG § 2J1.3(b)(2).  With a 2-level upward adjustment for obstruction of justice under USSG § 3C1.1, the offense level is 19.

### D.     Grouping Analysis

Counts 1 and 2 pertain to the same lie on the same form, and thus are closely related and take the highest applicable offense level, which is 27.  Counts 3 and 4 similarly pertain to the same lie on the same form — albeit a different lie than charged in Counts 1 and 2 — and thus they take the highest applicable offense level, which is 27.  Counts 1 through 4 can also be treated as closely related because although they deal with different lies, all those lies were on the same immigration form.  Consequently, Counts 1 through 4 group together as one unit, with offense level 27.

Count 5 concerns a separate set of lies told on a separate occasion and for a different purpose: to obtain release from ICE custody and a low bail.  Consequently, Count 5 does not group with Counts 1 through 4.  Its offense level is 19.  This group counts as one-half unit, because its offense level is 8 levels less serious than the Counts 1 through 4 group.  USSG § 3D1.4(b).

Per the table in USSG § 3D1.4, 1½ units merit a 1-level increase to the group with the highest offense level.  Consequently, the total offense level is 28.

### E.     Upward Departure Under USSG § 4A1.3 (Inadequacy of Criminal History Category)

Because Defendant Teganya has no criminal history in the United States beyond his recent conviction, his Criminal History Category is I.  Yet that history does not reflect the significant criminal conduct that he committed during the genocide, for which the jury necessarily found him guilty, or the post-genocide crimes that the government proved and Teganya admitted to on the witness stand.  That conduct consists of Teganya's participation in at least seven murders and five rapes in Rwanda during the genocide; use of a false passport to travel from India to Canada; lies to Canada during his refugee proceedings; hiding from justice in Canada for two years to avoid

complying with Canada's lawful order of removal; flight from Canada to the United States ; and illegal entry from Canada into the United States without inspection.

Defendant Teganya's Criminal History Category I therefore *substantially* underrepresents the seriousness of his criminal history and his likelihood of committing future crimes.

The remedy is an upward departure. "Ordinarily, if the sentencing court determines that the criminal history category is not appropriate, it may depart upward and use the 'criminal history category applicable to defendants whose criminal history or likelihood to recidivate most resembles the defendant's.' U.S.S.G. § 4A1.3(a)(4)(A). Thus, under the guidelines, where the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct, the normal course is to proceed horizontally across the sentencing table through successively higher CHCs until it reaches an appropriate, or reflective, sentencing range." *United States v. Marsh,* 486 F. Supp. 2d 150, 157 (D. Mass. 2007) (Saylor, D.J.) (internal quotation marks and citation omitted), *aff'd,* 561 F.3d 81 (1st Cir. 2009).

The Court should tailor the upward departure to truly reflect the amount of the defendant's past criminal conduct and the likelihood that he will commit future crimes. The Court should depart upward to "the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." USSG § 4A1.3(a)(4)(A). The Court may base the upward departure on "[p]rior similar adult criminal conduct not resulting in a criminal conviction." USSG § 4A1.3(a)(2)(E). The Court may also base the upward departure on decades-old conduct, such as Teganya's participation in the genocide. For example, in 2012 the First Circuit upheld an upward departure based on a prior conviction dating back to 1988: "Although the age of the three prior convictions resulted in zero criminal history points under the default Sentencing Guidelines formula, district courts have discretion to

depart upward if reliable information shows that a criminal history level substantially underrepresents the seriousness of a defendant's criminal history or the likelihood that he would commit other crimes in the future." *United States v. Lozada-Aponte,* 689 F.3d 791, 792 (1st Cir. 2012) (upholding upward departure based on conviction from the 1988 and other criminal conduct indicating "that his 1988 conviction for a serious and violent crime should be viewed not as a thing of the past but as indicative of a penchant for dangerous criminality not typically associated with a Category I criminal history"). In fact, at least two other courts have given similar upward departures in Criminal History Category to defendants convicted of immigration fraud related to genocide. *See United States v. Ngombwa,* 893 F.3d 546, 556 (8th Cir. 2018); Transcript of Sentencing Hearing, *United States v. Boskic,* No. CR-04-10298-DPW at 37:20-38:4, 51:22-52:4 (D. Mass. Nov. 20, 2006), *aff'd on other grounds,* 545 F.3d 69 (1st Cir. 2008).

