# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 16-88** |
| | : | |
| **MOHAMMED JABBATEH** | : | |

---

**Diamond, J.**                                                    **May 21, 2018**

## MEMORANDUM

Defendant Mohammed Jabbateh stands convicted of fraud in immigration documents and perjury.  (Verdict Sheet, Doc. No. 104); 18 U.S.C. §§ 1546(a), 1621(l).  When seeking United States permanent residency, Jabbateh falsely denied committing atrocities during the Liberian Civil War, instead fraudulently describing himself as an innocent refugee fleeing persecution.  Although Defendant's advisory Guidelines range was fifteen to twenty-one months' imprisonment, because Defendant violated our immigration laws in the most pernicious manner, I granted the Government's Motion to impose the statutory maximum term of thirty years' imprisonment.

I stated at sentencing that I would issue this opinion to set out more fully the basis of my decision.  (Tr. Sent. 7:4–7, Doc. No. 139); see also U.S.S.G. § 5K2.0(e).

## PROCEDURAL HISTORY

This matter was reassigned to me on September 20, 2017.  (Doc. No. 68.)  After conducting a two-day evidentiary hearing, I granted in part Defendant's Motion to Exclude, thus barring unreliable pre-trial and trial identifications of Defendant by three Government witnesses.  (Doc. Nos. 62, 83.)  Trial began on October 2, 2017, and concluded on October 18, 2017, when the jury found Defendant guilty of all four charges.  (Doc. Nos. 86, 88, 91, 92, 94, 95, 96, 101, 102, 103, 104.)

In its Presentence Investigation Report, Probation calculated that Defendant had a criminal history category of I and an offense level of fourteen, resulting in an advisory Guidelines range of fifteen to twenty-one months' imprisonment.  (Revised PSR ¶ 93.)  Relying on trial evidence that Defendant committed atrocities during the Civil War, Probation recommended an upward departure of seventeen offense levels and a sentence of ten years' imprisonment.  (Id. at ¶ 108); see also U.S.S.G. § 5K2.0.

I provided the Parties with Probation's sentencing recommendation and, on January 24, 2018, asked them to brief whether any upward departure or variance was warranted.  (Doc. No. 114.)  Defendant urged a Guidelines sentence, arguing that the sentencing court could not make factual findings based on trial evidence.  (See Def.'s Sent. Mem. 9–10, Doc. No. 116.)  The Government argued that both an upward departure and variance were warranted, and asked me to impose the thirty-year statutory maximum sentence.  (Gov't's Sent. Mem. 9–10, Doc. No. 117.)

On February 6, 2018, I ordered the Parties to brief:  (1) whether I could at sentencing make factual findings based on trial testimony and impose a sentence based on those findings; and (2) other grounds that might warrant an upward departure or variance.  (Doc. No. 121.)  In response, Defendant again argued against any upward departure or variance.  (Def.'s Resp. Ct. Orders 16, Doc. No. 127.)  Significantly, however, Defendant now conceded that the law allowed me at sentencing to make factual findings based on the trial testimony.  (Id.)  The Government again sought an upward departure on several grounds or, in the alternative, an upward variance to thirty years' imprisonment.  (Gov't's Am. Mot. Upward Depart. and/or Variance & Am. Sent. Mem. 12, Doc. No. 128 ("The government seeks an upward departure to the statutory maximum of each count of conviction."); id. at 21 ("The government therefore seeks an upward variance to four consecutive statutory maximum sentences.")); see also 18

U.S.C. § 3553; U.S.S.G. §§ 4A1.3, 5K2.0.

During Defendant's April 19, 2018 sentencing hearing, I granted the Government's Motion in part and departed upwardly twenty-six levels. (Doc. No. 130.) I thus determined that Defendant's criminal history category was I, his offense level was forty, and his adjusted Guidelines range was 292 to 365 months' imprisonment (reduced to the statutory maximum of 360 months). I sentenced Defendant to 120 months' imprisonment on each of Counts One and Two (fraud in immigration documents) and sixty months' imprisonment on each of Counts Three and Four (perjury), all to run consecutively: a combined term of 360 months' imprisonment, in addition to three years of supervised release and a $400 special assessment. See 18 U.S.C. §§ 1546, 1621. In the alternative, I granted the Government's request for an upward variance and imposed the same 360-month sentence.

## **EVIDENTIARY CONSIDERATIONS**

In recommending an upward departure, Probation relied on evidence that during the Liberian Civil War, Defendant was the rebel commander named "General Jungle Jabbah," who either himself committed or ordered the commission of countless crimes. (Revised PSR ¶¶ 7–36.) The Government also based its request for any upward departure or variance on that evidence. (Gov't's Am. Mot. Upward Depart. and/or Variance & Am. Sent. Mem. 3–9, Doc. No. 128.) Although Defendant conceded that I may consider the trial evidence in finding facts at sentencing, he nonetheless argued that the Government had failed to prove at trial that he is Jungle Jabbah. (Def.'s Resp. Ct. Orders 3, Doc. No. 127.)

Defendant's concession notwithstanding, because of the issue's significance, I will first discuss why a sentencing court may permissibly make factual findings based on trial evidence. I will then set out the facts the Government proved at trial by an evidentiary preponderance.

3

### I.      Fact Finding at Sentencing

"[T]he scope of what a trial court may consider in determining a[n appropriate] criminal sentence is breathtakingly broad."  United States v. Simmonds, 235 F.3d 826, 837 (3d Cir. 2000) (second alteration original); accord 18 U.S.C. § 3661.  The Sixth Amendment thus permits a court to base the sentence it imposes on factual findings that, in turn, are based on trial evidence, provided the court does not thus increase the minimum or maximum statutory penalty.  Alleyne v. United States, 570 U.S. 99, 116 (2013); United States v. Grier, 475 F.3d 556, 567–68 (3d Cir. 2007).  Any sentence imposed must be based on relevant, accurate, and reliable information. United States v. Nappi, 243 F.3d 758, 763 (3d Cir. 2001); United States v. Forsyth, No. 06-429, 2008 WL 2229268, at *1 (W.D. Pa. May 27, 2008); United States v. Green, 516 F. App'x 113, 134 (3d Cir. 2013).  Finally, the defendant must be "made aware of the evidence to be considered and potentially used against him at sentencing" and "provided an opportunity to comment on its accuracy."  Nappi, 243 F.3d at 763 (citing Fed. R. Crim. P. 32); accord United States v. Hart, 273 F.3d 363, 379–80 (3d Cir. 2001).

Once again, Defendant has conceded that at sentencing, I may make factual findings based on evidence from prior proceedings, including Defendant's trial.  (Def.'s Resp. Ct. Orders 8, Doc. No. 127); accord United States v. Pellerito, 918 F.2d 999, 1002 (1st Cir. 1990); United States v. Ngombwa, No. 14-123, 2017 WL 508208, at *3 (N.D. Iowa Feb. 7, 2017); see also United States v. Curran, 527 F. App'x 198, 201–02 (3d Cir. 2013); United States v. Dair, 174 F. App'x 68, 70 (3d Cir. 2006); United States v. Merlino, 349 F.3d 144, 160 (3d Cir. 2003); Hart, 273 F.3d at 379–380; United States v. Reynoso, 254 F.3d 467, 474 (3d Cir. 2001).

Defendant's convictions—two counts of perjury and two counts of fraud in immigration documents—carried a combined maximum penalty of thirty years' imprisonment and no

4

minimum statutory penalty, irrespective of the facts found at sentencing.  See 18 U.S.C. § 1546 (ten year maximum penalty for each count); id. at § 1621 (five year maximum penalty for each count).  I could thus permissibly make findings by an evidentiary preponderance, provided those findings did not require me to impose a minimum term of imprisonment or allow me to impose a prison sentence longer than thirty years.  See United States v. O'Brian, 560 U.S. 218, 224 (2010); see also United States v. Merlino, 349 F.3d 144, 159 (3d Cir. 2003).

