# United States Court of Appeals
## For the First Circuit

No. 19-1689

UNITED STATES OF AMERICA,

Appellee,

v.

JEAN LEONARD TEGANYA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, for
appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom Andrew E. Lelling, United States Attorney, was on brief,
for appellee.

May 17, 2021

**BARRON**, **Circuit Judge**.  Jean Leonard Teganya ("Teganya") appeals his convictions and sentence for three counts of perjury in violation of 18 U.S.C. § 1621 and two counts of fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546(a).  The convictions are based on his alleged failure to disclose his role in the Rwandan genocide to immigration authorities.  We affirm.

**I.**

The following facts are not in dispute.  Teganya was born in Rwanda in 1971 to a Tutsi mother and Hutu father.  Because his father was Hutu, Teganya is considered Hutu as well.

In July 1994, while a third-year medical student, Teganya left his home country during the Rwandan genocide, which targeted the country's Tutsi population, for Congo.  From Congo, Teganya traveled to Kenya and India before obtaining a fake Zimbabwean passport and flying to Canada in 1999.

Once in Canada, Teganya applied for asylum in that country, but Canadian authorities denied his application, first in 2002 and then, after a series of appeals, finally in 2012.  The ground for the denial was that Teganya "would not have survived" in Rwanda in 1994 "if he was not perceived as sharing the common intention to kill Tutsi and moderate Hutu."

On August 3, 2014, Teganya, who had remained in Canada despite having been denied asylum there, crossed the U.S.-Canadian

- 2 -

border in Houlton, Maine.  He was apprehended by a U.S. Border Patrol agent while he was walking down a road within a few miles of the international border.  Teganya told the agent that he had crossed the border illegally and that he was a refugee.  He then applied for asylum in the United States.

To apply for asylum, Teganya was required to complete a Form I-589.  One of the questions on the form asks:

> Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerilla organization, ethnic group, human rights group, or the press or media?

Teganya answered that question "[y]es."  The form then asks for a description of the "level of participation, any leadership or other positions held and the length of time you or your family members were involved in each organization or activity."  In response, Teganya wrote:

> My father was the local President (formerly Kibilira District) of [the Mouvement Républicain National pour la Démocratie et le Développement ("MRND")] from 1991 to 1994.  As a student, I belonged to the Red Cross Youth Section from 1986 to 1991.  I was president of the Red Cross Youth Section from 1989 to 1990.  I will submit a detailed declaration prior to my asylum hearing.

Teganya did not divulge any political connection with the MRND[1] party of his own.

Form I-589 also asks:

> Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

That question is relevant to what is known as "the persecutor bar," which prohibits the grant of asylum to an individual who has engaged in persecution against another on account of a statutorily protected ground.  See 8 U.S.C. § 1158(b)(2)(A)(i) (providing that a noncitizen who has "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" is ineligible to apply for asylum).

Teganya answered the question "[n]o."  He also verbally stated, while under oath in the bond hearing in connection with his asylum application on September 16, 2014, that his father had belonged to the MRND party but that he had not.  He further testified at the proceeding that while he was in Rwanda during the genocide he had not witnessed civilians being turned over to the

---

[1] The MRND party is the Hutu-dominated political party that controlled the Rwandan government when the genocide broke out.

military to be killed and that he had not personally seen any
violence being carried out by government authorities or others at
the National University Hospital, in which he had worked as a
medical student, because the atrocities that were committed there
were carried out at night.

On September 27, 2017, Teganya was charged in a five-
count indictment in the District of Massachusetts for two counts
of fraud and misuse of visas, permits, and other documents in
violation of 18 U.S.C. § 1546(a); two counts of perjury in
violation of 18 U.S.C. § 1621(2); and one count of perjury in
violation of 18 U.S.C. § 1621(1).  The counts under 18 U.S.C.
§ 1546(a) and 18 U.S.C. § 1621(2) alleged that he had failed to
disclose in his asylum application that he was personally a member
of the MRND party and the Interahamwe, a youth militia wing of the
MRND party; and that he had falsely stated in that application
that he had never personally ordered, incited, assisted, or
otherwise participated in causing harm or suffering to another
because of that individual's membership in a particular social
group.  The count under 18 U.S.C. § 1621(1) alleged that he falsely
stated at his immigration proceeding, while under oath, that he
had never belonged to a political party in Rwanda and that he had
not observed atrocities at the National University Hospital while
he was in that country during the genocide.

