UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
vs. ) Criminal Action
)
JEAN LEONARD TEGANYA, ) No. 17-10292-FDS
Defendant )
)
)
)

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

SENTENCING HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, MA 02210

July 1, 2019
8:30 a.m.

Kathleen Mullen Silva
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 7902
Boston, MA 02210
E-mail: kathysilva@verizon.net

APPEARANCES:

For The United States:

United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

P R O C E E D I N G S

THE CLERK: All rise.

(Court entered.)

THE CLERK: Court is now in session in the matter of United States v. Jean Leonard Teganya, criminal matter number 17-10292.

Would counsel please identify themselves for the record.

MR. VARGHESE: Good afternoon, your Honor. George Varghese from the United States.

MR. GARLAND: Good afternoon, your Honor. Scott Garland on behalf of the United States.

THE COURT: Good afternoon.

MR. LAUER: Good afternoon, your Honor. Scott Lauer on behalf of Mr. Teganya.

THE COURT: Good afternoon. All right. This is the sentencing of Jean Leonard Teganya. I've received and read the presentence report as revised through June 24, the defendant's sentencing memorandum with letters of support attached, the government's sentencing memorandum. And I think that was it.

Is there anything else I should have seen that I have not?

MR. GARLAND: No, your Honor.

MR. LAUER: No, your Honor.

THE COURT: Okay. Mr. Lauer, I know you've had a

chance to review the presentence report. Have you gone over it with Mr. Teganya?

MR. LAUER: I have.

THE COURT: Is that correct, Mr. Teganya?

THE DEFENDANT: Yes.

THE COURT: Are there any victims present who wish to participate in this process?

MR. GARLAND: No, there are not.

THE COURT: All right. Let me take up the objections to the presentence report. As I see it, there are basically two. One is not really an objection, but whether the obstruction of justice enhancement under Section 3C1.1 should apply, and the government has said whether there should be an upward departure based on the inadequacy of criminal history under 4A1.3.

As to the upward departure issue, I think that probably is best folded into the arguments generally on both sides. I don't know that it's actually a guideline objection. But let's take up the obstruction of justice question. Let me hear from the government first.

Mr. Varghese.

MR. VARGHESE: Thank you, your Honor. I'm sorry. You'd like to hear about the obstruction of justice?

THE COURT: Obstruction of justice first, yes.

MR. VARGHESE: That's fine, your Honor.

From presiding at this trial, the court has heard the evidence in this case, and there was a lot of it. Typically, your Honor, there was -- I think there was a total of 34 witnesses, 14 government witnesses and 20 defense witnesses who testified in this case.

Now, with respect to obstruction of justice, the First Circuit tells us that it's not simply for conflicting evidence, but where that evidence is directly contradictory of each other or a wholesale denial of involvement in criminal conduct, or as the First Circuit stated where it constitutes a web of lies, the obstruction of justice enhancement is applicable and should be applied.

Now, with respect to obstruction of justice, your Honor, the statements at issue that the government is relying on were directly contradictory, the government's witnesses and then the defendant in his statements. Putting aside the 19 other defense witnesses, the defendant's statements themselves were directly contradictory to the government's witnesses.

The jury's verdict, a unanimous verdict on all five counts, directly shows, your Honor, that the jury credited the government's witnesses as opposed to Mr. Teganya.

Let me just touch briefly on a couple of those statements. Counts One and Two relate to Mr. Teganya's involvement with the political party MRND. The testimony the defendant gave when he was on that stand under oath was that he

was not a member of that political party, that it was his father's party, and that he was too busy studying during his time in medical school to participate in MRND activities. Those statements were directly contradicted by the testimony of government witnesses, Dr. Bernard Kalimba, Dr. Anicet Nzabonimpa, Jerome Arusha and Innocent Habimana. All four of those witnesses testified that they saw him wearing clothing of MRND, the hat and the scarf. They saw him wearing pins, that he attended political meetings and rallies, that he had a flag in his room, and that he trained with the Interahamwe in the gym and in the fields. Again, directly contradictory to the statements the defendant made on the stand under oath.