Defendant Teganya's long criminal history — which spans decades and includes multiple murders and rapes, using a false passport, immigration fraud in Canada, flight from justice, and illegally entering the United States — deserves the highest criminal history category VI. With offense level 28, the guideline sentencing range is 140-175 months.

Contrary to the defendant's assertion, this upward departure would not impermissibly double-count Teganya's crimes during the genocide and the upward adjustment in § 2L2.2(b)(4)(B)(ii) for an offense committed to conceal the defendant's participation in a serious human rights offense. To begin with, the upward adjustment in § 2L2.2(b)(4)(B)(ii) applies to an offense committed to conceal the defendant's participation in *a* serious human rights offense, whereas Teganya committed *multiple* human rights offenses. *See infra.* Second, to the extent there is double counting, the First Circuit has rejected double-counting as a sentencing defense unless the Sentencing Commission has forbidden it expressly, and here the Sentencing

Commission has not. *See United States v. Chiaradio,* 684 F.3d 265, 282–83 (1st Cir. 2012) ("We have said before, and today reaffirm, that double counting in the sentencing context is a phenomenon that is less sinister than the name implies. The Sentencing Commission has shown itself fully capable of expressly forbidding double counting under the guidelines when appropriate. We regard it as settled that when neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, courts should be reluctant to read in a prohibition where there is none.") (citations, internal quotation marks, and alterations omitted). Third, the upward adjustment in § 2L2.2(b)(4)(B)(ii) covers only Teganya's genocide crimes, and not his post-genocide crimes of getting to Canada on a false passport, lying to Canada, hiding from Canada, leaving Canada, and entering the United States.

Accordingly, the upward departure to CHC VI is proper.

## III. THE COURT SHOULD IMPOSE AN UPWARD DEPARTURE UNDER USSG § 5K2.0 AND/OR VARY UPWARD TO 20 YEARS IN PRISON

Despite the government's guidelines calculation that Teganya deserves a sentence of 140-175 months (total offense level 28, CHC VI), the Court should vary or depart upward to sentence Teganya to the statutory maximum on each count, for a combined 20 years in prison.

Our immigration system acts most nobly when it offers a home in the United States to one who fears persecution in his own country. Offering asylum to one persecuted abroad is not only an act of mercy to the needy. Offering asylum to the persecuted affirms our own commitment to the civil liberties and ideals we enshrine and guarantee in our Constitution and our law. Denying asylum to the persecutors themselves does the same: it affirms our commitment to our civil liberties and ideals, and declares to the persecutors that the United States will not be their safe haven, that they must face justice for what they have done.

When an applicant applies for asylum for which he does not qualify because he faces no credible fear of persecution from abroad, he acts not only unlawfully, but also cynically. When an applicant applies for asylum for which he does not qualify because he himself was a persecutor, he acts not only unlawfully, not only cynically, but with perversion. He perverts the whole asylum process by undermining our civil liberties and ideals, by seeking to turn the United States into a safe haven for persecutors, and, tragically, by throwing suspicion on all asylum-seekers and their intentions and their candor. This last — sowing suspicion of legitimate asylum-seekers — is not a throwaway consideration. As the Court heard during trial, the asylum adjudication process relies in large part on the candor of applicants. Lies like Teganya's poison the system for all.