## II.     The Trial Evidence

The Government called, *inter alia*, numerous Liberian victims who testified in grim detail of the brutality they had witnessed and suffered at Defendant's hands or on his orders.  In addition, the Government presented the testimony of Liberian and American officials and agents, as well as supporting photographs and documents.  Defendant presented only character evidence.

The Government introduced two color photographs of Defendant taken in Western Liberia during the Civil War.  (Gov't Exs. A4 (as redacted), A5.)  Defendant conceded that the photographs depicted him.  (Compare Gov't Ex. A4 (as redacted), and Gov't Ex. A5, with Gov't Ex. F9.)  In one photo, Defendant was armed and surrounded by a large group of armed men and boys.  (Gov't Ex. A5.)  All were attired in military fatigues.  In the second photo, Defendant—who was again armed—stood with two other men.  (Gov't Ex. A4 (as redacted).)  All were in military fatigues.  I observed each victim identify Defendant as General Jungle Jabbah from those photographs.  Three witnesses also identified Defendant in the courtroom.  All the eyewitnesses were closely cross-examined about whether it was Defendant who directed and participated in atrocities during the Liberian Civil War.  Finally, my February 6, 2018 Order gave Defendant ample notice that the trial evidence "was before the sentencing court for the issue of" whether I should impose specific upward departures or a variance.  Curran, 527 F.

App'x at 202; (see also Order ¶ 1, Doc. No. 121; Doc. Nos. 118–25.)

**FINDINGS OF FACT**

It is difficult to convey the force of the prosecution's trial evidence. The Government called seventeen Liberian eyewitnesses, most of whom had little or no formal education and lived in crushing poverty. (See e.g., Tr. Jury Trial Day 1 at 147:7–12, Doc. No. 118; Tr. Crim. Jury Trial at 92:17–93:3, Doc. No. 122.) The demeanor and bearing of the witnesses—some outraged; some tormented; some terrified; some still in mourning—underscored the almost inconceivable horrors and indignities they had endured. In presenting those eyewitnesses, photographs, documents, and related testimony, the Government certainly proved the following facts by an evidentiary preponderance.

## I.    The Liberian Civil War

Beginning in late 1989, the conflict often involved combatants of different tribes, ethnicities, and religions. The Armed Forces of Liberia (AFL) were led by President Samuel K. Doe of the Krahn ethnic group. (Tr. Jury Trial Day 1 at 69:5–10, 70:13–18, Doc. No. 118.) Charles Taylor led the National Patriotic Front of Liberia (NPFL). (Id. at 67:11–24.) Prince Johnson led the Independent National Patriotic Front of Liberia (INPFL). (Id. at 72:6–73:14.)

Between 1990 and 1991, ethnic Mandingos and former-AFL ethnic Krahns formed a fifth faction to oppose the NPFL: the United Liberation Movement of Liberia for Democracy (ULIMO). (Id. at 75:20–23, 76:3–78:5.) In 1994, ULIMO itself split on ethnic lines into two rival factions: ULIMO-K, led by General Alhaji Kromah of the Mandingo tribe, and ULIMO-J, led by Roosevelt Johnson of the Krahn tribe. (E.g., id. at 107:9–108:6; Tr. Jury Trial Day 2 at 67:4–23, Doc. No. 119; Tr. Jury Trial Day 3 vol. II at 92:16–93:18, Doc. No. 140.)

## II.     General Jungle Jabbah

Witnesses from across Liberia identified Defendant as Jungle Jabbah, the Mandingo commander of ULIMO's (and later ULIMO-K's) Zebra Battalion and a member of Alhaji Kromah's Cabinet.  (See, e.g., Tr. Jury Trial Day 1 at 83:1–87:24, Doc. No. 118; Tr. Jury Trial Day 3 vol. II at 68:18–20, Doc. No. 140.)  Fourteen trial witnesses identified Defendant in the large group photograph I have described:  a photograph of ULIMO troops taken by Liberian journalist James Fasuekoi during the Civil War.  (Tr. Jury Trial Day 1 at 90:23–24, Doc. No. 118; Tr. Jury Trial Day 2 at 12:8–13:3, 49:2–12, 105:18–106:1, Doc. No. 119; Tr. Jury Trial Day 3 vol. II at 94:23–95:4, Doc. No. 140; Tr. Crim. Jury Trial 52:17–53:7, 89:25–90:8, 112:20–113:14, Doc. No. 122; Tr. Crim. Jury Trial 21:23–22:6, 95:11–96:2, 104:2–13, Doc. No. 123; Tr. Crim. Jury Trial 6:14–7:1, 26:11–21, 46:13–24, Doc. No. 124; see also Gov't Exs. A4 (as redacted), A5; Tr. Jury Trial Day 1 at 88:1–19, Doc. No. 118.)  In addition, Kufumba Konneh, Martha Togba, and Mr. Fasuekoi himself identified Defendant in the courtroom as Jungle Jabbah.  (Tr. Jury Trial Day 1 at 113:3–114:1, Doc. No. 118; Tr. Jury Trial Day 2 at 106:2–9, Doc. No. 119; Tr. Jury Trial Day 3 vol. II at 67:11–18, Doc. No. 140.)

As I found in ruling on Defendant's Motion to Exclude, although it had been over twenty years since the witnesses had seen Jungle Jabbah commit his crimes, their identifications were reliable.  (Order 20–21, Doc. No. 109.)  Mr. Fasuekoi, for instance, first saw Jungle Jabbah after the Civil War when he fortuitously encountered Defendant in 2011 at the Philadelphia shipping business Defendant owned.  (Tr. Jury Trial Day 1 at 111:15–113:2, Doc. No. 118.)  Significantly, most of the other eyewitnesses saw Jungle Jabbah repeatedly and at near distances for extended periods.  I credited those identifications of Defendant.

The Government thus presented exhaustive evidence that from 1992 to 1995, Defendant

and his troops sought to subjugate Western Liberia, committing acts of violence (murder, rape, starvation, beatings, torture, ritual cannibalism) and human enslavement on a massive scale.  I credited the Government's evidence respecting Defendant's wrongful acts, including those acts Defendant himself took, those acts taken at his command, and those acts that he necessarily foresaw.  Cf. United States v. Laboy, 351 F.3d 578, 582–83 (1st Cir. 2003).

## III.   Defendant's Wartime Atrocities

The trial evidence showed that Defendant and his ULIMO soldiers were based in the Liberian counties of Bomi, Lofa, Gbarpolu, and Grand Cape Mount, where they victimized war prisoners and civilians, most of whom were fleeing from Civil War violence.  (See generally Gov't Ex. A-3.)

### A.  Bomi and Tubmanburg

In August 1992, ULIMO drove the NPFL from the area north of the Kpo River Bridge. (Tr. Jury Trial Day 1 at 76:6–77:22, Doc. No. 118; Tr. Jury Trial Day 3 vol. II at 66:5–16, Doc. No. 140.)  Defendant and a subordinate ULIMO commander named "Pepper and Salt"—the brother of Government witness Kafumba Konneh—controlled "Zero Guard Post," an execution site on the Kpo River south of Tubmanburg.  (Tr. Jury Trial Day 3 vol. II at 71:12–21, Doc. No. 140.)  There, Defendant tortured prisoners in a closed steel box and ordered his soldiers to "arrest people, take them to the waterside . . . shoot them . . . [and] throw the bod[ies] into the river." (Id. at 74:4–9, 76:16–22.)  Mr. Konneh saw Defendant put two NPFL soldiers in "*tabay*"—an excruciatingly painful position by which each victim's elbows were tied together behind his back to suppress breathing.  (Id. at 84:17–85:14.)  At Defendant's order, a child soldier put a tire around each prisoner's neck, poured gasoline into the tires, and lit them on fire.  (Id. at 86:8– 90:2.)  The prisoners screamed in agony, and eventually were shot.  (Id. at 89:11–19.)