Teganya pleaded not guilty to each count, and his case proceeded to trial, which lasted eighteen days. He testified in his own defense at the trial, which focused on the extent of his involvement with the genocide in Rwanda. The jury nevertheless convicted Teganya on all five counts on April 5, 2019.

At sentencing, the District Court imposed a prison term of 97 months, which was at the high end of the sentencing range that it had calculated for him under the U.S. Sentencing Guidelines. The District Court based that range in part on a two-level enhancement to his base offense level under the Guidelines that the District Court determined applied for obstruction of justice. See U.S. Sent'g Guidelines Manual § 3C1.1 (U.S. Sent'g Comm'n 2018) (imposing the enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and where the "obstructive conduct" was related to either the "offense of conviction and any relevant conduct" or "a closely related offense"). In explaining why that enhancement applied, the District Court pointed to the discrepancies between Teganya's testimony on his own behalf at trial and "the testimony taken as a whole," which it stated that it "believe[d]" and which included "testimony that [Teganya] participated in multiple

murders and rapes" and committed atrocities against Tutsis, and that Teganya was an MRND member.

The District Court entered judgment on July 2, 2019. Teganya filed a timely notice of appeal on July 8, 2019. <u>See</u> Fed. R. App. P. 4(b)(1)(A)(i). We have jurisdiction over his appeal from his convictions under 28 U.S.C. § 1291 and over his appeal from his sentence under 28 U.S.C. § 3742(a).

**II.**

We begin with the challenges that Teganya brings to his convictions in which he argues that they must be vacated due to certain statements that were made at trial by Dr. Phil Clark ("Clark"), who testified for the government as an expert witness regarding the Rwandan genocide and its aftermath. Teganya does not question Clark's qualifications to testify as an expert on those matters. He instead contends that certain discrete statements that Clark made during his testimony concern matters that are not the proper subject of expert testimony under Federal

Rules of Evidence 702[2] and 704(b),[3] are inadmissible under Rule 403,[4] or both.[5]

Teganya contends first that the District Court erred in permitting Clark at certain points in his testimony at trial to comment on the credibility of Teganya's own testimony, because such commentary was not the proper subject of expert testimony under Rules 702 and 704(b). Teganya points specifically to Clark's testimony that it was "quite a common phenomenon during the genocide that many Hutu perpetrators would also at some stage during the genocide have harbored or protected Tutsi friends, Tutsi neighbors, Tutsi family members"; that "it was a common defense of

---

[2] Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

[3] Federal Rule of Evidence 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

[4] Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[5] Teganya does not distinguish between his arguments under Rule 702 and Rule 704(b) and so we treat them as a single contention that the challenged statements by Clark are not the proper subject of expert testimony.

many accused to say I could not have committed these genocide crimes of which I am accused because I was known to be protecting these Tutsi"; and, in response to the question whether he was "familiar with the theory that individuals could not [have engaged in genocidal acts] if they came from mixed ethnicities," that this "was a very common line of defense for genocide suspects."

Because Teganya objected to these portions of Clark's testimony below, our review of the District Court's decision to admit that testimony is for "a manifest abuse of discretion." See United States v. Gordon, 954 F.3d 315, 327 (1st Cir. 2020) (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994)). We find none.

"An expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible . . . because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." United States v. Gonzalez-Maldonado, 115 F.3d 9, 16 (1st Cir. 1997) (quoting United States v. Shay, 57 F.3d 126, 131 (1st Cir. 1995)). Clark did not purport to be testifying, however, about Teganya specifically in providing any of this testimony, and we conclude that the District Court acted within its discretion in treating the testimony as merely providing context that might prove counter-intuitive to a layperson. See Shay, 57 F.3d at 132 (explaining that the "fundamental question"

- 9 -

that a district court faces in evaluating whether "a proposed
expert's testimony will assist the trier of fact is 'whether the
untrained layman would be qualified to determine intelligently and
to the best degree, the particular issue without enlightenment
from those having a specialized understanding of the subject matter
involved'" (alteration omitted) (quoting <u>Montas</u>, 41 F.3d at 783));
<u>see also</u> <u>United States</u> v. <u>Tetioukhine</u>, 725 F.3d 1, 7 (1st Cir.
2013) ("[T]he relevance of expert testimony regarding cultural
matters is context-dependent and must be assessed on a case-by-
case basis.").