Counts Three and Four relate to Mr. Teganya's denial of ever causing harm to anyone because of their race or social group. Similarly, Count Five was his denial of ever seeing atrocities at the hospital. Once again, the defendant took the stand under oath and stated that he was at that hospital for a full 100 days during the heart of the genocide -- during the entire genocide, but the entire time he was there treating patients, that he never participated in acts of genocide, in fact, he didn't even see acts of genocide. Once again, that testimony was directly contradicted by several of the government's witnesses, including Jean Pierre Gasasira. He was the 17-year-old Tutsi boy who saw the defendant hunt down and murder three Tutsis at that hospital, Dr. Karekezi, Mathias

Gasarabwe and Protais Nyangezi. All three of those murders, Mr. Gasasira testified that the defendant not only participated in but actually was involved in killing them.

There was the testimony of Consolee Mukeshimana. She was the Tutsi woman who was hiding in the dermatology ward. She testified that she saw the defendant come and take her cousin Veneranda to be raped on three separate occasions. The last time she stated that Veneranda said that she was going to ask Mr. Teganya to kill her because she couldn't endure it any longer, and, in fact, Mr. Teganya did that. And then she herself testified that she was taken by Mr. Teganya, was beaten by Mr. Teganya, was raped by Mr. Teganya on two separate occasions, all the while that she was six months pregnant.

There was also the testimony of Esperance Mukamurenzi. She was the older Tutsi woman who was hiding in the maternity ward. She identified Mr. Teganya by describing him as the man with the gap in his teeth and wearing the white lab coat, which is exactly the same way Mr. Gasasira described him. She testified that she called Mr. Teganya and his militia Teganya's Army, and that's how they were referred to by the patients who were hiding there. She testified that Teganya's Army came and took Tutsi patients, including her aunt Venancia, to be killed in the field by the maternity ward steps from the Kiza dormitory where Mr. Teganya was living at the time. Esperance Mukamurenzi also testified that she too had been taken by

members of Teganya's Army and raped on the hospital grounds.

Lastly, there was Innocent Habimana. He testified about the defendant, his participation in the Interahamwe, the training sessions that took place, both at the gym and in the fields. He testified that Mr. Teganya was a member -- not only a member of the Interahamwe, but actually a leader of the Interahamwe, about how he wore the clothing, the scarf and the hat, and about how during the genocide Mr. Teganya flagged down Mr. Habyarimana and his group and tried to turn over four Tutsis who had been hiding in the Kiza dormitory to be killed. Mr. Habyarimana testified to the jury that he told Mr. Teganya you have to do the work too, and so they broke them up. Each group took two separate Tutsis. They went behind the Kiza dormitory. Mr. Habimana and his group killed two Tutsis. Mr. Teganya and his group killed the other two.

For all of the events that I just described Mr. Teganya was asked about all of these events while he was on the stand under oath, and for all of those events he denied his participation in any of it. Your Honor, we believe that those constitute the web of lies that the First Circuit has stated justify an obstruction of justice enhancement. It should be applied not only to the visa fraud counts or, sorry, Counts One through Four but also to the perjury count in Count Five. Under the guidelines, as the court knows, the perjury offense level is 2J1.3. It's a 14. It's a level 14. There's an

additional three-level enhancement if it interferes with the administration of justice. So 2J1.3(b)(2). There's an obstruction of justice enhancement on top of that. 3C1.1 applies if the defendant lied at the trial about the perjury charge. So that's the additional two-level enhancement.

So we believe that the first four groups -- the first four counts that are grouped together are a level 27. Count 5 stands alone at a level 19. When those are all grouped together, you end up with a total offense level of 28.

THE COURT: Okay. Mr. Lauer.

MR. LAUER: Your Honor, I'd be hard-pressed to say that there wasn't contradiction between the account offered by Mr. Teganya and the account offered by the government witnesses. That goes for many witnesses that the defense presented and the jury has spoken.

But the obstruction of justice enhancement, the First Circuit has been clear, requires more than simply contradictory testimony that is not endorsed by the fact finder. It would require you to make specific findings as to the nature of the perjury, the materiality, et cetera. Mr. Teganya testified in his defense. A number of other witnesses who knew him testified in a manner consistently with him. He certainly is not prepared to admit that that was perjurious or that that constituted obstruction of justice. However, the jury did render its verdict, and we are here today because of that. But

simply because the jury rejected Mr. Teganya's testimony does not automatically allow for a finding of obstruction.