## A.    Lies About Genocide and Human Rights Deserve the Maximum Punishment

Lies like Teganya's about human rights violations and genocide are the most serious lies that the immigration system faces. When Congress set statutory maximum penalties for the crimes of which Teganya was convicted, 18 U.S.C. §§ 1545(a) (ten years), 1621(1) (five years), and 1621(2) (five years), it contemplated that some crimes would be so serious to be sentenced maximally. Lies about genocide and human rights violations deserve the maximum punishment. *See* Court's Sentencing Memo., *Jabbateh,* 16-CR-00088-PD at 31 (imposing maximum sentence on army general guilty of many human rights violations in Liberia, noting "other courts have imposed upward departures up to the statutory maximum in factually analogous cases where foreign war criminals sought deliberately to evade the persecutor bar" and citing cases); *Munyenyezi,* 781 F.3d at 544 (affirming statutory maximum sentence for person who had manned a roadblock in Butare, Rwanda "not as punishment for genocidal conduct but because her lies were the most serious infractions of section 1425 that one can describe") (internal quotation marks omitted); *United States v. Worku,* 800 F.3d 1195, 1207-08 (10th Cir. 2015) (affirming statutory maximum sentence for former Ethiopian prison camp supervisor who tortured inmates, noting

sentencing court's rationale that "Congress has provided maximum sentences for the most egregious violations of these statutes. If this case is not egregious, I cannot imagine what case would be."), *cert. den.,*136 S. Ct. 1207 (2016); Sentencing Tr., *United States v. Jordan,* No. 9:10-CR-80069-WJZ at 12:12-18 (S.D. Fla. Sept. 16, 2010) ("Additionally, by providing a 10-year statutory maximum for a violation of 18 USC [sic], section 1425, Congress anticipated that there would be violations of the statute so serious that a sentence of 10 years['] imprisonment would be appropriate. The Court is unaware of any more serious basis for immigration fraud than an individual's concealment of his prior participation in the mass murder of innocent civilians."), *aff'd,* 432 Fed. App'x 950, 952 (11th Cir. 2011) (per curiam); *see also United States v. Sosa,* 608 Fed. App'x 464 (9th Cir. 2015) (affirming maximum statutory sentence of defendant who lied about past membership in Guatemalan army and participation in massacre that killed approximately 160 civilians), *cert. den.,* 136 S. Ct. 371 (2015). As all of these cases vividly demonstrate, concealing one's role in human rights violations is the most serious form of immigration fraud, and deserves the maximum punishment allowed under the law.

Consequently, this Court should sentence Teganya to the ten-year maximum on Counts 1 and 3, and to the five-year maximum on Counts 2, 4, and 5. The United States is not, however, asking the Court to run all these sentences consecutively, as explained below.

### B. The Sentencing Guidelines Are Inadequate and Do Not Account for All Circumstances of this Offense

An upward departure or variance is necessary because the generic genocide adjustment in USSG § 2L2.2(b)(4)(B) does not account adequately for Teganya's specific genocidal crimes. The adjustment applies "[i]f the defendant committed any part of the instant offense to conceal the defendant's participation in (i) the offense of incitement to genocide . . . or (ii) any other serious human rights offense." USSG § 2L2.2(b)(4)(B). If so, it raises the offense level to a minimum of

25. *Id.* To be sure, that enhancement does apply to Teganya. But it does not adequately account for the nature or number of his genocidal acts, or his role as a leader and medical student.

First, courts have departed upward on the ground that § 2L2.2(b)(4)(B)'s catch-all genocide adjustment does not adequately punish serious human rights violations that were depraved. *See Munyenyezi,* 781 F.3d at 544 (affirming district court's conclusion that even if § 2L2.2 applied despite *ex post facto* considerations, the guideline did not offer guidance on a departure, because "regardless of her criminal history category, the facts that made her immigration/naturalization statements lies — *i.e.,* the facts that showed her to be a génocidaire — are so disturbing that she deserved the maximum sentence permitted by statute") (internal quotation marks omitted); *Worku,* 800 F.3d at 1208 (affirming district court's conclusion that even if § 2L2.2(b)(4) had applied despite *ex post facto* considerations, the district court did not abuse its discretion in concluding that "the guideline range was too low because of (1) the horrific nature of Mr. Worku's violations of human rights in Ethiopia and (2) his lying about his identity to avoid punishment in Ethiopia"). As this Court heard during trial, Teganya's conduct was depraved. He led soldiers and Interahamwe to vulnerable Tutsis to be taken away and killed. He participated in at least seven murders. One victim was a pharmacist who was helping people, two were patients at the hospital, and four stayed in the same dorm room as him. He raped at least two Tutsis himself, including one who was pregnant. This was depraved, especially for a medical student who purportedly wanted to help people.