8

Shortly after the 1994 ULIMO split, ULIMO-K troops attacked a village near Tubmanburg, where Martha Togba and her sister Tina—the girlfriend of ULIMO-J commander T-Khalla—resided and ran a bar. (Tr. Jury Trial Day 2 at 65:7–69:15, 81:22–83:9, Doc. No. 119.) During the attack, Defendant assaulted the sister, who was four months pregnant, shirtless, and bleeding from a gunshot wound. Defendant dragged the sister by the hair from a school, and questioned her about T-Khalla's whereabouts. (Id. at 83:23–85:10.) Defendant then stabbed her, beat her, shoved a gun into her vagina, and shot her. (Id. at 85:17–86:19.) He ordered a child soldier to guard the sister's corpse and ensure that no one moved it until it rotted. (Id. at 86:8–87:10.)

When Defendant and his soldiers caught Martha Togba fleeing to Monrovia, they imprisoned and gang-raped her, and then made her watch as they ritualistically ate a human heart. (Id. at 90:7–92:17.)

Defendant subsequently met with other ULIMO-K commanders outside Bomi, where their soldiers had captured a group of Krahn prisoners, including four women. (Tr. Jury Trial Day 3 vol. II at 93:19–25, 95:10–96:25, Doc. No. 140.) Defendant bound the prisoners in the *tabay* position, took them to Lofa Bridge, and, ignoring their cries for mercy, surrendered them to another ULIMO-K commander for execution. (Id. at 97:1–98:9.)

### Northern Grand Cape Mount

In the early 1990's, Nathaniel Demen mined gold at Lofa Bridge and Bomi Hills, when Defendant and his troops invaded the area, confiscated the mines and forced Mr. Demen and others to dig for gold and diamonds as slave laborers. (Tr. Crim. Jury Trial 101:9–103:1, 103:7–105:23, 109:11–12, Doc. No. 123.)

Mr. Demen escaped and fled north to the Weajue gold mines in Grand Cape Mount,

9

where he lived in a hut with his friends Songoli, Freeman, and Freeman's wife, Dede.  (Id. at 105:24–106:20, 111:1–17.)  Defendant and his troops subsequently invaded Grand Cape Mount and confiscated the Weajue mine, once again forcing the miners to work as slave laborers.  (Id. at 106:21–108:25, 112:8–14.)  While Defendant and his child soldiers oversaw the mining activities in Weajue, Defendant noticed Dede bringing food to Freeman.  (Id. at 109:13–110:25, 112:17–113:2.)  Defendant abducted and raped her.  (Id. at 113:4–15.)

After fleeing from the INPFL and the NPFL, Alice Gaye and her aunt settled at Camp Israel in Grand Cape Mount.  (Tr. Jury Trial Day 1 at 147:25–150:16, Doc. No. 118.)  In 1994, Defendant and his troops invaded Camp Israel.  Assembling the townspeople, Defendant told Ms. Gaye that she "belonged" to him.  (Id. at 150:21–151:15, 152:5–153:1.)  Defendant forced Gaye (then twenty-two years old) to travel with him repeatedly between Camp Israel and Timor village.  (Id. at 153:5–154:23.)  Ms. Gaye saw Defendant rob the villagers of their food and valuables, put them in the *tabay* position, and use them as slave laborers.  (Id. at 155:14; Tr. Jury Trial Day 2 at 7:4–10:14, Doc. No. 119.)

For two weeks, Defendant repeatedly raped Ms. Gaye until she escaped when Defendant and his soldiers were distracted as they beat another woman.  (Tr. Jury Trial Day 2 at 5:3–6:13, 9:23–10:11, 10:15–12:3, Doc. No. 119.)

As a child, Abraham Togba worked on a rice farm in Grand Cape Mount.  (Tr. Crim. Jury Trial 64:19–65:2, 79:21–80:3, Doc. No. 122.)   After ULIMO invaded, at Defendant's order, his soldiers stripped the farm women down to their underwear.  (Id. at 65:3–67:4.)  When Mr. Togba's father objected, a soldier began beating him, and Defendant ordered him to be whipped and flogged.  (Id. at 67:6–68:3.)

Ordering Mr. Togba and others tied in the *tabay* position, Defendant forced them to

10

march for hours in the heat without water.  (Id. at 69:5–14, 70:12–71:1.)  At Defendant's order, all the male prisoners were crowded into a hut on a ULIMO base.  (Id. at 71:1–21.)  The female prisoners were told that they now "belonged" to ULIMO and that their children would serve as ULIMO soldiers.  (Id. at 74:7–13.)

*Gbarpolu*

Thomas Moikee worked in the Kongbor diamond mines when they were taken over by Defendant's Zebra Battalion.  (Tr. Crim. Jury Trial 15:2–21:23, Doc. No. 124.)  With Defendant's troops overseeing them, Mr. Moikee and the other miners became slave laborers. (Id.)  Mr. Moikee's fiancé was two months pregnant when, at Defendant's order, two of Defendant's child soldiers took her to the house where Defendant then resided.  (Id. at 23:14– 21.)  Defendant said that he wanted to have sex with the fiancé.  (Id. at 23:22–24:4.)  When Mr. Moikee took her hand and pleaded, Defendant struck Moikee in the head with a gun, and Defendant's child soldiers began to kick him.  (Id. at 24:4–12.)  Mr. Moikee's protests notwithstanding, Defendant raped the woman, who perished weeks later when she had a miscarriage.  (Id. at 24:13–25:4.)

In 1993, after fleeing through Margibi, Montserrado, and Nimba Counties to escape the NPFL, Amos Johnson and his family fled to Weasua.  (Tr. Crim. Jury Trial 83:25–88:17, Doc. No. 122; see generally Gov't Ex. A-3.)  By then, however, Defendant and his troops had taken over the mining town, compelling its residents to perform slave labor.  (Tr. Crim. Jury Trial 90:11–91:12, 91:19–92:16, Doc. No. 122.)  Mr. Johnson and his family again fled to the bush near the mines, but were unable to escape ULIMO's depravities.  (Id. at 90:17–91:12.)

For instance, ULIMO soldiers confiscated rice that Mr. Johnson tried to bring to his parents.  (Id. at 92:17–93:12.)  When Mr. Johnson resisted, the soldiers beat and bayonetted him.

11

(Id. at 93:13–94:1.)  After Mr. Johnson's father asked Defendant for permission to seek medical treatment for his son, Defendant ordered his soldiers to strip the father naked, put him in the *tabay* position, and leave him in the street to die overnight.  (Id. at 95:2–96:20.)  By morning, Mr. Johnson's father had died of internal bleeding.  (Id.)

Mamy Johnson (Amos Johnson's sister) testified that when she saw her father's body, she began sobbing uncontrollably.  (Id. at 106:5–107:12; see also id. at 97:12–21.)  Defendant ordered his troops to take her away; four soldiers then raped and stabbed her.  (Id. at 107:12–108:14; see also 97:22–98:18.)

Jesses Browne testified that while in Gbarpolu County, Defendant's soldiers arrested him and others, forcing them to march in the *tabay* position from Johnstown to Fodays Town.  (Id. at 53:10–13, 54:2–55:17.)  When Mr. Browne complained about the pain, Defendant ordered his soldiers to bring Mr. Browne closer.  (Id. at 55:18–56:2.)  After Browne begged Defendant to spare his life, Defendant cut off Mr. Browne's left ear.  (Id. at 56:3–24.)  When Browne removed the pullover cap that he wore during his trial testimony, the jury saw the remains of his ear.  (Id. at 56:25–57:6.)

*Bopolu*

Early in the Civil War, Carter Gbassay lived in Gbarquoi Town, when the NPFL invaded and tortured the Madingo residents.  (Id. at 15:10–17:12.)  ULIMO subsequently drove the NPFL from town, telling its residents that they were "free."  (Id. at 17:12–18:12.)  After ULIMO split, however, Defendant's ULIMO-K troops forced those same residents to perform slave labor.  (Id. at 21:18–24:9.)  On one occasion, a car crashed on a bridge four hours from Bopolu, leaving weapons, an industrial saw, and a dead body stuck in the river below.  (Id. at 28:4–6, 29:11–13.)  Defendant and his commanders ordered the townspeople to form two lines, one of healthy men,

and one of the sick and elderly.  (Id. at 28:10–20, 29:14–17.)  The soldiers whipped the healthy men (including Mr. Gbassay) and scarred their arms with knives.  (Id. at 29:19–30:5.)  The soldiers then ordered the townspeople to repair the bridge and remove the weapons and corpse from the river.  (Id. at 30:20–34:13.)