    Moreover, to the extent that there was any risk that
these aspects of Clark's testimony might be understood to have
been addressing Teganya's own testimony, we note that the District
Court specifically instructed the jury that Clark's testimony that
it was a common defense for genocide perpetrators to argue that
they had defended or protected certain Tutsis was "background
information" and did not "say anything about what the defendant
did or did not do."   In addition, when Clark further testified
that it was not uncommon for those who had participated in the
genocide to be of mixed ethnic descent, the District Court
"remind[ed] the jury" that his testimony was being permitted to
provide "context and background" as "a broad-spread set of
generalizations to help you understand things" but that it did not

"answer how a specific person acted or felt or what that person's motives were."

Thus, at least given these admonitions to the jury, we cannot conclude that it was an abuse of discretion for the District Court to admit the statements by Clark described above over Teganya's objections. See United States v. Henry, 848 F.3d 1, 12 (1st Cir. 2017) ("[A]ny danger posed by the [expert] testimony was substantially mitigated by cross-examination and the district court's limiting instruction."). Accordingly, we reject this ground for overturning Teganya's convictions.

Teganya separately argues that the District Court erred in permitting Clark's testimony that, in his research, he did not come across reports of the Rwandan government in the wake of the genocide attempting to coerce witnesses to testify against those suspected of participating in the genocide. Because the government's witnesses testified that they had not been so pressured, Teganya contends, Clark's testimony on that score was not the proper subject of expert testimony under Rules 702 and 704(b) because it improperly bolstered the testimony of witnesses for the government at trial who stated that they had not themselves been so coerced.

Relatedly, Teganya also challenges as improper bolstering under Rules 702 and 704(b) the District Court's admission of Clark's testimony that, when he interviewed genocide

victims in Rwanda (none of whom was a witness in this trial), many had "fuzzy recollections of the past" or "reasons to not necessarily tell the truth." Teganya points out that at trial he had sought to impeach testimony from two witnesses who stated that Teganya had raped them during the genocide by establishing that they had not mentioned him in earlier testimony they had given in distinct proceedings about the genocide.

Because Teganya failed to object to these aspects of Clark's testimony below, however, our review is for plain error only. See United States v. Diaz, 300 F.3d 66, 76 (1st Cir. 2002). He thus "must show '(1) an error, (2) that is clear or obvious, (3) which affects his substantial rights, and which (4) seriously impugns the fairness, integrity, or public reputation of the proceeding.'" United States v. Patrone, 985 F.3d 81, 84-85 (1st Cir. 2021) (alteration omitted) (quoting United States v. Correa-Osorio, 784 F.3d 11, 18 (1st Cir. 2015)). He has not done so.

In United States v. Rosales, 19 F.3d 763 (1st Cir. 1994), we rejected a claim of plain error based on the prosecutor's introduction of expert testimony about how minor victims discuss incidents of sexual abuse. Id. at 766. We concluded that the expert testimony was not "so prejudicial . . . 'as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice,'" id. (quoting United States v. Geer, 923 F.2d 892, 897 (1st Cir. 1991)), because the defense presented

directly contradictory expert testimony and because the district court "expressly instructed the jurors that they were free to reject the opinions offered by the experts," id.

The same is true here. Like in Rosales, Teganya presented his own expert witness, who testified that the Rwandan government was generally considered to have coerced witnesses to testify against suspected perpetrators of the genocide. And, like in Rosales, the District Court instructed the jurors that it was ultimately for them to decide whether to credit the expert testimony and whether to believe individual witnesses. Moreover, in Rosales, the expert testified not only that minor witnesses who had been the victims of such abuse generally "tend to be reluctant, they tend to be embarrassed, uncomfortable, ashamed of what happened," and are "very uncomfortable giving details," but also that, with respect to the particular minor witnesses in that case, the expert "saw that in these children." Id. at 765 (emphasis added). Given that Clark made no similar comment with respect to Teganya himself or his witnesses, we cannot say in light of Rosales that Teganya has established plain error with respect to the admission of the expert testimony that he argues constitutes bolstering of the government witnesses' testimony.[6]