THE COURT: All right. As to this issue, that is, whether the obstruction of justice enhancement under Section 3C1.1 should apply, I find that it does apply, and I will apply the two-level enhancement.

As counsel correctly points out, this doesn't apply for a mere denial of guilt or merely for exercise of one's right to testify or for merely contradictory statements. Something more is required, but I find by a preponderance of the evidence that the defendant made a variety of false statements during his testimony, as outlined by the government in its argument, and that those statements were, taken as a whole, material, and that, therefore, the enhancement applies.

I think we wind up at the same place, but I don't think that the enhancement should apply twice for grouping principles. That seems to me to be perhaps double counting on top of arguably double counting of the perjury offense followed by the enhancement of three levels on the perjury offense, but I think the two levels should be added at the end. I think that takes us to a level 28 regardless, but I think that's the fair way to calculate it.

And, again, the objections as to upper departure I think should be folded into the argument as to the appropriate sentence, whether I should either upwardly depart or impose a

variance sentence.

I think the other objections were resolved, or were offered to the court for information purposes. Is there anything else I need to take up as a guideline matter in terms of objections?

MR. VARGHESE: Not for the government, your Honor.

THE COURT: Mr. Lauer?

MR. LAUER: No, your Honor.

THE COURT: All right. Let me turn then to the guideline calculation. There are two groups under 2L2.2 which applies to immigration offenses. The base offense level is 8. There's an increase all the way up to 25 if the defendant committed the offense to conceal his participation in a serious human rights offense, which I think appropriately applies.

The second grouping is perjury under 2J1.3. The base offense level is 14. There's a three-level enhancement because it resulted in a substantial interference with the administration of justice. That adds up to 17. Applying grouping principles, we add one level to 25 to take us to 26, followed by two levels for obstruction of justice, and that takes us to a level 28, which is the final adjusted offense level.

His criminal history score is zero. His criminal history category is Roman Numeral I. That produces a guideline range of 78 to 97 months, a supervised release range of one to

three years. The fine range I think is lower, because the offense was committed before 2014, of $12,500 to $125,000. Restitution is not applicable. And there's a special assessment of $100 on each count for a total of $500.

Is there any further objection to that, other than what's already been raised?

Mr. Varghese.

MR. VARGHESE: No, your Honor.

THE COURT: Mr. Lauer?

MR. LAUER: No. Aside from the obstruction of justice, no.

THE COURT: All right.

With that as our starting point, let me hear from the government.

THE COURT: Mr. Garland.

MR. GARLAND: Thank you, your Honor.

The government's argument for 20 years of imprisonment begins and is underpinned largely by the enormity of the genocide, the enormity of Mr. Teganya's part in the genocide and the enormity of his lies about what he did then and its effect upon the asylum system.

The enormity I think is hard to grasp, and I say that because one of the things that we were thinking about in trying to decide how to present this to the court and to the jury was who should the first witness be. And there was enormous

thought given to whether it should be, say, Mr. Gasasira, and who could identify what it was that Mr. Teganya had done at the Butare Hospital. And ultimately the thought was that what he was about to relate to the court and to the jury was so far out of the understanding of us that something that big as the Rwandan genocide, something that enormous happened during our lifetime, we were worried that people would not be able to apprehend the horror of what happened then, the worst genocide since the Holocaust.

And that's why we started out with an expert, an expert who could basically talk about the historical record, and what other people had seen and done not only throughout Rwanda but in Butare and around the hospital itself, to base that so that other people could understand the testimony -- the eyewitness testimony that they were going to hear, and to judge what Mr. Teganya had said in the immigration proceedings. And that through that they would understand that this was real and that it was horrible.

And they would also learn what type of people participated in the genocide, that it wasn't just soldiers; it wasn't just party partisans; but it was also people like neighbors and relatives and teachers and priests and seminarians. It could be done by people that you could not imagine doing these sort of things, people who were smart, educated, sometimes religious, sometimes leaders, all people

who had attributes that Mr. Teganya portrayed himself as having, and that other witnesses identified him as having as well.