Second, § 2L2.2's genocide adjustment does not adequately punish one who commits *multiple* serious human rights violations. The adjustment applies to a defendant who committed his offense to conceal his participation in inciting genocide or "any other serious rights offense." § 2L2.2(b)(4)(B). As the court held in *Jabbateh,* "[t]he 2012 amendment applies where a

defendant conceals his participation in even one serious human rights offense. Unfortunately, Defendant concealed his involvement in countless human rights offenses." Court's Sentencing Memo., *Jabbateh,* 16-CR-00088-PD at 24 (citation and emphasis omitted). Although Jabbateh committed and commanded more violations than did Teganya, the same reasoning applies: Teganya committed and commanded more serious human rights violations than the guideline contemplated.

Third, the guideline does not take into account whether the defendant participated in genocide as a leader or in a position of trust. Like the defendants in *Munyenyezi* and *Jabbateh*, Teganya was a leader during the genocide: he was an Interahamwe student leader, and Tutsis called the soldiers and Interahamwe at the hospital "Teganya's army." Moreover, as a medical student, Teganya abused the position of trust the university placed in him by turning the hospital, supposedly a place of refuge, into a nightmare for the Tutsis who chose to hide there.

For all these reasons, an upward departure or variance is necessary because the generic genocide adjustment in USSG § 2L2.2(b)(4)(B) does not account adequately for Teganya's specific crimes. A departure is warranted under § 5K2.0(a)(2)(B), on the ground that this is "the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determine the appropriate sentence." A departure is also warranted under § 5K2.0(a)(3), on the ground that this is "an exceptional case, even though the circumstance that forms the basis for the departure is taken in determining the guideline range," because "such circumstance is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that offense." A variance is warranted to the extent that the guideline simply does not take concealment of genocide seriously enough and for the sentencing factors in 18 U.S.C. § 3553(a), which are discussed below.

Regardless of whether the Court imposes the statutory maximum as an upward departure or a variance, the United States asks the Court to announce that it would impose the same sentence either way, in order to make the record clear in case of appeal.

**C.     18 U.S.C. § 3553(a)**

Imposing the statutory maximum on each count and a 20-year sentence overall is justified by the sentencing factors in 18 U.S.C. § 3553(a).

### *1.      Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment - § 3553(a)(2)(A)*

Because lying about participating in genocide is one of the most serious lies that one can tell during immigration proceedings, the courts have held that doing so deserves the maximum punishment in order to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, consistent with 18 U.S.C. § 3553(a)(2)(A).  *See Munyenyezi,* 781 F3d at 544-45 (noting need to promote respect for the law and provide a just punishment); Sentencing Tr., *Jordan,* No. 9:10-CR-80069-WJZ at 13:12-14, *aff'd,* 432 Fed. App'x at 952.

### *2.      Deter Other Persecutors from Seeking Asylum – § 3553(a)(2)(B)*

If Teganya were not punished severely for lying about genocide in his asylum proceedings, then the United States risks becoming a safe haven for human rights violators to try their luck through fraud and deceit.  Multiple courts have warned against this danger.  *See Munyenyezi,* 781 F3d at 545 (affirming sentencing judge's conclusion that "[w]e cannot abide this country being a haven for génocidaires" and that "[c]itizenship applicants must know . . . that if they lie about taking part in genocide, the punishment for that fraud will not be lenient") (internal quotation marks omitted); *Worku*, 800 F.3d at 1207 (affirming district court's conclusions that "[t]he crime was serious because it corrupted the established processes of immigration and limited the prospects of truly deserving immigrants" and that therefore "[d]eterrence was necessary for the United States

to avoid becoming a haven for fugitives from justice in their own countries") (internal quotation marks and citation to record omitted); Sentencing Tr., *Jordan,* No. 9:10-CR-80069-WJZ at 13:16-18) ("Those involved in egregious human rights violations abroad must be meaningfully deterred in their attempts to fraudulently obtain United States citizenship."); Court's Sentencing Memo., *Jabbateh,* 16-CR-00088-PD at 30 ("Moreover, just as imposing a greater sentence will likely deter other war criminals from lying to United States immigration officials, imposing a fifteen-to-twenty-one month sentence here would certainly have the opposite effect: encouraging other persecutors to seek dishonest admission to the country.") (citing *Munyenyezi*).