Defendant's subordinate commanders "Bad Blood Dejango" and "Tutu Boy" sought to drive Krahn residents from Gbarquoi Town.  (Id. at 18:22–20:4.)  When two Krahns refused to leave the village, Dejango ordered his troops to put them in a well, cover them with bamboo and gasoline, and set them alight.  (Id. at 20:16–21:11.)

In 1992, Edward Barclay and others fled from Bong Mines and Haindi when the NFPL invaded.  (Tr. Crim. Jury Trial 122:17–124:9, Doc. No. 123.)  Defendant's soldiers captured the fleeing civilians, accused them of being ULIMO-J spies, and took them to Bopolu.  (Id. at 126:3–127:4, 127:7–128:10.)  There, Defendant ordered his soldiers to separate the men from the women, beat the men, and imprisoned them without food.  (Id. at 128:21–130:25.)  After three days, Defendant ordered one of his subordinates to take the men to Henry's Town, where Defendant and his child soldiers forced them to perform slave labor in the diamond mines.  (Id. at 131:1–11; Tr. Crim. Jury Trial 7:2–8:10, 8:23–9:19, Doc. No. 124.)

Janghai Barclay (Edward Barclay's sister) also testified that Defendant compelled her to perform slave labor.  (Tr. Crim. Jury Trial 35:9–36:17, Doc. No. 124.)  When she and her brother tried to flee after ULIMO split, they were captured by Defendant's men, who took them and others to Waybama (between Haindi and Bopolu), imprisoned them, and made them perform slave labor.  (Id. at 37:18–40:8.)  When Defendant's troops accused one prisoner of being a ULIMO-J spy, Defendant ordered the soldiers to tie the man to a tree and decapitate him, ignoring his cries for mercy.  (Id. at 40:11–41:18.)  Defendant then told two of his soldiers that

Ms. Barclay (who was eight months pregnant) and another woman were their "wives."  (Id. at 41:23–25.)   One soldier raped Ms. Barclay repeatedly for three days, despite her having a miscarriage on the second day.  (Id. at 41:25–42:13.)

Hawa Gonoie and her family also fled from the fighting in Dobli Town (near Haindi) in 1992 and again in 1994.  (Tr. Jury Trial Day 2 at 30:9–32:25, Doc. No. 119.)  In 1994, Defendant captured her and the other villagers, forced them to run at gunpoint for some five hours from Waybama to Bopolu, and then imprisoned them.  (Id. at 32:20–33:18.)  The next day, Defendant ordered the women ritualistically to shave the men's heads with glass shards, and then conscripted the men into ULIMO-K.  (Id. at 34:17–35:8.)  Defendant accused one prisoner (possibly the same man described by Janghai Barclay) of being a spy, executed him, and ordered the ULIMO-K soldiers to eat his heart.  (Id. at 38:10–22.)

After conscripting the male prisoners, Defendant ordered that his ULIMO-K soldiers could "have" the women.  (Id. at 35:9–23.)  Defendant "assigned" Ms. Gonoie (then thirteen years old) to an adult soldier named "Cobra Red," who raped her in a house occupied by other sex slaves.  (Id. at 38:23–40:14.)  Although Cobra Red injured Ms. Gonoie the first time he raped her, he continued raping her for the next month and a half.  (Id. at 40:23–41:14.)  During that time, she was also forced to pick lice from Defendant's hair for hours at a time.  (Id. at 41:25–42:19.)

### Dassamalu

Jusu Sambola was living in the town of Dassalamu, when ULIMO drove the NPFL from southern Grand Cape Mount.  (Tr. Crim. Jury Trial 116:22–118:3, Doc. No. 122.)  After ULIMO split, ULIMO-K and the Economic Community of West Africa (ECOMOG)—a peacekeeping force created by several west African governments—called a meeting at ECOMOG's

14

headquarters in Sinje (east of Dassalamu) with civilian representatives from the surrounding towns. (Id. at 124:11–22, 125:24–126:2.) Town Chief Jayah Kromah represented Dassalamu. (Id. at 125:3–14.) Defendant announced to the representatives that ULIMO-K and ECOMOG controlled southern Grand Cape Mount County, and that if any ULIMO-K soldiers harmed any of the townspeople, they should report it to ECOMOG in Sinje. (Id. at 126:3–12.)

Defendant's announcement notwithstanding, in the ensuing months Defendant's soldiers continued to rape and enslave civilians throughout southern Grand Cape Mount. (Id. at 127:2–128:5, 130:1–131:9; Tr. Crim. Jury Trial 38:18–39:9, 40:14–42:12, 84:7–85:21, Doc. No. 123.) Mr. Sambola and others reported these crimes to Sinje's Town Chief and Commissioner, who reported the crimes to ECOMOG. (Tr. Crim. Jury Trial 131:21–134:3, Doc. No. 122; Tr. Crim. Jury Trial 44:9–47:12, Doc. No. 123.)

Several months later, Defendant ordered one of his subordinates to establish a ULIMO-K base in Dassalamu. (Tr. Crim. Jury Trial 50:12–52:5, Doc. No. 123.) Defendant then travelled to the base, where he punished the villagers for complaining to ECOMOG. (Tr. Crim. Jury Trial 135:25–136:10, 139:4–11, Doc. No. 122; Tr. Crim. Jury Trial 52:12–15, 53:19–54:17, Doc. No. 123.) Defendant's troops forced the assembled townspeople to perform slave labor. (Tr. Crim. Jury Trial 54:18–21, 55:14–56:2, 57:10–20, Doc. No. 123; Tr. Crim. Jury Trial 137:8–138:15, Doc. No. 122.) That night, Defendant's troops took two of the townspeople to the rear of the house where Defendant was seated on the front porch, executed them, and cut out their hearts. (Tr. Crim. Jury Trial 56:17–57:7, Doc. No. 123; Tr. Crim. Jury Trial 138:16–139:3, 140:15–19, Doc. No. 122.) At 4:00 a.m., when the soldiers brought Jayah Kromah to Defendant, Mr. Kromah screamed for his family to escape. (Tr. Crim. Jury Trial 140:20–141:3, Doc. No. 122.) Defendant took Mr. Kromah behind the building, executed him, and cut out his heart. (Tr. Crim.

15

Jury Trial 57:22–58:21, 60:2–3, 65:5–10, Doc. No. 123.)

Dudu Kromah (Jayah Kromah's wife) testified that after the soldiers killed Mr. Kromah, Defendant forced her to cook her husband's heart.  (Id. at 90:2–8, 91:4–92:5.)  The soldiers told her that if she did not do so, Defendant would have her executed as well.  (Id. at 91:17–18.)

## IV.    Defendant's Asylum and Permanent Residency Applications

The Government proved that Defendant told material falsehoods to the United States Immigration and Naturalization Service when he sought asylum, and to the United States Citizenship and Immigration Service when he sought permanent residency.

On August 16, 1998, Defendant left Liberia and, on October 30, 1998, applied for asylum in the United States, filing a Form I-589 with the United States Immigration and Naturalization Service.  (Form I-589, Gov't Ex. F1.)  In the "personal statement" that was part of his application, Defendant repeatedly lied, describing himself as an innocent victim of ethnic persecution.  (See Form I-589, Personal Statement of Mohamed A. Jabateh 1, Gov't Ex. F1.)

Defendant wrote, *inter alia*, that when the Civil War broke out in 1990, he fled from the NPFL to Sierra Leonne, where the Liberian United Defense Force (later ULIMO) conscripted him to be an intelligence officer.  (Id. at 2.)  Defendant stated that ULIMO sought only to bring democracy to Liberia and end the war.  (Id. at 3.)

Defendant also wrote that when ULIMO entered the BOMI hills in 1992, he left for Monrovia and was recruited by the Special Security Service of the interim government.  (Id.)  In 1995, he was purportedly reassigned to Alhaji Kromah's security detail.  (Id.)  It was at this point, Defendant stated, that he was promoted to serve as ULIMO's Lieutenant General and assigned to work on "issues related to disarmament."  (Id.)