---

[6] Although Teganya appears to bring challenges to the purported instances of commenting on witness credibility just described under Federal Rule of Evidence 403 in addition to Rules

Teganya objects as well to Clark's description of the phenomenon of genocide denial, which Clark explained at trial is "the idea that an individual or a group would claim that a genocide that is historically known to have occurred did not occur." Teganya contends that the admission of that testimony violated Federal Rule of Evidence 403, which provides for the exclusion of testimony if its probative value is substantially outweighed by the risk of unfair prejudice, as he contends that the testimony "implied that the defense was ignoring, or at least minimizing, a serious and well-documented tragedy."  But, Teganya did not object to the testimony at issue below, and so again our review is for plain error only, see Diaz, 300 F.3d at 76, and again he fails to meet his burden to establish error of that kind.

The government noted in its closing argument that "both sides agree" that, although the genocide did not reach the city in Rwanda in which Teganya lived until after it had reached other parts of the country, "when it did, it was fierce."  Teganya's defense counsel also made clear that Teganya was not disputing that the Rwandan genocide occurred, stating in opening arguments

---

702 and 704(b), in his opening brief he merely asserts that the testimony was more prejudicial than probative.  In contending that he was prejudiced by the testimony's admission, he develops no argument that the testimony lacked probative value and does not explain why the prejudice it caused to his defense was unfair. See Fed. R. Evid. 403.  Thus, we do not consider this argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

that "no one is denying that the genocide took place."  Thus, even
if the evidence that Teganya challenges under Rule 403 had only
limited probative value, we cannot conclude that Teganya has met
his burden to show that any error here burdened his substantial
rights as he must do to establish plain error.  See Patrone, 985
F.3d at 84-85.

Finally, Teganya argues that even if he cannot meet his
burden with respect to any of the individual errors addressed
above, they cumulatively require reversal.  It is true that
"[i]ndividual errors, insufficient in themselves to necessitate a
new trial, may in the aggregate have a more debilitating effect."
United States v. Peña-Santo, 809 F.3d 686, 702 (1st Cir. 2015)
(alteration in original) (quoting United States v. Sepúlveda, 15
F.3d 1161, 1195-96 (1st Cir. 1993)).  But, we have already
concluded with respect to Teganya's preserved claims that the
District Court did not err.  And, with respect to his unpreserved
claims, even if the District Court did err, they implicate only a
handful of statements by one witness in the course of an eighteen-
day trial involving thirty-four witnesses in which the defense had
ample opportunity to cross-examine the government's expert and
presented an expert of its own.  Moreover, the District Court
"issued 'final instructions to the jury [that] were strong and
clear' on their duty to . . . properly weigh the credibility of
witnesses."  United States v. Cormier, 468 F.3d 63, 74 (1st Cir.

- 15 -

2006) (first alteration in original) (quoting <u>United States</u> v. <u>Rodríguez-Estrada</u>, 877 F.2d 153, 159 (1st Cir. 1989)).  We thus see no basis for finding cumulative error here.  <u>See</u> <u>id.</u>

### III.

We turn now to Teganya's challenges to his sentence, in which he contends that the District Court erred in calculating his sentencing range under the U.S. Sentencing Guidelines by applying the two-level, obstruction-of-justice enhancement.  <u>See</u> U.S. Sent'g Guidelines Manual § 3C1.1 (U.S. Sent'g Comm'n 2018).  He does so on a number of grounds, none of which provides a basis for overturning his sentence.

First, Teganya contends that the application of the obstruction-of-justice enhancement in his case impinges on his federal constitutional right to testify on his own behalf.  But, he concedes that he failed to raise any such argument below, and he makes no argument that plain-error review should not apply.  He also concedes that he cannot show plain error.  We thus must reject this contention.  <u>See</u> <u>United States</u> v. <u>Jiménez</u>, 946 F.3d 8, 16 (1st Cir. 2019).