And I emphasize this not because the court didn't sit through this and understand all of it, but as we talk about the technical aspects of sentencing at a remove of three months from when this testimony was given, it can be difficult to keep the enormity of what went on and his part in it in the mind's eye.

And this informs, I believe, as well the understanding of what Mr. Teganya's lies -- what effect they had, those lies, on the asylum system itself. And those are the crimes for which he is to be sentenced. For that -- imagine that it's May of 1994. The genocide is raging on as we speak, and imagine that there are a stream of refugees coming from Rwanda lining up to ask for asylum before the immigration courts. One would hope that that asylum system whose very goal is to give refuge to the persecuted and to reject the persecutors, one would hope that it would accurately identify the Tutsi refugees and the moderate Hutu refugees who were truly fleeing the horror that was going on in the genocide, that they would come here, we would identify them, and that we would open our arms to them and give them asylum.

And one would hope equally that the asylum system would do exactly the same with the perpetrators of that

genocide, that it would identify them quickly and accurately and because of the persecutor bar and just the fundamental notions of decency that the asylum procedures and the laws under exhibit, that we would catch them quickly and refuse them so that they could face justice elsewhere in their home country.

And in that regard, putting oneself back in May of 1994, playing that out as the refugees are coming in live essentially, while the genocide goes on, I think it's much, much easier to understand how the lies that Mr. Teganya told, his dressing himself up in the garb of the persecuted rather than the persecutor, how awful they were. They weren't just the heartland lies that might be told in immigration court for which we still prosecute people, lies about former marriages, lies about current marriages, lies about who they're related to, presenting false identity documents, but these were instead lies about the most consequential catastrophe that Rwanda has faced. And doing that perverts the system. It says the persecutor deserves some sort of refuge here, that he somehow deserves to have some sort of freedom from prosecution elsewhere, and at the same time it also casts suspicion on all those other Rwandan refugees who are standing right in front of you, because as the court heard, the whole system starts with the candor of the applicants, and from there the inquiry goes on, but it starts with the candor of the applicants.

So thinking about that, the court can understand what it was that Mr. Teganya was doing in Canada when he was spewing similar lies to the Canadian authorities, as well what he was trying to gain here. Because, remember, it wasn't just, well, you try it, see whether it works, and if it doesn't, you go out. If Mr. Teganya had been successful, he would have been granted a first step on the path to citizenship here.

So why the upward departure to the statutory maximum? I'm going to structure this in two ways. One is why the upward departure to the statutory maximum on each of the counts, and then why the 20-year sentence that the government has recommended.

Court after court that has seen similar facts, whether from Rwanda or Liberia or Ethiopia, have recognized that the enormity of the genocide, the enormity of the types of acts that Mr. Teganya has done is directly related to the enormity of the lies, and that these are the most significant, most corrosive, most morally culpable lies possible. They deserve the most serious penalty, and that is the maximum on each count.

And each court that has considered this have asked if this is not the crime that deserves the maximum penalty, then what is? And, your Honor, that is true here.

And it's in this light that the government suggests, specifically with regard to 2L2.2 and the upward enhancement or

adjustment for genocide, that it's inadequate. It's inadequate in light of the fact that it's just a regular offense level of 25 that it brings you only to, for criminal history category I, 57 to 71 months, which is far below the statutory maximum for what are normally ten-year crimes. It's inadequate in light of the defendants prosecuted, and that includes Mr. Teganya, people who are leaders who direct other people to engage in acts of genocide or rape, people who commit multiple genocidal acts, as did Mr. Teganya, people whose participation in those crimes are grotesque, as they were here with Mr. Teganya being a medical student and having the duty of care, with Mr. Teganya raping a woman who was pregnant six months at the time. As well it's inadequate given the types of lies that were told as you think about the defendant and his own characteristics.