The danger would be even higher here: serious human rights violators would be encouraged not only to seek safe haven, but also, if caught, to take the stand and lie to the jury.

### 3.  *Avoid Unwarranted Sentencing Disparities – § 3553(a)(6)*

The Court should also impose the statutory maximum on each count in order to avoid unwarranted sentencing disparities with other, similarly-situated defendants who lied during immigration proceedings about their participation in genocide or other serious human rights violations.  The courts that have upheld and imposed the statutory maximum include *Munyenyezi,* 781 F.3d at 542-45 (woman who manned a roadblock in Butare during the genocide and ordered Tutsis killed); *Sosa,* 608 Fed. App'x at 468 (member of Guatemalan army who participated in massacre that killed about 160 civilians); *Worku,* 800 F.3d at 1207-08 (supervisor at Ethiopian prison camp who tortured inmates); *Jordan,* 432 Fed. App'x 950 (11th Cir. 2011) (per curiam), *aff'g, Jordan,* No. 9:10-CR-80069-WJZ (S.D. Fla. Sept. 16, 2010) (defendant who lied about participating in mass murder of civilians, including personally killing a baby by throwing it into a dry well); and *Jabbateh,* 16-CR-00088-PD (E.D. Penn. May 21, 2018) (general in a militia who committed and commanded multiple atrocities in Liberia).  The statutory maximum has even been imposed on one defendant who was not charged for lying about his participation in the Rwandan

genocide but rather about his relation to a former Rwandan politician; in fact, evidence about his participation in the genocide was introduced only at sentencing. *Ngombwa,* 893 F.3d at 551. Consistent with these cases from around the country, this Court should sentence Teganya to the statutory maximum on each count. To do otherwise would be an unwarranted sentencing disparity.

The United States is not, however, asking that Defendant Teganya be sentenced to the maximum sentence that could be ordered here, that is, 35 years if all counts were imposed consecutively. A 35-year sentence would be out of line in comparison to the sentences imposed on similarly-situated defendants. The longest sentence for lying about serious human rights violations in immigration proceedings of which the United States is aware is the 30-year sentence imposed on Mohammed Jabbateh, who personally committed and personally commanded an army to commit many more acts of genocide than Teganya committed, including many that were much more depraved, such as cannibalism. Teganya's conduct is arguably more comparable to Worku, who received 22 years and who concealed his identity and lied about having been a supervisor at an Ethiopian prison camp who tortured inmates. Teganya is in one sense more culpable than Ngombwa, who received 15 years, because although Ngombwa "personally killed numerous Tutsis, transported and directed the Interahamwe to kill Tutsis, looted Tutsi property and led brutal attacks on groups of Tutsis seeking refuge in locations such as the local church, a priests' compound, the Kanzenze commune office and Kayumba hill," *United States v. Ngombwa,* 2017 WL 508208 at *8 (N.D. Iowa Feb. 7, 2017), Ngombwa was *not* charged with lying about his participation in genocide but rather with lying about who he was related to; evidence about his participation in the genocide was heard at sentencing, not trial. *Ngombwa,* 893 F.3d at 551. Teganya is also more culpable than Ngombwa because Teganya obstructed justice at trial and also because as a medical student, Teganya had a higher obligation to uphold human rights.

**CONCLUSION**

For all these reasons, Defendant Teganya deserves to be sentenced to the maximum penalty on each count and to serve in prison for an aggregate sentence of twenty years.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY
District of Massachusetts

By:    */s/ Scott L. Garland*
Scott L. Garland
George P. Varghese
Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that these documents are being filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Scott L. Garland*
Scott L. Garland
Assistant United States Attorney

Date: June 27, 2019