According to Defendant, when Charles Taylor won the 1997 election, all Mandingos

16

were dismissed from the SSS.  (Id. at 4.)  Because Defendant purportedly feared persecution, he came to the United States.  (Id. at 5.)  Although Defendant mentioned during his asylum interview that some in Liberia referred to him as "Jungle Jabbah," he concealed his criminal conduct.  (Tr. Jury Trial Day 3 at 76:23–77:8, 77:22–80:7, Doc. No. 120.)

Nancy Vanlue, Defendant's 1998 asylum interviewer, testified that if Defendant had informed the INS of his actual conduct during the Liberian Civil War, such a material disclosure would have resulted in Defendant being deemed a persecutor:  an automatic bar to asylum.  (See id. at 70:19–71:3, 77:9–17); see also 8 U.S.C. § 1231(b)(3)(B)(i) (asylum must be denied to applicants who "ordered, incited, assisted, or otherwise participated in . . . persecution . . . because of . . . race, religion . . . membership in a particular social group, or political opinion"); Balachova v. Mukasey, 547 F.3d 374, 386–87 (2d Cir. 2008) ("We have no doubt that rape is sufficiently serious to constitute persecution.").

On April 12, 2001, Defendant applied for permanent residency status, filing a Form I-485 with the INS.  (Form I-485, Gov't Ex. E1.)  Defendant answered "No" to Part Three, Question Eight (known as the "persecutor bar"):  whether Defendant had "ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion."  (Id.)  He also answered "No" to Part Three, Question Ten:  whether Defendant had "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S. or any immigration benefit."  (Id.)

On March 11, 2011, USCIS adjustment officer Norman De Moose interviewed Defendant to determine his eligibility for permanent residency.  (Tr. Jury Trial Day 3 vol. II at 14:4–6, Doc. No. 140.)  Defendant again omitted from both his Form I-485 and his interview any

information about his role as a military commander and the atrocities he committed in Liberia—omissions Mr. De Moose also confirmed were material.  (Id. at 22:25–23:14, 33:21–34:15.)

## V.   Verdict

Defendant was convicted of:  (1) two counts of fraud in immigration documents when he knowingly and willfully provided false answers to Questions Eight and Ten of Form I-485; and (2) two counts of perjury when he reaffirmed those false written answers during his 2011 permanent-residency interview.  (Verdict Sheet, Doc. No. 104.)

The jury thus necessarily found that Defendant lied at least five times during the asylum and permanent residency application processes:  (1) when he falsely denied in his asylum application that he had ever harmed anyone or when he falsely denied his involvement in persecution; (2) when he falsely answered "No" to Part Three, Question Eight of his permanent residency application:  whether he had "ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion;" (3) when he falsely answered "No" to Part Three, Question Ten of his permanent residency application:  whether he had "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S. or any immigration benefit;" (4) when he falsely affirmed under oath his answer to Part Three, Question Eight during his permanent residency interview; (5) and when he falsely affirmed under oath his answer to Part Three, Question Ten during his permanent residency interview.  (See id.)

## CONCLUSIONS OF LAW

I based Defendant's sentence on two alternative grounds:  (1) an upward departure because of the seriousness of Defendant's immigration offenses, pursuant to Guidelines § 5K2.0;

and (2) an upward variance from the Guidelines, pursuant to 18 U.S.C. § 3553.

I.      **Guidelines Departure**

   A.  **Standards**

An upward departure is permissible if the court finds "that there exists an aggravating or mitigating [feature] of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."  18 U.S.C. § 3553(b)(1); U.S.S.G. § 5K2.0.  "In determining whether a [feature] was adequately taken into consideration," the court may "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."  18 U.S.C. § 3553(b)(1).

> In formulating the Guidelines, the Sentencing Commission
>
> intend[ed] the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Part A, cmt. 4(b).  Accordingly, "[b]efore a departure is permitted, certain [features] of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. 81, 98 (1996).

After determining that particular features of the case take it outside the Guidelines' heartland, the court must then determine whether:  (1) the Commission has precluded departures based on these features; (2) the Commission has encouraged departures based on these features; and (3) the Commission has discouraged departures based on these features.  Id.  Where a feature "is discouraged, or encouraged but already taken into account by the applicable guideline," the court may "depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present."  United States v.

Iannone, 184 F.3d 214, 226 (3d Cir. 1999).  Where a feature "is unmentioned," the court must determine whether a departure based on this factor is appropriate "after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole."   Id. (quotation mark omitted).

Defendant violated §§ 1546(a) and 1621(l) in an exceptionally pernicious manner when he lied to immigration authorities about the fact and extent of his criminal acts.  I thus imposed an upward departure because of the seriousness of Defendant's lies, separate and apart from the horror of the crimes themselves.

### B.  Heartland Analyses

#### *United States Asylum Policies*

An understanding of immigration offense Guidelines must turn in part on the asylum policies that well preceded the Guidelines themselves.

Modern asylum policies began as part of an international effort to assist millions of World War II refugees.  See generally Chief Judge Michael J. Creppy, Nazi War Criminals in Immigration Law, 12 Geo. Immigr. L. J. 443 (1998).  Congress created the "persecutor bar" to prevent war criminals from entering this country pretending to be displaced refugees.  Id. at 445; see also The Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009.  Congress then expanded that bar to conform to various international agreements intended to:  (1) exclude asylum applicants whose "acts are so grave that they render [them] undeserving of international protection as refugees;" and (2) "ensure that such persons do not abuse the institution of asylum in order to avoid being held legally accountable for their acts."   UNHCR, Guidelines on International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention    Relating    to    the    Status    of    Refugees    ¶    2    (Sept.    4,    2003),

20

http://www.unhcr.org/cgibin/texis/vtx/search?page=search&docid=3f7d48514&query=exclusion %20clause; accord H.R. Conf. Rep. No. 96-781, at *19–20 (1980) ("The Senate bill incorporated the internationally-accepted definition of refugee contained in the U.N. Convention and Protocol Relating to the Status of Refugees.").

Those who commit acts of genocide and then lie about their crimes to obtain asylum in the United States as displaced persons thus defeat this most fundamental purpose of our refugee laws.  Yet, that is what Defendant did here:  his concealment and lies undermined the United States' asylum and immigration regime.  Because Defendant's falsehoods thus fall well outside the usual parameters of immigration fraud and perjury, this case falls well outside the Guidelines' heartland for those crimes.  See U.S.S.G. §§ 2L2.1(a), 2J1.3(a), 3D1 (2010); cf. U.S.S.G. § 2L2.2(b)(4) (2012); id. at § 2L2.2 ed.'s notes ("The new enhancement reflects the impact that such immigration fraud offenses can have on the ability of immigration and naturalization authorities to make fully informed decisions regarding the defendant's immigration petition, application or other request and is intended to ensure that the United States is not a safe haven for those who have committed serious human rights offenses.").

*Immigration Fraud Heartland Analysis—2010 Guidelines*

The 2010 edition of Guidelines § 2L2.2 provides similar offense levels for many immigration offenses, including all violations of § 1546 involving fraud in immigration documents acquired for a defendant's own use.  Compare U.S.S.G. § 2L2.2 (2010), with id. at § 2L2.1.  See generally 18 U.S.C. § 1546.  The statute itself also penalizes a wide range of conduct.  See 18 U.S.C. § 1546 (forgery of immigration documents, possession of blank permits, impersonation of another or use of a fictitious name in immigration application, false swearing in immigration application). The subparagraph of § 1546 with which Defendant was charged

applies to every case where a defendant

> knowingly makes under oath, or . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

Id. at § 1546(a).