Teganya next contends that the District Court's application of the obstruction-of-justice enhancement was inconsistent with the Guidelines and that his sentence must be vacated in consequence.  He points out that where the underlying crime is perjury, the obstruction-of-justice enhancement may only

be applied if "a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)." U.S. Sent'g Guidelines Manual § 3C1.1 cmt. n.7 (U.S. Sent'g Comm'n 2018).[7] Teganya argues that the District Court erroneously applied the enhancement without finding a "significant further obstruction," because he argues that it did not find that he "did anything other than repeat the charged falsehoods," which Teganya contends cannot themselves qualify as a "significant further obstruction" for the purposes of the Guidelines in this instance.

We may assume that Teganya preserved this challenge because even on de novo review it fails. See United States v. Tirado-Nieves, 982 F.3d 1, 11 (1st Cir. 2020) ("Because the claim fails regardless of the standard applied, we assume, favorably to [the defendant], that the claim was preserved."); United States v. Corbett, 870 F.3d 21, 31 (1st Cir. 2017) ("We review the district court's interpretation of the meaning and scope of a sentencing guideline de novo . . . ."). As the D.C. Circuit persuasively explained in United States v. McCoy, 316 F.3d 287 (D.C. Cir. 2003), "[l]ying under oath to protect oneself from punishment for lying

---

[7] The government concedes that, due to the way in which Teganya's convictions were grouped for sentencing purposes, application of the enhancement is appropriate only if such a "significant further obstruction" occurred.

under oath seems . . . to be precisely the sort of 'significant
further obstruction'" to which the Guidelines refer, id. at 289,
and thus we do not see how the Guidelines may be read to exclude
such conduct from triggering the enhancement's application.

        Indeed, Teganya's only rejoinder to McCoy is that,
there, the D.C. Circuit "did not discuss the constitutional
dimensions of this issue or cite authority other than" United
States v. Dunnigan, 507 U.S. 87 (1993).  But, we do not see how
that assertion provides a reason for us to reject the reading of
the Guidelines adopted in McCoy, given that McCoy did rely in part
on Dunnigan, see McCoy, 316 F.3d at 289, and that in Dunnigan the
Supreme Court explained that the defendant there could not
successfully contend "that increasing her sentence because of her
perjury interferes with her [federal constitutional] right to
testify" for, as the Court "ha[s] held on a number of
occasions[,] . . . a defendant's right to testify does not include
a right to commit perjury," Dunnigan, 507 U.S. at 96.  Teganya
also has waived any challenge to the application of the
obstruction-of-justice enhancement based on a contention that it
must be construed not to be triggered by perjurious statements
that repeated those for which he has been convicted, because any
other construction would violate his federal constitutional right
to testify in his own defense.

Teganya also argues that "[j]ust as pleading not guilty, going to trial, presenting a defense of truthfulness, and introducing evidence and witnesses to support that defense" cannot give rise to the application of the enhancement, neither can "making the choice to testify consistent with that defense."  We again may assume that the challenge, which we understand to concern the meaning of the obstruction-of-justice enhancement itself rather than its constitutionality, is properly preserved, as it fails even if we review it de novo.  See Tirado-Nieves, 982 F.3d at 11; Corbett, 870 F.3d at 31.

In so concluding, we note that the first three examples that Teganya invokes to support his position do not do so.  The application notes to § 3C1.1 expressly provide that none of these examples constitutes a "significant further obstruction," see U.S. Sent'g Guidelines Manual § 3C1.1 cmt. n.2 (U.S. Sent'g Comm'n 2018) (providing that the "refusal to enter a plea of guilty is not a basis for application" of the enhancement, nor is a "defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury)"), without similarly providing as to the kind of perjurious statements that were relied on by the District Court in finding that he was subject to the enhancement.  And Teganya fails to offer any basis for concluding that the fourth example he has proffered, "introducing evidence and witnesses to support [his] defense," can never give rise to the enhancement's

- 19 -

application in a trial for perjury.  Cf. U.S. Sent'g Guidelines
Manual § 3C1.1 cmt. n.4(B) (U.S. Sent'g Comm'n 2018) (providing
that, in the ordinary case, the enhancement can apply to
"committing, suborning, or attempting to suborn perjury").  We
thus are not persuaded by his contention that the text of the
Guidelines does not contemplate application of the enhancement in
a case such as his.[8]