I'll address the 4A1.3 argument at this point. You'll recall, your Honor, that the criminal history category here, as you said, was zero points, criminal history category I. As we said in our papers, that does not take into count the multiple murders and rape, incitement to murder and rape that Mr. Teganya was responsible for. It doesn't take into account the fact that even afterwards, throughout as many as 15 years -- 20 years, he has taken repeated step after repeated step to renew that story in what were lies.

It starts out with the false Zimbabwean passport that allows him to get into Canada. It continues with the many,

many statements that he made to Canada. It continues with Canada deciding that he must be removed and Mr. Teganya becoming a fugitive for two years. It continues with him coming into the United States, clearly not intending to assert an asylum claim but skirting the border and walking away from that border station so that he would not be arrested. It's only because of that arrest that he came forward and he continued with these lies. And it continues again with the lies that he told you and the jury inside of the trial.

And it's important as well because of the lies that he told what effect they actually had. Part of what he was doing was denying the very reality that the government's expert, that the defendant's expert, that the government's witnesses and some of the defendant's witnesses as well showed to this court. It denied the enormity and the reality of what happened there. That the genocide was open, that it was pervasive, that it was staggering in effect. It denied as well the basic humanity of those witnesses who sat on that stand and testified to the court and to the jury about the unbearable suffering that they saw, that they endured, that they saw others endure, and that they saw others endure at Mr. Teganya's hands.

As you recall, Mr. Teganya didn't get up there and basically say, you know, what happened during the Rwandan genocide was a terrible thing. There was a lot going on there. And I feel so bad for these people who came up here and said

that this happened to them, but you have to understand it wasn't me. What he basically said and what he painted those victims as were liars. And if there's one small mercy it's that they were not here to hear him say that when he was on the stand.

This is the exact opposite of Gacaca. As the court will recall, the whole Gacaca process back in Rwanda was intended to essentially move past this episode. What do you do with people who have participated in such large crimes and so many of them? What was the Gacaca process supposed to do? It was supposed to deal with it and move on and reconcile. This only prolonged and denied the agony that actually had happened. And it showed, I think, Mr. Teganya's contempt for the whole process, asylum, immigration as well.

The 3553(a) factors also support, as numerous courts have talked about, going to the statutory max for each count, promoting respect for the law, banning persecutors, recognizing the seriousness of Mr. Teganya's lies which I've just addressed, giving just punishment for these as well, and letting, most importantly, other persecutors know that the United States is no safe haven for people who are persecutors or those who lie about being persecuted, and that they must face justice elsewhere.

So once it's understood why each count must have the statutory maximum penalty associated with it, whether it's five

Case 1:17-cr-10292-FDS Document 174 Filed 01/15/19 Page 20 of 33



years or ten years, the next question is how to determine how those should run, consecutively or concurrently, to arrive at the sentence that the government has suggested. And for that we look to other sentences. Clearly at the outer limits is the sentence for Jabbateh, who is known as Jungle Jabbah. We are not contending that Mr. Teganya is Jungle Jabbah. Jungle Jabbah got 30 years for being essentially the commander of a battalion of some sort doing this for years upon end essentially commanding a province and commanding other people to do things that were unspeakable, including cannibalism, but it gives us an outer limit to be wary of. We noted that in this case the statutory maximum, if you were to run everything consecutively, would have been 35 years. That did not appear to be an appropriate punishment for Mr. Teganya given what he had done in comparison to Jungle Jabbah.

At the other end of the spectrum is Mr. Ngombwa, which was an interesting case, because Mr. Ngombwa was a part of the genocide. Now, there his lies were only about, what he was tried for, were only about who he was related to. Whether he was related to a former prime minister who left the country, whether he was related to other people as well. And there the facts about his participation in genocide became relevant only at sentencing.

Now, there as well Mr. Ngombwa actually did testify at his own trial but the lies that he said were not lies about his

participation or his lack of participation in genocide. It was only lies about his relations with other people, who his relatives were, and there Mr. Ngombwa got 15 years. The government suggests to the court that Mr. Teganya's lies, the very things that he was convicted upon, were far, far worse than about who he was related to. There were, as the court has already identified, denials about participation in genocide.