Guidelines § 2L2.2 and § 1546 thus contemplate offenses that are vastly less serious than lying to avoid the persecutor bar.  To the contrary, almost all the reported cases arising under § 2L2.2 have nothing to do with concealment of persecution.  See, e.g., United States v. Samuels, 874 F.3d 1032, 1034–35 (8th Cir. 2017) (defendant stated material falsehood on visa application for fourth husband by not disclosing prior visa application for second husband); United States v. Munoz-Valencia, 59 F. App'x 483, 484 (3d Cir. 2003) (illegal re-entry using false resident identification card); United States v. Miller, No. 15-580, 2017 WL 2819782, at *2 (E.D.N.Y. June 28, 2017) ("Defendant had falsely denied any prior arrests and falsely denied being known by any other names or aliases."); see also U.S.S.G. Ch. 1, Part A, cmt. 4(b).

Moreover, although the 2010 edition of § 2L2.2 provides several offense-level enhancements, there is no enhancement for lying to avoid the persecutor bar.  See U.S.S.G. § 2L2.2(b)–(c) (2010) (offense level enhancements where the defendant:  (1) is an unlawful alien who has been previously deported; (2) has been convicted previously of felony immigration and naturalization offenses; (3) fraudulently obtained a United States or foreign passport; or (4) used a passport or visa in the commission or attempted commission of a felony other than an immigration offense).

Finally, as I discuss in greater detail below, the 2012 Guidelines § 2L2.2, increased the

22

offense level for lying to avoid the persecutor bar.  See id. at § 2L2.2(b)(4) (2012).  Although *ex post facto* considerations preclude me from applying that amendment in sentencing Defendant, there is "no better evidence of the inadequacy of a sentencing guideline than a subsequent amendment to that guideline to include and qualify previously unmentioned components of the convicted offense."  United States v. Larkin, 629 F.3d 177, 194 (3d Cir. 2010).

In sum, it is evident that Defendant's violation of § 1546 by lying to avoid the persecutor bar takes a case well outside the 2010 Guidelines § 2L2.2's heartland because it "seriously undermines the integrity of this country's immigration standards in the most offensive way imaginable."  United States v. Munyenyezi, 781 F.3d 532, 544 (1st Cir. 2015) (quotation mark omitted); see also United States v. Worku, 800 F.3d 1195, 1207 (10th Cir. 2015) ("[T]he very integrity of the United States [was] challenged and its claim to decency in the world community [was] besmirched." (second and third alterations original)); cf. U.S.S.G. § 5K2.7 (disruption of governmental function).

### *Immigration Fraud Heartland Analysis—2012 Amendment*

Once again, in 2012, the Sentencing Commission amended Guidelines § 2L2.2, increasing the offense level where

> the defendant committed any part of the [immigration fraud] to conceal the defendant's membership in, or authority over, a military, paramilitary, or police organization that was involved in a serious human rights offense during the period in which the defendant was a member or had such authority . . . [or] to conceal the defendant's participation in (i) the offense of incitement to genocide . . . or (ii) any other serious human rights offense . . . .

U.S.S.G. § 2L2.2(b)(4).  A serious human rights offense includes "genocide, torture, war crimes, and the use or recruitment of child soldiers."  Id. at § 2L2.2 n.4; see also 18 U.S.C. §§ 1091, 2340, 2441, 2442.

Because Defendant committed his immigration fraud and perjury offenses in 2011, I may not apply the 2012 amendment in sentencing him. See U.S. Const. art. I, § 10, cl. 1; U.S.S.G. § 1B1.11. I may nonetheless consider "subsequent amendments . . . as tools in making a well-reasoned, individualized determination of whether to impose an upward departure in a particular case or to determine the degree of departure that is warranted." United States v. Larkin, 629 F.3d 177, 194 (3d Cir. 2010).

If applied here, the 2012 amendment to § 2L2.2 would increase the advisory range to fifty-seven to seventy-one months' imprisonment. See U.S.S.G. § 5A. Defendant's offenses are so serious, however, that they fall far outside the heartland of the 2012 amendment as well.

The 2012 amendment applies where a defendant conceals his participation in even one "serious human rights *offense*." Id. at § 2L2.2(b)(4)(B) (emphasis supplied). Unfortunately, Defendant concealed his involvement in countless human rights offenses. See, e.g., 18 U.S.C. § 1091(a) (genocide); id. at § 2441 (war crimes include torture, cruel or inhumane treatment, murder, mutilation or maiming, intentionally causing serious bodily injury, rape, sexual assault or abuse, and taking hostages). As I have found, to subjugate Western Liberia and eliminate Krahn rivals, Defendant and his Zebra Battalion committed innumerable acts of violence and enslavement. See United States v. Ngombwa, No. 14-123, 2017 WL 508208, at *16 (N.D. Iowa Feb. 7, 2017) ("Credible eyewitnesses state that, during the genocide, Defendant personally killed Tutsis and led the Interahamwe on missions to kill Tutsis."). Indeed, Defendant himself committed and ordered the commission of every conceivable war crime.

Moreover, although the 2012 amendment provides an enhancement for those who conceal their "membership in, or authority over, a military, paramilitary, or police organization that was involved in a serious human rights offense," the degree of Defendant's dominance over

24

ULIMO far exceeds that contemplated by this supervisory enhancement.  Cf. United States v. Brown, 338 F. Supp. 2d 552, 560–61 (M.D. Pa. 2004) (defendant exercised "authority over . . . culpable participants" under § 3B1.1 where, "*[a]lthough not as directly involved as other participants in the fraud-related aspects,* [d]efendant . . . organized and directed the entire effort to obstruct Rite Aid's internal investigation as well as the Government's criminal and civil investigations" (emphasis supplied)); U.S.S.G. § 3B1.1 (sentencing enhancement for organizers, leaders, managers, and supervisors).  Compare Balachova v. Mukasey, 547 F.3d 374, 386–87 (2d Cir. 2008) (extent of Russian soldier's involvement in rape is significant when determining application of persecutor bar), with Negusie v. Holder, 555 U.S. 511, 523 (2009) (asylum statute is ambiguous as to whether persecutor bar applies to applicants who act under duress).

Defendant did not merely "participate in" or have "authority over" an organization that was "involved in" a human rights offense:  for over three years, Defendant treated each county of Western Liberia as his personal fiefdom, and subjected whole populations—comprised largely of refugees fleeing Civil War violence—to almost unimaginable depravities.  In lying to INS about his crimes and seeking sanctuary as a persecuted refugee, Defendant stood the persecutor bar and, indeed, the asylum system itself, on its head.  See UNHCR, supra, at ¶ 2 (asylum policies should exclude asylum applicants whose "acts are so grave that they render [them] undeserving of international protection as refugees" and "ensure that such persons do not abuse the institution of asylum in order to avoid being held legally accountable for their acts"); see also U.S.S.G. § 5K2.0 n. 3(B)(ii) (where § 5K2 takes feature into consideration, "departure is warranted only if the [feature] is present to a degree substantially in excess of that which is ordinarily involved in the offense"); cf. U.S.S.G. § 5K2.7 (disruption of governmental function).

As one who did not follow criminal orders, but gave them in seemingly endless numbers,

Defendant has taken himself well outside the heartland of both the 2012 amendment and its enhancement.  Cf. United States v. Worku, 800 F.3d 1195, 1207–08 (10th Cir. 2015)  ("But whether the variance was 14 levels above the range under the 2012 guidelines or 31 levels above the range under the 2010 guidelines, the district court acted within its discretion.").

*Perjury Heartland Analysis—2010 Guidelines*

The 2010 Guidelines respecting perjury also contemplate many offenses, including violations of other statutes that penalize false swearing:  §§ 201(b)(3) and (4), 1621, 1622, and 1623.   U.S.S.G. § 2J1.3 stat. provisions; see also 18 U.S.C. §§ 201(b)(3)–(4) (bribery of witnesses); 18 U.S.C. § 1622 (subornation of perjury); 18 U.S.C. § 1623 (false declarations before court or grand jury).  Section 1621 itself is violated whenever a defendant,

> having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true.