Finally, Teganya separately challenges the adequacy of
the District Court's findings that he committed perjury in
testifying at trial.  He neither argues that there was insufficient
evidence from which the District Court could have concluded that
he committed perjury nor contends that the District Court clearly
erred in making a particular factual finding.  He likewise does
not argue that the District Court's findings fall short of what is
"necessary to permit effective appellate review."  United
States v. Mendez, 802 F.3d 93, 99 (1st Cir. 2015) (quoting United
States v. Zehrung, 714 F.3d 628, 632 (1st Cir. 2013)).  Instead,

---

[8] We are also not persuaded by the Eleventh Circuit's
unpublished opinion in United States v. Thomas, 193 F. App'x 881
(11th Cir. 2006), which holds that it was error for a district
court to apply the enhancement where the defendant testified
consistently with the grand jury testimony that gave rise to her
perjury conviction.  Id. at 889-91.  While we agree that the "base
offense level for perjury . . . adequately [takes] into account
the obvious obstruction of justice in perjury," id. at 890, it
does not follow, in our view, that doubling down on false
statements in a later proceeding is not itself additional
significant obstructive behavior.

he asserts only that, even if the obstruction-of-justice enhancement could have theoretically been applied to his sentence, the District Court's "pro forma" conclusions did not qualify as a finding that any of Teganya's statements at trial was false.[9]  We can again assume without deciding that this claim is properly preserved and thus review it for clear error, see United States v. García-Sierra, 994 F.3d 17, 39 (1st Cir. 2021) (considering the defendant's argument that the district court failed to make sufficiently specific findings and reviewing the determination that a sentencing enhancement applied for clear error); United States v. Rehal, 940 F.2d 1, 6 (1st Cir. 1991) (similar), because the challenge still fails under that standard, see Tirado-Nieves, 982 F.3d at 11.

It is true that the District Court did not specify which of the statements Teganya made at trial it found were perjurious.

---

[9]  In his reply brief, in addition to his arguments about falsity, Teganya asserts that the District Court failed to make findings as to the other elements of perjury in that it "d[id] not discuss willfulness or explain how lying about these additional matters was material."  Even aside from the fact that this argument was first developed in his reply brief, see Brandt v. Wand Partners, 242 F.3d 6, 19 (1st Cir. 2001), Teganya's contention overlooks the fact that the District Court concluded that he made false statements "as outlined by the government in its argument," and that, in its sentencing memorandum, the government contended that the statements in question were also both willful and material.  And, while Teganya asserts that there are reasons to doubt whether the District Court adopted the government's position as a whole in connection with falsity, he makes no such claim as to willfulness or materiality.

Instead, it stated only that it found "by a preponderance of the evidence that the defendant made a variety of false statements during his testimony, as outlined by the government in its argument, and that those statements were, taken as a whole, material." But, as we have previously noted, while it is "better practice" for a district court in applying the obstruction-of-justice enhancement to "specifically identif[y] the segments of [the defendant's] testimony it found to be false," such an "omission does not preclude affirmance of its finding in an instance where . . . the record speaks eloquently for itself." United States v. Akitoye, 923 F.2d 221, 229 (1st Cir. 1991).

The record fills in the gaps here. Among the statements that the government highlighted to the District Court were comments where Teganya "denied being aware of the genocide while it happened" and "denied having belonged to the MRND." Indeed, he not only testified unequivocally that he was never a member of the MRND party and that he never saw atrocities being committed at the hospital, but he also elaborated on each point. The jury, in reaching the verdict that it did, necessarily concluded that his testimony in that regard was false beyond a reasonable doubt. Moreover, although Teganya makes much of the fact that the District Court in applying the enhancement was reluctant to make particular findings that Teganya committed specific atrocities, we do not see how any skepticism the District Court expressed with respect to

some of the acts that Teganya denied undercuts the fact that it did find other statements of Teganya's were false. Thus, the District Court did not clearly err when it held that Teganya "made a variety of false statements during his testimony," as this "generalized finding of untruthfulness" by the District Court was "sufficiently supported by the record." <u>Rehal</u>, 940 F.2d at 6. We thus see no basis for disturbing that finding and affirm Teganya's sentence as well.

### IV.

For all these reasons, we **<u>affirm</u>** Teganya's convictions and sentence.

- 23 -