There are other cases as well that the court can consider. One is U.S. v. Worku. That was the case where the Ethiopian prison guard had been torturing people, lied about that, and also used a false identity. He got 22 years. Mr. Teganya should be sentenced above Mr. Ngombwa, below Jungle Jabbah, right around where Mr. Worku was as well. And that is how we get to the 20 years.

Now, in Mr. Teganya's sentencing brief one of the things he suggests to the court is that a 63-month sentence is fine because after that surely he'll be deported to or removed to Rwanda and he'll face justice there, but it's important to note that that's unknown. It's unknown whether Mr. Teganya will do something such as fight removal. If he fights removal, what decisions will be made by the immigration courts, how long that process will take. Prudence Kantengwa, for example, who was convicted years ago, her appeal was done I think in 2015, she still sits in the United States, hasn't been removed anywhere.

Moreover it's the height of the irony, and I think as well continued contempt, that Mr. Teganya, who has spent his entire life running from Rwandan justice, to plead that now he should be able to go back to Rwanda and be sentenced there so he can have a shorter sentence here. That can't be right.

It's now time for him to face justice for what he did in the United States, making those most consequential, most serious lies that the asylum system can understand to have, and it's time for the court to sentence him to 20 years in prison, three years of supervised release, a fine if he's able to do it, but since he is in forma pauperis I understand that there would probably be no fine, and a $500 mandatory special assessment.

THE COURT: Okay. Thank you.

Mr. Lauer.

MR. LAUER: Your Honor, there's a couple principles that are important to keep in mind here. The first principle is that the punishment should fit the offense. The offense here is lying. It's lying in an asylum application. It's lying before an immigration court. It is not the acts of violence that the government has described in great detail and that you yourself heard from the witnesses. It is true that this case relates to the genocide. It is true that the subject of the trial had to do with his conduct during the genocide, but what he is charged with and the offenses that you must

sentence him for are not offenses that -- are not murders, are not rapes, are not incitement to commit genocide. You must sentence him for the charged offenses, which are immigration fraud and perjury. So that's one principle to keep in mind.

The second principle to keep in mind is that the Sentencing Guidelines exist for a reason, and that's a strange thing for me to be saying because I'm often in a position of explaining that the Sentencing Guidelines are inadequate for one reason or another. But the fact of the matter is is that the Sentencing Guidelines, while not mandatory, are a useful reference point for the court in determining what an adequate punishment is.

This is not a case -- this is not a situation, a factual situation that is completely without precedent. In fact, 2L2.2 specifically contemplates the very situation that is before you today: Someone who has lied in reference to their participation in serious human rights offenses. That is the reason we are dealing with a base offense level of 25 as opposed to a base offense level of 8. This is not a situation where the commission has failed to foresee someone like Mr. Teganya. In fact, that provision, 2L2.2(a) -- excuse me -- (b)(4)(A) was added relatively recently, and it was added to ensure, essentially, that courts were mindful of the serious consequences of lying about genocide, lying about serious human rights abuses. This is not a situation that was

uncontemplated. Instead the provision is there, it applies, and it produces a certain sentencing range. Granted, it is not mandatory, but the court should be wary of departing from it certainly to the extreme of the statutory maximum without good cause. The government has cited a number of cases in other districts about defendants you know nothing about. I think it's more useful to proceed with reference to the guidelines than it is by anecdote.

This defendant was convicted of lying. That is the gravamen of the offense, and that is what the punishment should fit. To the extent that the government believes that he committed murder, the government believes that he committed rape, that was not the charges that he faced here. That was not the verdicts returned by this jury.

What will happen, undoubtedly, is the government will seek to remove him to Rwanda. You heard evidence at the trial that Rwandian authorities intend to prosecute him. There is certainly no reason to think that he would not be removed to Rwanda, he would not be jailed in Rwanda, and really that is the court of competent jurisdiction for the charges of murder and rape during the genocide. It is not the place of this court to transform itself into a tribunal to punish that conduct.

We would ask the court, in consideration of the evidence that you heard, in consideration of the guidelines, in

consideration about -- of what you know about Mr. Teganya and how he's conducted himself over the past 25 years, to impose a guideline sentence. Twenty-five years this man has been outside of Rwanda. The government in their sentencing brief takes the position that he has a criminal history that is understated and that it does not adequately calculate the risk of future offense that he presents. I think the past 25 years of his life suggest otherwise. This is a man who lived a quiet life, an unassuming life, working, going to school, raising a family. Really the only problems that he has had have flowed from the genocide. There's nothing else to speak of.