18 U.S.C. § 1621(1).   As with § 2L2.2 of the 2010 edition of Guidelines, § 2J1.3 thus contemplates offenses that are vastly less serious than lying to avoid the persecutor bar.  See, e.g., United States v. Grant, 850 F.3d 209, 219–20 (5th Cir. 2017) (false statements in bankruptcy petitions); United States v. Scirotto, 499 F. App'x 220, 221 (3d Cir. 2012) (false statements in bankruptcy petition); United States v. Hochstedler, No. 15-7, 2015 WL 9647520, at *1 (N.D. Ind. December 3, 2015) ("[Defendant] committed perjury by stating that B.W. provided the Defendant with Bebida shares as repayment for loans made by the Defendant over the previous five or six years.").  Yet Guidelines § 2J1.3 provides the same offense level for most acts of perjury, regardless of the context, motive, or effect of the falsehood.  See U.S.S.G. §

26

2J1.3(a).

Finally, although § 2J1.3 provides offense-level enhancements in some circumstances—for instance, lying to obstruct a criminal investigation—there is no enhancement for lying to avoid the persecutor bar.  (See Gov't's Am. Mot. for Upward Depart. and/or Var. and Am. Sent. Mem. 9 n.1, Doc. No. 128); U.S.S.G. § 2J1.3 n. Background (Guidelines were structured to treat perjury "similarly to obstruction of justice"); see also United States v. Knight, 700 F.3d 59 (3d Cir. 2012).

Once again, the heartland of Guidelines § 2J1.3 is far removed from the kind of perjury Defendant committed here:  perjury that undermines the foundations of our immigration and asylum system.

It is thus evident that Defendant's criminal actions fall well outside the heartland of all Guidelines provisions related to immigration fraud and perjury.  See U.S.S.G. §§ 2J1.3(a), 2L2.2. As I have discussed, an upward departure is not permissible, however, unless I also determine whether the Sentencing Commission has precluded, encouraged, or discouraged upward departures based on the "features" presented by Defendant's case.

### C.  Unmentioned Factor

The 2010 Guidelines do not prohibit, encourage, or discourage the Court from considering the seriousness of Defendant's lies.  In determining whether I may base an upward departure on this "unmentioned factor," I recognize that such departures must be "highly infrequent."  Koon v. United States, 518 U.S. 81, 95 (1996).

Plainly, "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole" allow consideration of the seriousness of Defendant's falsehoods. United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999).

Guidelines § 1B1.1(c) instructs courts to "consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole," including "the nature and circumstances of the offense" and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct."  U.S.S.G. § 1B1.1(c); 18 U.S.C. § 3553(a).

As I have discussed, immigration fraud and perjury can be committed in many ways. The seriousness of Defendant's falsehoods thus directly relates to the "nature and circumstances" of Defendant's criminal acts.  18 U.S.C. § 3553(a); U.S.S.G. § 1B1.1(c); see also United States v. Sosa, 608 F. App'x 464, 468 (9th Cir. 2015) ("The crimes that Sosa lied about on his naturalization application were exceptionally heinous, making the circumstances of his offense distinct from most § 1015(a) and § 1425(a) prosecutions."); United States v. Jordan, 432 F. App'x 950, 952 (11th Cir. 2011).

Consideration of the seriousness of Defendant's falsehoods is also consistent with the relevant individual Guidelines:  the 2010 edition of Guidelines §§ 2J1.3 and 2L2.2.

Section 2L2.2 provides offense-level enhancements where the circumstances of the immigration offense increase the need for deterrence.  It thus provides a two-point enhancement where the defendant is an illegal alien who had previously been deported.  U.S.S.G. § 2L2.2(b)(1); United States v. Zapata, 702 F. App'x 831, 833 (11th Cir. 2017) ("Defendant received a two-level increase under § 2L2.2(b)(1) because he was an illegal alien who had been previously deported.").  Similarly, that section provides a two-point enhancement where the defendant committed the immigration fraud after sustaining a conviction for a felony immigration and naturalization offense, and a four-point enhancement where the defendant committed the immigration fraud after sustaining two or more convictions for felony

28

immigration and naturalization offenses.  U.S.S.G. § 2L2.2(b)(2).  The need for deterrence is especially great where a high-level war criminal (like Defendant) lies about his crimes to gain admission to the United States and so escape justice in his home country.  See United States v. Worku, 800 F.3d 1195, 1207 (10th Cir. 2015).

Sections 2J1.3 and 2L2.2 also provide enhancements where the circumstances of the offense increase the defendant's degree of culpability.  For instance, where a defendant "use[s] a passport or visa in the commission or attempted commission of a felony offense, other than an [immigration] offense," § 2L2.2(c)(1) instructs the court to "apply [the Guidelines sections for attempt, solicitation, or conspiracy] in respect to that felony offense, if the resulting offense level is greater than that determine [under § 2L2.2]; or if death resulted, the most analogous offense guideline from [the Guidelines section for homicide]."   U.S.S.G. § 2L2.2(c)(1)(A)–(B). Similarly, where the defendant commits "perjury . . . in respect to a criminal offense," § 2J1.3(c) treats the defendant as an accessory after the fact to that offense.  Id. at § 2J1.3(c)(1); see also United States v. Knight, 700 F.3d 59 (3d Cir. 2012).  Although these provisions do not apply to Defendant, they strongly suggest that consideration of the motive and consequences of Defendant's lies is consistent with §§ 2J1.3 and 2L2.2 and the structure and theory of the 2010 Guidelines as a whole.  Cf. United States v. Iannone, 184 F.3d 214, 228 (3d Cir. 1999) ("[W]hile no existing guideline enhancement covers Iannone's conduct, two areas of the Guidelines provide specific bases for upward departures based on conduct similar to his.").  Indeed, by providing greater penalties for those who commit perjury to obstruct the investigation of other crimes, Guidelines § 2J1.3 strongly implies that a greater penalty may also be appropriate where high-ranking war criminals lie to impair INS's vetting of asylum applicants.  Cf. U.S.S.G. § 5K2.7 (court may depart upwardly where a defendant's conduct resulted in a significant

29

disruption of a governmental function, unless "the offense of conviction is an offense such as bribery or obstruction of justice" where "interference with a governmental function is inherent in the offense").

Finally, it is apparent that application of the "unmentioned factor" I consider here will be rare.  Reported case law confirms that although military and political leaders have previously sought to evade the persecutor bar, this has rarely resulted in the imposition of an upward departure based on the kinds of immigration fraud and perjury committed here.  Cf. United States v. Jordan, 432 F. App'x 950, 952 (11th Cir. 2011) ("[C]oncealment of [defendant's] membership in the military and his participation in a massacre to fraudulently obtain United States citizenship . . . [was] virtually unprecedented." (quotation mark omitted)).

In sum, as a permissible-but-unmentioned feature under the 2010 Guidelines, the seriousness of Defendant's lies warrants an upward departure.

### D.  Extent of the Departure

Once again, the egregiousness of Defendant's lies and their effect on our immigration system take this case far outside the heartland of §§ 2L2.1(a) and 2J1.3(a) and the 2012 amendment.  Indeed, those lies allowed Defendant to impugn the integrity of our asylum process for almost twenty years.

Moreover, just as imposing a greater sentence will likely deter other war criminals from lying to United States immigration officials, imposing a fifteen-to-twenty-one month sentence here would certainly have the opposite effect:  encouraging other persecutors to seek dishonest admission to the country.  United States v. Munyenyezi, 781 F.3d 532, 545 (1st Cir. 2015) ("We cannot abide this country being a haven for génocidaires . . . . Citizenship applicants must know . . . that if they 'lie' about taking part in genocide, the punishment for that fraud will not be

lenient." (internal quotation marks omitted)); see also United States v. Worku, 800 F.3d 1195, 1207 (10th Cir. 2015) (defendant "concealed his identity to avoid prosecution for the violation of human rights in Ethiopia"). Although I cannot know whether Liberian authorities would have brought Defendant to justice had he remained there, by gaining fraudulent admission into the United States, Defendant has deprived the people of Liberia of any opportunity to do so.