So with all that in mind, your Honor, we would ask you to consider a guideline sentence because this is a case where the guidelines specifically contemplate the conduct that you have heard, and there is not adequate reason to depart.

THE COURT: Okay. Thank you.

Mr. Garland, any response?

MR. GARLAND: No, your Honor. I think that our argument in our brief says it all, other than to reaffirm what we said before, that if we were asking the court to sentence Mr. Teganya for what he did during the genocide, we'd be asking for life in prison, and we're not.

THE COURT: All right. Mr. Teganya, do you wish to address the court?

MR. LAUER: He would decline, your Honor.

THE COURT: Okay.

THE COURT: All right. I find this sentencing to be unusually challenging, really for the -- as is perhaps obvious from the arguments of counsel. The jury convicted him of immigration offenses and perjury. There was testimony that he participated in multiple murders and rapes, and that was the subject of the immigration fraud and the perjury. He was not charged in this court with murder or rape and could not be so charged. Obviously the jury did not specifically find that he committed or participated in any particular murder or particular rape. They were not asked to and could not legally have been asked to.

There is, I think, substantial ambiguity in the verdict as to what he actually did for that reason, but the basic question is do I sentence him as a liar or do I sentence him as a murderer or rapist or genocide participant.

There's no question that I have the authority to impose a sentence all the way up to the maximum if I make the necessary findings, but I find this subject troublesome.

To begin, as Mr. Lauer says, the punishment should fit the offense. Of course it should also fit the offender. There's a fundamental problem here that is inherent in many sentencing proceedings. Take the famous case of Al Capone, who was convicted for tax evasion. Should he be sentenced as a tax cheat or should he be sentenced as Al Capone, as a murderer and

racketeer? And the answer is maybe either of those things or somewhere in between. And in this case it's more complex than that.

Of course I need to look at all the relevant conduct, but that doesn't really answer the question for me. I could make specific factual findings as to particular actions. I'm not comfortable doing that. Virtually every atrocity that was described by witnesses in this trial was supported by the testimony of a single witness without much in the way of corroboration, and at least some of the witnesses had some credibility issues, at least as to some aspects of their testimony. It's not to say I don't believe the testimony taken as a whole, but my confidence level is not as high as it might be in, let's say, a murder trial in a modern American court, let's put it that way.

There's the question of the extraterritorial reach of this. There's an argument that you prosecute people where you find them for human rights abuses, whether they occur in Latin America or Africa or Asia or in the United States or Europe. And, of course, there's a counter argument that jurisdiction matters; the precise criminal charges matter; that this is not an international tribunal. There's no international sanction for me to sit in judgment on the genocide in Rwanda.

Of course, I certainly don't want to suggest in any way, shape or form that this was not a terrible tragedy, one of

the worst episodes in the whole degraded and unhappy history of the human race. It apparently was the fastest genocide ever in terms of killings per day or per week, or whatever the right metric is. It may be the most direct genocide in the sense that the murders were committed for the most part not by an army or by secret police or even a political party but by ordinary people killing their neighbors and in the most direct way possible, with hatchets and machetes. It's so horrifying that it's hard to get your arms around it, to think about it clearly. It's so beyond the pale of our ordinary existence that it's hard to understand it or to think of it as real.

So where does all that take me?

As to the record -- the argument that his criminal record is inadequate, I think that doesn't really quite fit what we're doing here. This is not an issue, for example, of unscored offenses or anything like that. I think the real issue is whether I should simply impose a variant non-guideline sentence, if that's what I think is appropriate, or stick with a guideline sentence, and if so, where within the range.

Again, there is no easy answer to these questions, which are pointing in absolutely opposite directions, and I certainly don't want to make a statement of any kind, other than the actual sentence I'm pronouncing, as to how bad this genocide is or how it compared with other genocides or whether I'm being light on people who commit genocide or sufficiently

tough on people who commit genocide.