Once again, other courts have imposed upward departures to the statutory maximum in factually analogous cases where foreign war criminals sought deliberately to evade the persecutor bar. See Munyenyezi, 781 F.3d at 542; United States v. Ngombwa, No. 14-123, 2017 WL 508208, at *21 (N.D. Iowa Feb. 7, 2017); see also United States v. Sosa, 608 F. App'x 464, 468 (9th Cir. 2015) (departure for violation of 18 U.S.C. §§ 1015(a) and 1425); United States v. Jordan, 432 F. App'x 950, 951 (11th Cir. 2011) (departure for violation of 18 U.S.C. § 1425); see also Worku, 800 F.3d at 1201–08 (variance for violation of 18 U.S.C. §§ 1425 and 1546); United States v. Horton, 487 F. App'x 302, 303 (4th Cir. 2012) (departure for violation of 18 U.S.C. § 1542).

In sum, Defendant's lies and their effect on our immigration system warranted a twenty-six level upward departure pursuant to § 5K2.0. See Munyenyezi, 781 F.3d at 544 ("[D]efendant is accountable for lying to obtain refuge and citizenship for which she was not qualified. . . . [I]f [I] were to impose a sentence for her participation in the Rwandan genocide, it would not be a sentence of ten years to be served concurrently on each count[;] it would be a sentence of, at minimum, obviously life in prison." (quotation marks omitted)).

### E.  The Sentence Imposed

A twenty-six level upward departure resulted in an adjusted offense level of forty, a criminal history category of I, and an adjusted Guidelines range of 292 to 360 months'

imprisonment.  U.S.S.G. § 5A.  Having considered the adjusted Guidelines Range and the other § 3553(a) factors (which I discussed at sentencing, discussed above, and discuss again below), I determined that a Guidelines sentence of thirty years is "sufficient, but not greater than necessary, to comply with the purposes of" § 3553(a)(2).  18 U.S.C. § 3553(a); see also, e.g., id. at § 3553(a)(4)(A) (courts shall consider, *inter alia*, "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines").

## II.   Upward Variance

In the alternative, I varied upward from the original Guidelines sentence, concluding that a thirty-year sentence was appropriate and reasonable even in the absence of a departure.  See 18 U.S.C. § 3553.

### A. Standards

In addition to considering the Guidelines, the sentencing court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available . . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); see also United States v. Booker, 543 U.S. 220 (2005).

A Guidelines sentence of fifteen to twenty-one months would be inadequate to serve the

purposes of sentencing.  Rather, as I have discussed, a sentence of thirty years is "sufficient, but not greater than necessary, to comply with the purposes of" § 3553(a)(2).  18 U.S.C. § 3553(a). Although I discussed all the § 3553(a) factors at sentencing, I will discuss here only those factors compelling an upward variance.

### B.  Nature and Circumstances of the Offense

In 2011 alone, Defendant lied four times about his role in the commission of innumerable crimes during the Civil War.  Defendant thus violated §§ 1546 and 1621 in the most outrageous manner.  As the leader and hands-on manager of ULIMO's lawless, genocidal Zebra Battalion, Defendant is the least sympathetic "refugee," and the least deserving of asylum in the United States.  See UNHCR, supra, at ¶ 2 (asylum policies should exclude asylum applicants whose "acts are so grave that they render [them] undeserving of international protection as refugees").

### C.  Defendant's History and Characteristics

As might be expected with an escaped war criminal, Defendant, undoubtedly anxious to avoid Government scrutiny, has no criminal history in this country.  Since obtaining permanent residency in 2011, Defendant has lived lawfully in Philadelphia and Delaware Counties, raised his family, and operated his shipping business.  (Revised PSR ¶¶ 54–60.)  There is considerably more to his "history and characteristics" than this, however.  18 U.S.C. § 3553(a)(1).  Since 1998, Defendant has flouted our asylum policies and defied our immigration laws.  In his asylum application, Defendant depicted himself as an innocent, persecuted refugee, who joined ULIMO to help in its "disarmament" role.  Such astonishing dishonesty and seeming indifference to this nation's laws and policies plainly warrant a lengthy term of imprisonment.

### D.  Section 3553(a)(2) Factors

The Supreme Court has underscored the importance of our immigration regime.  See,

e.g., Arizona v. United States, 567 U.S. 387, 395 (2012) ("Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws.").  A substantial prison sentence is necessary to promote respect for our immigration laws, which Defendant violated so cavalierly and outrageously.  Similarly, this case well demonstrates the need to deter other war criminals from abusing our asylum system and so evade justice in their home nations. "We cannot abide this country being a haven for génocidaires . . . . [Permanent residency] applicants must know . . . that if they 'lie' about taking part in genocide, the punishment for that fraud will not be lenient."  United States v. Munyenyezi, 781 F.3d 532, 545 (1st Cir. 2015) (internal quotation marks omitted).

A thirty-year sentence is thus necessary to reflect the seriousness of Defendant's crimes, promote respect for the law, and deter others from committing similar crimes.

### E.  Kinds of Sentences and Sentencing Disparities

Probation, home detention, and the like would obviously be inappropriate here.  See also United States v. Musgrave, 647 F. App'x 529, 533–34 (6th Cir. 2016) (two-years' home detention appropriate for "the lesser culpable defendant" in bank fraud scheme).  Indeed, anything but a lengthy prison sentence likely would erode respect for the law, especially among the many actual victims of foreign persecution who have sought refuge in the United States.  Cf. Arizona v. United States, 567 U.S. at 395 ("Immigration policy can affect . . . the perceptions and expectations of aliens in this country who seek the full protection of its laws.").

Finally, as I have discussed, in factually analogous cases, courts have repeatedly imposed the statutory maximum penalty.  See United States v. Worku, 800 F.3d 1195, 1201–08 (10th Cir. 2015); United States v. Sosa, 608 F. App'x 464, 468 (9th Cir. 2015); Munyenyezi, 781 F.3d at

542; United States v. Jordan, 432 F. App'x 950, 951 (11th Cir. 2011); United States v. Ngombwa, No. 14-123, 2017 WL 508208, at *21 (N.D. Iowa Feb. 7, 2017).  Significantly, in those cases the defendants were lower-level functionaries, unlike Defendant, who commanded the Zebra Battalion and was a member of Alhaji Kromah's Cabinet.  Compare (Tr. Jury Trial Day 1 at 83:1–87:24, Doc. No. 118), with Sosa, 608 F. App'x at 468 (member of the Guatemalan Army), Jordan, 432 F. App'x at 952 (member of military), United States v. Worku, No. 12-346, 2014 WL 2197537, at *1–3 (D. Colo. May 27, 2014) (defendant controlled one of many prisons under direction of committee of 120 military officers), and Ngombwa, No. 14-123, 2017 WL 508208, at *8 (defendant led a local chapter of a large political party).

### F.  The Variance Imposed

Imposing a sentence of three decades' imprisonment is an extremely serious matter in any circumstance—even more so when the Guidelines as originally calculated provided a maximum sentence of less than two years.  As I have explained, however, in the circumstances presented, the lies Defendant told INS were outrageous, calling for far greater punishment than twenty-one months' imprisonment.

In light of the § 3553(a) factors and the compelling trial evidence, a sentence of thirty years is "sufficient, but not greater than necessary, to comply with the purposes of" § 3553(a)(2). 18 U.S.C. § 3553(a).

### III.    Other Upward Departure Grounds

In light of my decision, I need not address the Government's other requested bases for upward departure.

### CONCLUSION

In providing five and ten year maximum sentences for immigration fraud and perjury,

Congress necessarily contemplated circumstances sufficiently shocking to warrant those punishments.  Surely such circumstances are presented here.  See United States v. Worku, 800 F.3d 1195, 1207–08 (10th Cir. 2015) ("Congress has provided maximum sentences for the most egregious violations of [§§ 1425 and 1546(a)].  If this case is not egregious, I cannot imagine what case would be."); United States v. Horton, 497 F. App'x 302, 305 (4th Cir. 2012). Accordingly, I sentenced Defendant to thirty years' imprisonment on two alternative grounds: (1) an upward departure, pursuant to § 5K2.0, based on the seriousness of Defendant's immigration offenses; and (2) an upward variance from the Guidelines, pursuant to 18 U.S.C. § 3553.

*/s/ Paul S. Diamond*

_____

May 21, 2018                                                      Paul S. Diamond, J.

36