I think where I'm coming to rest is with the Sentencing Guidelines. There is a guideline directly on point. It does, to a considerable degree, balance these factors. It's something of a fudge perhaps because all sentencing is something of a fudge in the sense that you're asked to reconcile things that can't be reconciled. But I think under the circumstances I'm going to sentence him within the guideline range, which is 78 to 97 months.

The next question is where within that range. And I guess I'm convinced that under the circumstances here that the high end of the range is appropriate. So I'm going to impose a sentence of 97 months.

I do that with misgivings, as you can tell. Misgivings that maybe it ought to be higher, maybe it ought to be lower, but I'm just going to impose the guideline sentence at the high end of the range. Not automatically; I've certainly given it considerable thought, but because I think it best balances the different factors that I'm being asked to weigh here.

I'm not going to impose a term of supervised release. I do expect that he's going to be deported or removed, and I'm not going to do that, and I'm not going to impose a fine because there's no evidence that he has any financial resources. So the sentence will be the sentence plus the $500

Case 1:17-cr-10292-FDS Document 117-1 Filed 09/15/19 Page 30 of 33


special assessment, and that's what I'm going to impose.

So what I'm going to do, as is my practice, is to formally state the sentence that I'm going to impose followed by a statement of the reasons, to the extent I haven't done so already. Then I'll give counsel a final opportunity to impose any additional corrections or additions.

Would the defendant please stand.

Pursuant to the Sentencing Reform Act of 1984 and having considered the sentencing factors set forth at 18 United States Code Section 3553(a), it is the judgment of the court that the defendant Jean Leonard Teganya is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 97 months. This term consists of 97 months on all five counts to be served concurrently. It is further ordered that the defendant shall pay to the United States a special assessment of $500 which shall be due immediately.

You may be seated.

In terms of the reasons for the sentence, it is a non-guideline sentence -- I'm sorry -- a guideline sentence imposed for the reasons indicated. Again, I'm imposing no term of supervised release as I expect the defendant will be deported or removed. I'm imposing no fine because he's established that he is not able, and even with a reasonable installment schedule, is not likely to become able to pay all or part of the fine required under the guidelines. And the

special assessment is, of course, mandatory.

Do counsel have any addition or correction or objection to that sentence not previously raised?

I'm sorry?

PROBATION: Your Honor, my apologies.

THE COURT: I can't make them concurrent? Is that --

PROBATION: I believe Counts Two, Four and Five have a statutory maximum of five years.

THE COURT: So Two, Four and Five?

PROBATION: Correct.

THE COURT: All right. So it's 60 months on Two, Four and Five, and 97 months on One and Three to be served concurrently.

PROBATION: Thank you.

THE COURT: Thank you.

Mr. Garland.

MR. GARLAND: No objections other than those already raised, your Honor.

THE COURT: Mr. Lauer.

MR. LAUER: No, your Honor. I would just say that we request a judicial recommendation that the sentence be served at Berlin in New Hampshire.

THE COURT: All right. I will make a judicial recommendation that the defendant serve his term of incarceration if consistent with security and other

requirements of the prison system at the facility in Berlin, New Hampshire.

All right. The sentence is hereby imposed as stated. Let me give him his advice of rights.

Mr. Teganya, you can appeal your conviction. You also can appeal your sentence, particularly if you think the sentence was contrary to law. If you're unable to pay the costs of appeal, you may ask permission to have those costs waived and appeal without paying. You must file any notice of appeal within 14 days after the entry of judgment. And if you request, the clerk will immediately prepare and file a notice of appeal on your behalf. Is there anything further?

MR. GARLAND: No, your Honor.

MR. LAUER: No, your Honor. Thank you.

THE COURT: All right. Thank you. We'll stand in recess.

THE CLERK: All rise.

(Proceedings adjourned at 2:50 p.m.

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS )

I certify that the foregoing is a correct transcript from the record of proceedings taken July 1, 2019 in the above-entitled matter to the best of my skill and ability.

/s/ Kathleen Mullen Silva 9/20/19

Kathleen Mullen Silva, RPR, CRR Date
Official Court Reporter